# EXHIBIT 1

# LEASE AGREEMENT

by and between

## Union Station Investco, LLC
(Landlord)

and

## Walgreen Co., an Illinois corporation

d/b/a

Walgreens

(Tenant)

10/18/14

Walgreens TRANSITION DOCS033614 05/31/24

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND ATTACHMENTS..................................................................1

    Section 1.1. Certain Defined Terms. .................................................................1
    Section 1.2. Additional Defined Terms. ...........................................................6
    Section 1.3. Attachments. ...............................................................................8

ARTICLE II PREMISES.........................................................................................................9

    Section 2.1. Demise. ........................................................................................9
    Section 2.2. Measurement of Premises.............................................................9

ARTICLE III TERM ...............................................................................................................9

    Section 3.1. Term.............................................................................................9
    Section 3.2. Termination.................................................................................10
    Section 3.3. Holding Over. .............................................................................10

ARTICLE IV USE.................................................................................................................10

    Section 4.1. Prompt Occupancy and Use.........................................................10
    Section 4.2. Storage and Office Areas.............................................................10
    Section 4.3. Tenant's Trade Name. ..................................................................11
    Section 4.4. Operating Hours...........................................................................11
    Section 4.5. Failure of Tenant to Open;  Failure to Operate.............................12

ARTICLE V RENTAL............................................................................................................13

    Section 5.1. Rentals Payable............................................................................13
    Section 5.2. Annual Basic Rental. ...................................................................13
    Section 5.3. Annual Percentage Rental.............................................................13
    Section 5.4. INTENTIONALLY OMITTED. ..................................................14
    Section 5.5. "Gross Sales" Defined. ................................................................14
    Section 5.6. Statement of Gross Sales. .............................................................15
    Section 5.7. Tenant's Records..........................................................................16
    Section 5.8. Payment of Rental........................................................................16
    Section 5.9. Advance Rental.............................................................................17
    Section 5.10. Security Deposit..........................................................................17

ARTICLE VI TAXES .............................................................................................................17

    Section 6.1. Payment in Lieu of Taxes. ............................................................17
    Section 6.2. Taxes on Rental. ...........................................................................17
    Section 6.3. Taxes on Personal Property. ..........................................................17

ARTICLE VII IMPROVEMENTS ........................................................................................ 17

    Section 7.1. Landlord's Improvements. ....................................................................... 17
    Section 7.2. Tenant's Improvements. ........................................................................... 18
    Section 7.3. "Ready for Occupancy" Defined. ........................................................... 18
    Section 7.4. Effect of Opening for Business. ............................................................. 18
    Section 7.5. Mechanic's Liens. .................................................................................... 19
    Section 7.6. Tenant's Trade Fixtures. .......................................................................... 19

ARTICLE VIII OPERATIONS ............................................................................................ 20

    Section 8.1. Operations by Tenant. ............................................................................. 20
    Section 8.2. Signs and Advertising. ............................................................................ 22
    Section 8.3. Painting and Displays by Tenant. ........................................................... 22
    Section 8.4. Trash Removal. ........................................................................................ 23

ARTICLE IX REPAIRS AND ALTERATIONS .................................................................. 24

    Section 9.1. Repairs to be Made by Landlord. ........................................................... 24
    Section 9.2. Repairs to be Made by Tenant. ............................................................... 25
    Section 9.3. Damage to Premises. ............................................................................... 25
    Section 9.4. Alterations by Tenant. ............................................................................. 26
    Section 9.5. Changes and Additions to Landlord's Buildings. .................................... 26
    Section 9.6. Roof and Walls. ....................................................................................... 27
    Section 9.7. Relocation. ............................................................................................... 27

ARTICLE X COMMON AREAS .......................................................................................... 27

    Section 10.1. Use of Common Areas. ......................................................................... 27
    Section 10.2. Management and Operation of Common Areas. ..................................... 27
    Section 10.3. "Landlord's Operating Costs" Defined. ................................................ 28
    Section 10.4. Tenant to Share Expense of Common Areas. ........................................ 28
    Section 10.5. Cross Easement Agreement. .................................................................. 28

ARTICLE XI PARKING ....................................................................................................... 29

    Section 11.1. Customer Parking. ................................................................................. 29
    Section 11.2. Annual Convenience Charge. ................................................................ 29
    Section 11.3. Termination of Parking Agreement. ...................................................... 29

ARTICLE XII MARKETING FUND ................................................................................... 29

    Section 12.1. Marketing and Advertising Fund. ........................... **Error! Bookmark not defined.**
    Section 12.2. Landlord's Contribution to Marketing and Advertising Fund. **Error! Bookmark not def**
    Section 12.3. Trade Names, Logos and Advertising Material. .................................... 29
    Section 12.4. Expansion Opening Contribution. ......................................................... 30

ARTICLE XIII UTILITIES......................................................................................................30

    Section 13.1. Water, Electricity, Telephone and Sanitary Sewer.......................................30
    Section 13.2. Heating, Ventilating and Air Conditioning. ..............................................31
    Section 13.3. Natural Gas Service. ...............................................................................32
    Section 13.4. Miscellaneous Utilities. ...........................................................................32
    Section 13.5. Fire Protection Sprinkler System.............................................................32
    Section 13.6. Discontinuances and Interruptions of Utility Services. .............................33

ARTICLE XIV INDEMNITY AND INSURANCE ................................................................33

    Section 14.1. Indemnity by Tenant................................................................................33
    Section 14.2. Landlord Not Responsible for Acts of Others. .........................................33
    Section 14.3. Tenant's Insurance. .................................................................................34
    Section 14.4. Tenant's Contractor's Insurance. .............................................................35
    Section 14.5. Policy Requirements. ..............................................................................35
    Section 14.6. Increase in Insurance Premiums. .............................................................36
    Section 14.7. Waiver of Right of Recovery...................................................................36
    Section 14.8. Tenant to Pay Proportionate Share of Insurance Costs. ...........................36

ARTICLE XV DAMAGE AND DESTRUCTION....................................................................36

    Section 15.1. Landlord's Obligation to Repair and Reconstruct.....................................36
    Section 15.2. Landlord's Option to Terminate Lease. ...................................................37
    Section 15.3. Demolition of Landlord's Buildings. .......................................................37
    Section 15.4. Insurance Proceeds. ................................................................................37

ARTICLE XVI CONDEMNATION..........................................................................................38

    Section 16.1. Taking Resulting in Termination of this Lease. ........................................38
    Section 16.2. Partial Taking..........................................................................................38
    Section 16.3. Effective Date of Termination. ................................................................39
    Section 16.4. Condemnation Awards. ...........................................................................39

ARTICLE XVII ASSIGNMENTS AND SUBLETTING.........................................................39

    Section 17.1. Landlord's Consent Required...................................................................39
    Section 17.2. Transfer of Corporate Shares..................................................................42
    Section 17.3. Acceptance of Rent from Transferee........................................................43
    Section 17.4. "Tenant's Bankruptcy" Defined. .............................................................43

ARTICLE XVIII DEFAULT .....................................................................................................44

    Section 18.1. "Event of Default" Defined......................................................................44
    Section 18.2. Bankruptcy..............................................................................................44
    Section 18.3. Remedies.................................................................................................46
    Section 18.4. Damages. ................................................................................................47
    Section 18.5. Waiver.....................................................................................................48

ARTICLE XIX SUBORDINATION AND ATTORNMENT ...................................................49

    Section 19.1. Subordination. ...................................................................................49
    Section 19.2. Mortgagee's Unilateral Subordination. ...........................................49
    Section 19.3. Attornment. ......................................................................................50
    Section 19.4. Landlord's Financing .......................................................................50

ARTICLE XX NOTICES.................................................................................................50

    Section 20.1. Sending of Notices. ..........................................................................50
    Section 20.2. Notice to Mortgagees and Right to Cure. ........................................51

ARTICLE XXI MISCELLANEOUS .................................................................................52

    Section 21.1. Option to Terminate Lease. ..............................................................52
    Section 21.2. Excuse of Landlord's Performance. .................................................52
    Section 21.3. Estoppel Certificates. .......................................................................52
    Section 21.4. Inspections and Access by Landlord. ...............................................52
    Section 21.5. Memorandum of Lease. ....................................................................53
    Section 21.6. Remedies Cumulative. ......................................................................53
    Section 21.7. Successors and Assigns. ...................................................................54
    Section 21.8. Compliance with Laws and Regulations. .........................................54
    Section 21.9. Environmental Requirements. ..........................................................54
    Section 21.10. Captions and Headings. ..................................................................58
    Section 21.11. Joint and Several Liability. .............................................................58
    Section 21.12. Broker's Commission. ....................................................................58
    Section 21.13. No Discrimination. .........................................................................58
    Section 21.14. No Joint Venture. ............................................................................59
    Section 21.15. No Modification. .............................................................................59
    Section 21.16. Severability. ....................................................................................59
    Section 21.17. Third Party Beneficiary. .................................................................59
    Section 21.18. Corporate Tenants; Fictitious Names. ............................................59
    Section 21.19. Applicable Law. ..............................................................................60
    Section 21.20. Performance of Landlord's Obligation by Mortgagee. ...................60
    Section 21.21. Waiver of Jury Trial. ......................................................................60
    Section 21.22. Limitation of Right of Recovery Against Landlord. .......................60
    Section 21.23. Creditworthiness of Tenant. ...........................................................61
    Section 21.24. Financing Contingency. ..................................................................61
    Section 21.25. Construction Bond. .........................................................................61
    Section 21.26. Conflicts. .........................................................................................61
    Section 21.27. No Accord and Satisfaction. ...........................................................61
    Section 21.28. Time of Essence. .............................................................................61
    Section 21.29. "Person(s)" Defined. .......................................................................61
    Section 21.30. Execution of Lease. ........................................................................61

## EXHIBITS

Schedule A-1 -  Legal Description of Landlord's Building Area

Schedule A-2 -  Plans Showing Landlord's Buildings and approximate location of the Premises

Schedule B -  Description of Landlord's Work and Tenant's Work

Schedule C -  Landlord's Tenant Design Criteria

Schedule D -  Form of Estoppel Certificate

Schedule E -  Mortgage and Underlying Leases Currently Affecting Landlord's Building Area

Schedule F -  List of Exclusives and Restrictions

Schedule G -  Prohibited Uses By Assignees or Subtenants.

Schedule H -  Area of Radius Restriction

Schedule I -  Tenant's Signage

Schedule J -  Temporary Signage

Schedule K -  Proposed Digitalized Signage

Rev:11/12/14

## LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") made as of the $\underline{12}^{th}$ day of November, 2014, by and between UNION STATION INVESTCO, LLC ("Landlord") and WALGREEN CO., an Illinois corporation, d/b/a WALGREENS ("Tenant").

## WITNESSETH:

THAT FOR AND IN CONSIDERATION of the mutual covenants and agreements herein contained, the parties hereto do hereby covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ATTACHMENTS

Section 1.1. Certain Defined Terms.

As used herein, the term:

A.    "Premises" means Tenant's portion of Landlord's Buildings as shown on Schedule A-2 being space number C-101 having approximately 14,778 square feet constituting Tenant's Floor Area.

B.    "Term" means a period of Ten (10) years and three (3) months, commencing on the date of delivery of the Premises to Tenant in accordance with the provisions of Schedule B with Landlord's Work (as hereinafter defined) substantially completed (the "Commencement Date") and continuing until the last day of the month which is three (3) months following the tenth (10th) anniversary of the Commencement Date. Notwithstanding the foregoing, unless Tenant shall achieve Gross Sales of at least Thirteen Million Seven Hundred Thousand ($13,700,000.00) Dollars (the "Termination Threshold") in any Lease Year prior to the sixth (6th) Lease Year (in which event the early termination right as set forth herein shall be deemed null and void), if Gross Sales for the fifth (5th) Lease Year shall be less than the Termination Threshold, Landlord and Tenant shall each have a one-time right to terminate this Lease upon one hundred eighty (180) days' prior notice to the other party, which notice by Tenant must be given within ninety (90) days after the earlier of (i) Landlord's receipt of Tenant's annual statement of Gross Sales or (ii) ninety (90) days after the end of the fifth (5th) Lease Year and which notice by Landlord must be given within ninety (90) days after Landlord's receipt of Tenant's annual statement of Gross Sales. In order for such early termination by Tenant to be effective, Tenant shall pay to Landlord a termination fee of One Million ($1,000,000.00) Dollars in a single lump sum payment along with such termination notice by Tenant. Upon such early termination by Landlord, Tenant shall have the right to nullify such early termination notice by agreeing to amend this Lease in writing within thirty (30)

Rev:10/18/14

days' thereafter to impose an Annual Basic Rental of One Million Five Hundred Thousand ($1,500,000.00), which amendment shall be effective as of the first day of the sixth (6th) Lease Year. The Termination Threshold (as it applies to Tenant only) shall be reduced by 1/365th for each day during any Lease Year that Tenant fails to open, excluding Easter Sunday, Thanksgiving Day, Christmas Day, any other holidays observed by the majority of the occupants of Landlord's Buildings, and any other day or days that Tenant is expressly permitted or required to close its business in accordance with the terms of this Lease. Notwithstanding the foregoing, Tenant shall not have the right to terminate the Lease due to Tenant's failure to reach the Termination Threshold if Tenant shall not be continuously open for business as required in this Lease for a period in excess of thirty (30) consecutive days during the first five (5) Lease Years.

Provided Tenant shall not then be in default of the Lease beyond any applicable notice and cure periods, Tenant shall have the right to renew the Lease for one (1) Option Term of ten (10) years commencing, if exercised, on the day immediately following the last day of the Term and shall terminate on the last day of the last calendar month in the Option Term. Tenant must notify Landlord of its election to exercise each option by written notice given no later than 360 days prior to the last day of the initial Term.

C.    "Tenant Trade Name" means Walgreens, which name Tenant represents it is entitled to use pursuant to all applicable laws.

D.    "Notice Addresses" means "Landlord's Notice Address" and "Tenant's Notice Address" as follows:

"Landlord Notice Address" means:

Union Station Investco, LLC
150 East 58th Street
Penthouse
New York, NY  10155
Attention: Legal
212-213-4444

with a copy to:

Jones Lang LaSalle Americas, Inc., its agent
40 Massachusetts Avenue, N.E.
Washington, DC  20002
Attention: General Manager
202-289-1908

"Tenant's Notice Address" means:

Rev:11/12/14

Walgreen Co.
Community & Real Estate Law Department
104 Wilmot Rd.
MS #1420
Deerfield, IL  60015

E. "Permitted Use" means the operating of a Walgreens retail store similar in nature to a majority of its other stores in the Washington, DC metropolitan area, with the right to sell such merchandise and provide such services, as Tenant may, from time to time, sell and provide in a majority of its other stores in the Washington, DC metropolitan area and for no other purpose. Nothing contained herein shall be construed so as to prohibit Tenant from expanding or eliminating any department(s) or from expanding or eliminating any line(s) of merchandise in the Premises. Landlord and Tenant hereby acknowledge and agree that Tenant shall have the right, but not the obligation to operate a pharmacy. Notwithstanding the foregoing, in no event shall Tenant offer anything for sale in conflict with the List of Exclusives and Restrictions attached hereto and made a part hereof as Schedule F.

F. "Operating Hours" mean from 10:00 a.m. until 9:00 p.m. Monday through Saturday, and from 12:00 [noon] until 6:00 p.m. on Sunday, excluding therefrom any days or hours during which Tenant is otherwise expressly permitted or required to close its business in accordance with the terms of this Lease. See Section 4.4.

G. "Annual Basic Rental" – For the time period commencing on the Rent Commencement Date, and continuing for twelve (12) months thereafter, the Annual Basic Rental shall be $780,000.00 ($65,000.00 per month).

H. "Annual Percentage Rental" means the amount which is eleven percent (11%) ("Percentage Rent Rate") of Gross Sales in a Lease Year, but commencing as of the fourth (4th) Lease Year and continuing for the remainder of the Term, not less than the Annual Stabilized Rent, as hereinafter defined. For purposes of this Lease, Annual Stabilized Rent for each three (3) year period, shall mean the average Annual Percentage Rental (or Deemed Percentage Rental, as the case may be) during the preceding twenty four (24) month period, but not less than the Annual Stabilized Rent Floor as hereinafter defined. For purposes of this Lease, the Annual Stabilized Rent Floor shall mean the greater of the highest previous Annual Stabilized Rent or the Annual Stabilized Rent for such three (3) year period. By way of example, if the Annual Percentage Rental for the first three Lease Years is $1,870,000.00, $1,980,000.00, and $2,420,000.00, respectively, then the Annual Stabilized Rent for the fourth (4th) through the sixth (6th) Lease Years will be $2,200,000.00. If the Annual Percentage Rental for the fourth, fifth, and sixth Lease Years is $1,500,000 for all three Lease Years, the Annual Stabilized Rent would be $2,200,000.00 (i.e. the previous Annual Stabilized Rent). Commencing as of the seventh (7th) Lease Year and continuing every three

Walgreens v.2
WUS-USI TRANSITION DOCS033622 05/31/24

Rev:11/12/14

(3) years thereafter, including the Option Term, if any, a new Annual Stabilized Rent shall be determined based upon the formula set forth above.

I.    "Deemed Percentage Rental" means $3,000.00 per day until the first anniversary of the date on which Tenant initially opens the Premises for business and remains open for business as required herein for twelve (12) consecutive months, and thereafter Deemed Percentage Rent shall be deemed to be the greater of (i) $3,000.00 per day or (ii) the average daily Percentage Rental payable by Tenant for the prior three hundred sixty five (365) days in which Tenant was open for business.

J.    "Payment in Lieu of Real Estate Taxes" – Not Applicable.

K.    "Annual Convenience Charge Rate" – Not Applicable.

L.    "Sprinkler Contribution Rate" – is estimated to be the product of $0.25 per square foot multiplied by Tenant's Floor Area.  See Section 13.5.

M.    "Marketing Fund Contribution" – Not Applicable.

N.    "Trash Removal Cost" - is estimated to be the product of $.74 per square foot multiplied by Tenant's Floor Area.  See Section 8.4.

O.    "Tenant's Insurance Cost" – Not Applicable.

P.    "Tenant's Proportionate Share" – , shall be a fraction, the numerator of which is the number of leasable square feet of the Demised Premises and the denominator of which is the total number of leasable square feet in Landlord's Buildings. Landlord and Tenant agree that, as of the date of this Lease, Tenant's Proportionate Share is Six and 99/100 percent (6.99%).

Q.    "Security Deposit" – Not Applicable.

R.    "Guarantor" - Intentionally omitted

S.    "Radius Restriction" means the area shown on Schedule H attached hereto and made a part hereof.

T.    Broker – Winick Realty Group, LLC

U.    "Landlord's Buildings" means the existing structures and the structures constructed or improved by Landlord within Landlord's Building Area as shown on Schedule A-2, including, without limitation the parking garage, as the same may be altered, reduced, expanded or replaced from time to time as hereinafter provided.

Rev:11/12/14

V. "Landlord's Building Area" means that certain parcel of land, situate and lying in the District of Columbia which is more particularly described in Schedule A-1 and, upon the opening of business with the public of any expansion of Landlord's Buildings on any property adjacent to Landlord's Building Area, the term "Landlord's Building Area" shall include the property used for such expansion.

W. "Amtrak Station Space" means the areas within Landlord's Buildings outlined and designated on Schedule A-2 hereof, including any retail, restaurant or other commercial space located in such areas.

X. "Landlord's Floor Area" means the aggregate amount of square feet of Landlord's leasable floor area located in the interior of Landlord's Buildings and designed for the exclusive use and occupancy of Retail Tenants (with respect to premises leased to Retail Tenants to be determined from the amount of square feet set forth in the individual leases, and with respect to the remaining leasable floor area to be calculated in the manner set forth in Section 1.1.U for Tenant's Floor Area), specifically excluding Common Areas, the Amtrak Station Space, office premises leased to non-retail tenants, storage areas other than storage area located within premises leased to Retail Tenants for the sale of goods, wares, merchandise, or services, mezzanine and basement level areas within multi-level spaces which are designated for the use of Retail Tenants, and areas used for Landlord's management and promotion offices. "Leased Occupied Floor Area" shall mean that portion of Landlord's Floor Area for which a lease has been executed and which is open for business.

Y. "Main Concourse Building" shall mean the area of Landlord's Buildings on the street and mezzanine levels as outlined and designated on Schedule A-2 hereto.

Z. "Tenant's Floor Area" means that portion of Landlord's Floor Area constituting the Premises which shall be measured (a) with respect to the front and rear width thereof, from the exterior face of the adjacent exterior or corridor wall or, if none, to the center of the demising partition, to the exterior face of the opposite exterior or corridor wall or, if none, to the center of the opposite demising partition, and (b) with respect to the depth thereof, from the front lease line (as designated on the Lease Outline Drawings to be prepared by Landlord pursuant to Schedule "B" hereof with respect to the Premises) to the exterior face of the rear exterior wall or corridor wall or, if neither, to the center of the rear demising partition; in no case shall there be any deduction for columns, stairs or stairway openings, or other structural elements within Tenant's Premises. Tenant's Floor Area shall also include, if applicable, that portion of Landlord's Floor Area beyond the front lease line which is designed for the exclusive use of Tenant and Tenant's customers, including (by way of example only) any customer seating area located adjacent to the Premises which Landlord designates for the exclusive use of Tenant and Tenant's customers.

Rev:11/12/14

AA.    "Retail Tenant" means any tenant of Landlord's Buildings that is engaged primarily in selling goods, wares, merchandise or services to the public. Tenant shall be deemed to be a Retail Tenant, unless otherwise provided in this Lease.

BB.    "Major Retail Space" means any space in Landlord's Buildings comprised of Landlord's Floor Area, mezzanine and/or basement space totaling at least 5,000 square feet and occupied or designed to be occupied by a single Retail Tenant.

CC.    "Common Areas" means those areas and facilities which may be furnished by Landlord or others in or near Landlord's Building Area for the non-exclusive general common use of Retail Tenants, Amtrak and other occupants of Landlord's Buildings, their officers, agents, employees and customers, including (without limitation) all parking areas, if any, access areas (other than public streets), employee parking areas, if any, truckways, driveways, loading docks and areas, delivery passageways, package pick-up stations, sidewalks, interior and exterior pedestrian walkways and pedestrian bridges, malls, roofs, sprinklers, plazas, courts, ramps, common seating areas, landscaped and planted areas, retaining walls, stairways, escalators, elevators, bus stops, first-aid stations, lighting facilities, common utility facilities, drainage areas, flood plains, roads, bridges, transportation facilities, comfort stations or rest rooms, civic center, meeting rooms, and other similar areas, facilities or improvements.

DD.    "Lease Year" means:
The first "Lease Year" shall commence on the first day of the Term, and shall end on the first January 31, following the commencement of the Term. Thereafter, each Lease Year shall consist of successive periods of twelve calendar months, each commencing on February 1 and ending on January 31. Any portion of the Term remaining at the end of the last full Lease Year shall constitute the final Lease Year. Annual Basic Rental, Annual Percentage Rental and all Additional Rental shall be apportioned for any Lease Year of less than twelve (12) months.

EE.    "Consumer Price Index" means the index now known as the "United States Bureau of Labor Statistics, Consumer Price Index for Urban Wage Earners and Clerical Workers," all items, for Washington, D.C., Maryland, Virginia (1982-84 = 100). If, during the Term the Consumer Price Index is changed or discontinued, Landlord shall apply a comparable index, formula or other means of measurement of the relative purchasing power of the dollar and such substitute index, formula or other means shall be utilized in place of the Consumer Price Index as if it had been originally designated in this Lease.

FF.    "Food Court" means that part or parts of the Common Areas designed for seating of customers of Retail Tenants engaged in the retail sale of prepared foods and/or beverages and that part or parts of Landlord's Buildings ancillary to such part or parts of the Common Areas, designated by Landlord, from time to time, in its sole and absolute discretion, for the exclusive use of such Retail Tenants.

Rev:11/12/14

Section 1.2. <u>Additional Defined Terms.</u>

The following additional terms are defined in the places in this Lease noted below:

"Additional Rental" has the meaning set forth in Section 5.1.

"Amtrak" means the National Railroad Passenger Corporation, a corporation organized and existing under the Rail Passenger Service Act and the District of Columbia Business Corporation Act, and its successors or assigns."

"Annual Convenience Charge" has the meaning set forth in Section 11.2.

"Annual HVAC Equipment Charge" has the meaning set forth in Section 13.2.

"Bankruptcy Code" has the meaning set forth in Section 17.4.

"Casualty" has the meaning set forth in Section 15.1.

"Default Rate" means an annual rate of interest equal to prime rate of Citibank, N.A., as announced from time to time, plus two percent (2%).

"Display Zone" has the meaning set forth in the General Criteria Section of Schedule C.

"Event of Default" has the meaning set forth in Section 18.1.

"Expansion Opening Contribution" has the meaning set forth in Section 12.4.

"Gross Sales" has the meaning set forth in Section 5.5.

"HVAC Maintenance Cost" has the meaning set forth in Section 13.2.

"Insurance Contribution" has the meaning set forth in Section 14.8.

"Landlord's Operating Costs" has the meaning set forth in Section 10.3.

"Landlord's Trash Removal Cost" has the meaning set forth in Section 8.4.

"Liquidated Damages" has the meaning set forth in Section 18.4.

"Marketing Fund" has the meaning set forth in Section 12.1.

"Monthly Basic Rental" has the meaning set forth in Section 5.2.

"Mortgage" has the meaning set forth in Section 19.1.

"Mortgagee" has the meaning set forth in Section 19.1.

Rev:11/12/14

"New Premises" has the meaning set forth in Section 9.7.

"Parking Agreement" has the meaning set forth in Section 11.1.

"Ready for Occupancy" has the meaning set forth in Section 7.3.

"Rental" has the meaning set forth in Section 5.1.

"Sprinkler Contribution" has the meaning set forth in Section 13.5.

"Taxes" has the meaning set forth in Section 6.1.

"Termination Damages" has the meaning set forth in Section 18.4.

"Underlying Lease" means any of the underlying leases described in Schedule E.

"USRC" means the Union Station Redevelopment Corporation, a District of Columbia corporation, and its successors and assigns.

Section 1.3. <u>Attachments.</u>

The following documents are attached hereto, and such documents, as well as all drawings and documents prepared pursuant thereto, shall be deemed to be a part hereof:

| | |
|---|---|
| Schedule A-1 - | Description of Landlord's Building Area |
| Schedule A-2 - | Plans Showing Landlord's Buildings and approximate location of the Premises |
| Schedule B - | Description of Landlord's Work and Tenant's Work |
| Schedule C - | Landlord's Tenant Design Criteria. |
| Schedule D - | Form of Estoppel Certificate |
| Schedule E - | Mortgage and Underlying Leases Currently Affecting Landlord's Building Area |
| Schedule F - | List of Exclusives and Restrictions |
| Schedule G - | Prohibited Uses By Assignees or Subtenants. |
| Schedule H - | Area of Radius Restriction |
| Schedule I - | Tenant's Signage |
| Schedule J - | Temporary Signage |
| Schedule K - | Proposed Digitalized Signage |

Rev:10/18/14

## ARTICLE II
## PREMISES

Section 2.1.  Demise.

Landlord hereby leases to Tenant, and Tenant hereby rents from Landlord, the Premises for the Term and at the Rental hereinafter described.

Landlord warrants that it and no other person or corporation has the right to lease the Premises hereby demised, and that so long as Tenant is not in default hereunder (after notice and beyond applicable cure periods), Tenant shall have peaceful and quiet use and possession of the Premises, subject to any Mortgage and all matters of record or other agreements to which this Lease is or may hereafter be subordinated.

Notwithstanding the foregoing, Landlord shall not be liable to Tenant for any damages incurred by Tenant caused by the inability of Landlord to give possession of the Premises to Tenant due to the failure of a former tenant to surrender the Premises upon the termination of said prior Lease.

Section 2.2.  Measurement of Premises.

The floor area stated in Section 1.1.A hereof shall be deemed to be Tenant's Floor Area for all purposes of this Lease.

## ARTICLE III
## TERM

Section 3.1.  Term.

The Term shall commence and expire, as respectively set forth in Section 1.1.B hereof.  Tenant shall have the right and option to extend the Lease Term upon the same terms and conditions, which shall be as set forth in Section 1.1 except that Tenant shall have no further option to extend the Lease Term (the "Option Term"), provided that at such time the option is exercised, Tenant is not in default under this Lease beyond any applicable notice or cure period.  The Tenant shall exercise its right and option to so extend the Lease Term by serving written notice upon Landlord of its election to exercise said option as provided in Section 1.1 under Exercise of Option Term.  In the event Tenant does not timely exercise its option for extension of the Lease as provided above, or is in default under this Lease at the time of such exercise or at any time thereafter prior to the commencement of the Option Term (after notice and beyond applicable cure periods), then, in such event, Tenant shall have no right to the Option Term and the exercise of said option shall be null and void and of no further force or effect.  If Tenant does not timely exercise such option, Landlord may act in reliance on such election not being exercised by the time period set forth above, and Tenant hereby waives any claim or right to invoke or exercise such election after the above prescribed time period.  Time shall be of the essence with respect to Tenant's exercise of said extension option.

Rev:10/18/14

Section 3.2. Termination.

This Lease shall terminate at the end of the Term without the necessity of any notice from either Landlord or Tenant to terminate the same, and Tenant hereby waives notice to vacate or quit the Premises and agrees that Landlord shall be entitled to the benefit of all provisions of law respecting the summary recovery of possession of the Premises from a tenant holding over to the same extent as if statutory notice had been given.

Section 3.3. Holding Over.

If Tenant shall be in possession of the Premises at the end of the Term, with the prior written consent of Landlord, the tenancy under this Lease shall become one from month to month upon all the terms and conditions contained in this Lease and such tenancy shall be terminable by either party on thirty (30) days' notice to the other party. Tenant hereby agrees that if it fails to surrender the Premises at the end of the Term, or any renewal thereof, to Landlord without the express written consent of Landlord, Tenant (i) shall be considered a tenant at sufferance, (ii) will be liable to Landlord for any and all damages which Landlord shall suffer by reason thereof, (iii) will indemnify Landlord against all claims and demands made by any succeeding tenants against Landlord founded upon delay by Landlord in delivering possession of the Premises to such succeeding tenant, and (iv) shall pay to Landlord a Rental equal to (x) one and a half (1.5) times the Rental payable by Tenant to Landlord during the last Lease Year of the Term for the first sixty (60) days of such hold over; and (y) two (2) times the Rental payable by Tenant to Landlord during the last Lease Year of the Term for any hold over beyond sixty (60) days.

## ARTICLE IV
## USE

Section 4.1. Prompt Occupancy and Use.

Tenant shall open its business in the Premises to the public within ninety (90) days following the Commencement Date (subject to reasonable delays in the performance of construction of Tenant's Improvements, provided that Tenant has commenced and is diligently proceeding with such construction) and thereafter will continuously use the Premises for the Permitted Use and for no other purpose whatsoever.

Section 4.2. Storage and Office Areas.

Tenant shall only use such minor portions of the Premises for storage and office purposes as are reasonably required therefor, provided that Landlord acknowledges that such storage and office areas as shown on the Floor Plan and Fixture Plan attached hereto as Schedule B-1 is acceptable. Any goods, wares, merchandise, equipment or other property which is stored by Tenant other than within the Premises is stored at Tenant's sole risk and Landlord shall not be liable to Tenant in any manner whatsoever for any loss whether or not the result of Landlord's negligence or the negligence of any of its employees, servants, agents or workmen.

Rev:10/18/14

Section 4.3.  Tenant's Trade Name.

Unless otherwise approved in writing by Landlord, Tenant shall conduct business in the Premises only in Tenant's Trade Name.

Section 4.4.  Operating Hours.

Tenant shall cause its business to be conducted and operated in good faith and in such manner as shall assure the transaction of a maximum volume of business in and at the Premises. Unless other hours are approved by Landlord in writing, Tenant shall cause the Premises to be open for business during all Operating Hours, as defined in Section 1.1.F of this Lease. Notwithstanding anything to the contrary, the Tenant shall be entitled to remain closed for up to two non-consecutive days in any lease year for the purpose of taking inventory and for reasonable periods of repair and renovation; provided, however, that the Termination Threshold shall be reduced by $1/365^{th}$ for each such day that Tenant shall not open for business. Furthermore, Landlord reserves the right to reduce or eliminate the hours of operation of Landlord's Buildings as a result of bad weather or similar conditions if Landlord, in its reasonable judgment, deems such reduction or elimination of hours to be appropriate, provided that Tenant shall nevertheless have the right to remain open for business, but in such event Landlord shall not be obligated to provide any services which Landlord would otherwise provide if Landlord's Buildings remained open.  If Tenant shall fail to cause its business to be operated during the hours required in this Section on more than two (2) occasions in any Lease Year, in addition to any other remedy available to Landlord under this Lease, Tenant shall pay to Landlord, as liquidated damages for such breach and not as a penalty, a sum equal to One Hundred Ten Percent (110%) of the Deemed Percentage Rent for each hour during which Tenant shall fail to so operate.  Notwithstanding the foregoing, Tenant shall be permitted to close its business if the operation of its store at the Premises shall be delayed, hindered or prevented due to fire or other casualty, strikes, lockout, acts of God, governmental restrictions, enemy act, civil commotion, or other causes of a like nature beyond the control of Tenant.  Additionally, Tenant shall be permitted to temporarily close its business from time to time but not more frequently than one time in any 24 month period, in order to remodel or refurbish the Premises or to perform any other alterations pursuant to Article IX hereof, provided that Tenant proceeds to completion with such remodeling, refurbishing or other alterations with commercially reasonable diligence.

If Tenant shall request Landlord's approval of the opening of the Premises for business for periods exceeding those designated above and Landlord shall approve such request, Tenant shall pay for any additional costs incurred by Landlord in connection with Tenant's opening the Premises for business during such additional hours (which costs shall be charged to Tenant at the same rate as Landlord charges to its other tenants in Landlord's Buildings, including but not limited to, additional charges for utilities furnished to the Premises by Landlord).

Rev:11/12/14

Section 4.5. <u>Failure of Tenant to Open;  Failure to Operate.</u>

If Tenant fails to open for business within ninety (90) days after the Commencement Date and/or (a) thereafter, if Tenant fails to continuously operate its business in accordance with the terms of this Lease or (b) vacates the Premises prior to the Termination Date hereof, Landlord will suffer damages in an amount which are not readily ascertainable and thus, in any such event, Landlord shall have the right, at its option, in addition to all other remedies available under this Lease and under law and equity, to collect as liquidated damages, and not as penalty, in addition to all other charges which are due hereunder, including, but not limited to, the charges, adjustments and/or Percentage or Additional Rental set forth in Section 4.4, one-sixtieth (1/60th) of an amount equal to the Monthly Deemed Percentage Rental for each day which Tenant fails to so operate and, in addition, Landlord shall have the right to treat any of the aforesaid events as an "Event of Default" pursuant to Section 18.1 hereof.

Section 4.6. <u>Exclusive Use.</u>

Subject to the rights of existing tenants as expressly set forth on Schedule F, their successors and assigns, during the term of the Lease and for so long as Tenant is operating a pharmacy in the Premises, the Premises for the Permitted Use, Landlord shall not permit the sale of Pharmacy Items (as hereinafter defined) or prescription drugs in any store in Landlord's Buildings.  The foregoing prohibition as to Pharmacy Items or prescription drugs shall not apply to any large format retailer occupying more than 20,000 square feet in Landlord's Building, such as Target.  For purposes of this Lease, Pharmacy Items shall mean the those items sold in a drug store or a so-called prescription pharmacy or prescription ordering, processing or delivery facility, whether or not a pharmacist is present at such facility, which requires a qualified pharmacist or other person authorized by law to dispense medicinal drugs, directly or indirectly, for a fee or remuneration of any kind.  For clarification purposes, the foregoing prohibition as to Pharmacy Items shall not apply to retail stores which sell items typically found in a drug store or pharmacy which do not require a qualified pharmacist or other person authorized by law to dispense on an ancillary basis.  In the event that Tenant is not operating a pharmacy in the Premises and Landlord intends to enter into a lease or other agreement permitting occupancy in Landlord's Building which would allow the tenant or occupant therein to sell Pharmacy Items, Landlord shall first provide Tenant with written notice of such intent, and Tenant shall thereafter have the right, by delivery of written notice to Landlord within thirty (30) days after receipt of Landlord's notice, to elect to commence or recommence the sale of Pharmacy Items in the Premises, in which case, the Permitted Use hereunder shall be deemed to thereafter require the operation of a pharmacy by Tenant in the Premises, provided that Tenant shall be permitted a commercially reasonable amount of time, not to exceed three (3) months, to take such actions as are necessary to  enable the operation of a pharmacy in the Premises (including without limitation, permitting and construction of a pharmacy within the Premises, and obtaining a pharmacy license).  In the event that Tenant so elects to operate a pharmacy, then Tenant's exclusive as provided herein shall remain in full force and effect.

Rev:10/18/14

<div align="center">

ARTICLE V

RENTAL

</div>

Section 5.1. <u>Rentals Payable.</u>

Commencing as of the earlier of the date (i) in which Tenant shall open the Demised Premises for business to the public, or (ii) which is ninety (90) days following the Commencement Date (hereinafter, the "Rent Commencement Date") Tenant covenants and agrees to pay to Landlord as rental ("Rental") for the Premises, the following:

    (a)    the Annual Basic Rental specified in Section 1.1.G, (if any); plus

    (b)    the difference, if any, between the Annual Percentage Rental specified in Section 1.1.H and the amount of the Annual Basic Rental specified in Section 1.1.G, (if any); plus

    (c)    all additional sums, charges or amounts of whatever nature to be paid by Tenant to Landlord in accordance with the provisions of this Lease, whether or not such sums, charges or amounts are referred to as additional rental (collectively referred to as "Additional Rental"):

provided, however, that the Annual Basic Rental and the minimum amount of Gross Sales utilized in the computation of Annual Percentage Rental shall be increased or reduced proportionately for any Lease Year of greater or less than twelve (12) calendar months.

Section 5.2. <u>Annual Basic Rental.</u>

Annual Basic Rental, if any, shall be payable in equal monthly installments (the "Monthly Basic Rental") in advance on the first day of each full calendar month during the Term, the first such payment to also include any prorated Annual Basic Rental for the period from the date of the commencement of the Term to the first day of the first full calendar month in the Term.

Section 5.3. <u>Annual Percentage Rental and Deemed Percentage Rental.</u>

Tenant shall be under no obligation to make payments of Annual Percentage Rental in any Lease Year until the Annual Percentage Rental exceeds the Annual Basic Rent for any Lease Year, if any. Upon achieving such amount of Gross Sales, Tenant shall thereupon make monthly payments of Annual Percentage Rental, on or before the twentieth (20th) day following the close of each full calendar month during the remainder of such Lease Year, which shall be calculated by multiplying the percentage specified in Section 1.1.H by the amount of Gross Sales for the month in question. The obligation to pay Rent shall commence on the Rent Commencement Date of the Lease, but if Tenant fails to open for business on the Commencement Date, Tenant agrees to pay Landlord as "Deemed Percentage Rental" for the Premises the sum as provided in Section 1.1.I in advance on the first calendar day of each month during the Term beginning with the first calendar day of the first calendar month following the Commencement Date until such

Rev:10/18/14

time as Tenant shall open for business. As long as the Premises are open for business for the Permitted Use hereunder Tenant shall not be obligated to pay Deemed Percentage Rental. If the Rent Commencement Date begins or if the date in which Tenant shall open for business to the public begins on a day other than the first day of a calendar month, then the Deemed Percentage Rental for such period shall be prorated by the number of days this Lease is in effect during such period.

In addition to the Deemed Percentage Rental to be paid by Tenant pursuant to Section 5(a) above, if applicable, Tenant agrees to pay, as "Percentage Rental," for each Lease Year (as defined in Section 6) an amount equal to the percentage shown in Section 1.1.F of Gross Sales for such Lease Year, but only to the extent that such Percentage Rental shall exceed the Deemed Percentage Rental paid by Tenant. Percentage Rental for each Lease Year shall be paid without demand commencing in the calendar month that Tenant opens for business for the Permitted Use; thereafter, Tenant shall pay Percentage Rental for each and every succeeding month during the Term on all Gross Sales, payable within thirty (30) days following the expiration of the month.

Section 5.4. Intentionally Omitted.

Section 5.5. "Gross Sales" Defined.

"Gross Sales" means the actual sales prices of all goods, wares and merchandise sold, leased, licensed or delivered and the actual charges for all services performed by Tenant or by any subtenant, licensee or concessionaire in, at, from, or arising out of the use of the Premises, whether for wholesale, retail, cash, credit, trade-in or otherwise, without reserve or deduction for inability or failure to collect. Gross Sales shall include, without limitation, sales and services (a) where the orders therefor are filled or originate in, at, from, or arise out of the use of the Premises, whether delivery or performance is made from the Premises or from some other place, (b) made or performed by mail, telephone, or online or other electronic orders, (c) made or performed by means of mechanical or other vending devices in the Premises, or (d) which Tenant or any subtenant, licensee, concessionaire or other person in the normal and customary course of its business would credit or attribute to its operations in any part of the Premises. Any deposit not refunded shall be included in Gross Sales. Each installment or credit sale shall be treated as a sale for the full price in the month during which such sale is made, regardless of whether or when Tenant receives payment therefor. No franchise, occupancy or capital stock tax and no income or similar tax based on income or profits shall be deducted from Gross Sales.

The following shall not be included in Gross Sales: (i) any exchange of merchandise between stores of Tenant where such exchange is made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale made in, at or from the Premises, or for the purpose of depriving Landlord of the benefit of a sale which would otherwise be made in or at the Premises, (ii) returns to shippers or manufacturers, (iii) cash or credit refunds to customers on transactions and the selling price of goods delivered in exchange for goods returned (not to exceed the actual selling price of the item returned or exchanged) otherwise included in Gross Sales, (iv) sales of trade fixtures, machinery and equipment after use thereof in the conduct of Tenant's business, (v) amounts collected and paid by Tenant to any government for any sales or excise tax, (vi) credit card processing fees, (vii) license and

Rev:10/18/14

transaction fees received from the operation of automatic teller machines and any other similar electronic consumer service apparatus, (viii) sales at a discount to employees (provided that, to the extent that such sales at a discount to employees shall exceed 2% of Gross Sales, then such discounted sales in excess of 2% of Gross Sales shall not be subject to this exclusion); and (ix) sales of gift cards.

Section 5.6. <u>Statement of Gross Sales.</u>

Tenant shall deliver to Landlord: (a) within twenty (20) days after the close of each calendar month of the Term, a written report signed by Tenant or by an authorized officer or agent of Tenant, showing the Gross Sales made in the preceding calendar month and (b) within sixty (60) days after the close of each Lease Year and after the termination of this Lease, a statement of Gross Sales for the preceding Lease Year which shall conform to and be in accordance with generally accepted accounting principles. The annual statement shall be accompanied by the signed certificate of the Company's Chief Accounting Officer stating specifically that (i) he has examined the report of Gross Sales for the preceding Lease Year, (ii) his examination included such tests of Tenant's books and records as he considered necessary or appropriate under the circumstances, (iii) such report presents fairly the Gross Sales of the preceding Lease Year, (iv) the Gross Sales conform with and are computed in compliance with the definition of Gross Sales contained in Section 5.5. hereof, (v) such report specifically enumerates any and all exclusions from Gross Sales claimed by Tenant pursuant to Section 5.5 and (vi) he has described in such report the discrepancies, if any, between the Gross Sales in the annual statement and the cumulative total of monthly reports of Gross Sales submitted previously. If Tenant shall fail to deliver such annual statement and certificate to Landlord within said sixty (60) day period, Landlord shall have the right thereafter, upon not less than ten (10) days advance notice and opportunity to cure, to employ an independent Certified Public Accountant or any other representative of Landlord to examine such books and records, including without limitation all records required by Section 5.7, as may be necessary to certify the amount of Tenant's Gross Sales for such Lease Year, and if such independent Certified Public Accountant or any other representative of Landlord shall discover that Tenant has underpaid Percentage Rental by more than three percent (3%), Tenant shall pay to Landlord the reasonable cost of such independent Certified Public Accountant or any other representative of Landlord as Additional Rental.

All data, reports, financial statements and other information furnished by Tenant to Landlord and/or its representatives from time to time during the Term shall be kept and maintained by Landlord and its representatives on a strictly confidential basis and shall not be disclosed to any person without the prior written consent of Tenant.

As soon as practicable after the end of each Lease Year, but no later than thirty (30) days after receipt of Tenant's annual statement of Gross Sales, the Annual Percentage Rental paid or payable for such Lease Year shall be adjusted between Landlord and Tenant, and each party hereby agrees to pay to the other, on demand, the amount of any excess or deficiency in Annual Percentage Rental paid by Tenant to Landlord during the preceding Lease Year as may be necessary to effect adjustment to the agreed Annual Percentage Rental.

Rev:10/18/14

Section 5.7. Tenant's Records.

For the purpose of permitting verification by Landlord of any amounts due as Rental, Tenant shall cause to be kept, in accordance with its customary accounting procedures, records of the Gross Sales made by Tenant in the operation of Tenant's store on the Premises and preserve for at least three (3) years, and during the Term shall keep such records at the Tenant Notice Address or the Premises and which shall conform to and be in accordance with generally accepted accounting principles. At any time or from time to time after advance notice to Tenant, Landlord or Mortgagee, their respective agents and accountants, shall have the right during business hours to make any examination or audit of such books and records which Landlord or Mortgagee may desire. If such audit shall disclose a liability in any Lease Year for Rental in excess of the Rental theretofore paid by Tenant for such period, Tenant shall promptly pay such additional Rental then payable, accounting from the date such additional Rental was due and payable, with interest at the Default Rate. In addition, if Gross Sales have been understated by more than three percent (3%) and Landlord is entitled to an increase in Annual Percentage Rental or Additional Rental as a result of such understatement, then Tenant shall pay the cost of such audit, which cost shall be deemed Additional Rental and paid to Landlord upon demand. In addition, if Gross Sales are found to have been understated by more than five percent (5%) as a result of such audit on more than one occasion during any twelve (12) month period, Tenant shall pay to Landlord, in addition to the cost of such audit, and in addition to the payments set forth above, one hundred twenty percent (120%) the amount of the payments wrongfully withheld.

Section 5.8. Payment of Rental.

Tenant shall pay all Rental when due and payable, without any setoff, deduction or prior demand therefor whatsoever. Any Rental which is not paid within ten (10) days after the same is due shall bear interest at the Default Rate from the first day due until paid and in addition to such interest, in the event that Tenant is late in the payment of Rental more than two (2) times during any twelve (12) month period during the Term, Tenant shall pay each month a late charge equal to five percent (5%) of the total amount of Rental remaining unpaid. If any of Tenant's payments to Landlord is returned uncollected by Tenant's bank (whether as a result of "NSF", uncollected funds or otherwise) Landlord shall have the right to demand, by written notice to Tenant, that all future payments be made by either certified or Treasurer's check or, at Tenant's election, by Electronic Funds Transfer (in which case, Landlord shall provide Tenant with written direction, containing such information as Tenant may reasonably require in order to accomplish such payments by Electronic Funds Transfer). Any Additional Rental which shall become due shall be payable, unless otherwise provided herein, shall be paid together with the next installment of Annual Basic Rental. Rental and statements required of Tenant shall be paid and delivered to Landlord at the address designated on the Rental invoice prepared by Landlord, or at such other place as Landlord may from time to time designate in a notice to Tenant. Any payment by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord or acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full, shall be given no effect, and Landlord may accept such check without prejudice to any other rights or remedies which Landlord may have against Tenant. All Rental shall be paid in United

Rev:10/18/14

States currency. In addition, in the event any check tendered by Tenant to Landlord is not honored on initial presentation, Tenant shall pay Landlord the greater of Fifty ($50.00) Dollars or the amount Landlord's bank charges Landlord for processing such returned check.

Section 5.9. Advance Rental.

Intentionally Omitted.

Section 5.10. Security Deposit.

Intentionally Omitted.

ARTICLE VI
TAXES

Section 6.1. Payment in Lieu of Taxes.

Intentionally Omitted.

Section 6.2. Taxes on Rental.

Intentionally Omitted.

Section 6.3. Taxes on Personal Property.

Tenant shall pay to the appropriate agency, or to Landlord if Landlord is charged with the responsibility of collecting such monies, prior to the time the same shall become delinquent or payable with penalty, all taxes imposed on Tenant's inventory, furniture, trade fixtures, apparatus, equipment, leasehold improvements installed by Tenant or by Landlord on behalf of Tenant, and any other property of Tenant.

Section 6.4 Taxes on Real Estate

Intentionally Omitted.

ARTICLE VII
IMPROVEMENTS

Section 7.1. Landlord's Improvements.

Subject to the provisions of Section 21.1 hereof, and subject to delays due to labor disputes, Acts of God or the public enemy, governmental regulations or controls, Casualty or other conditions or causes beyond its reasonable control, Landlord will, as promptly as possible, let contracts for or otherwise cause to be completed the construction of only those improvements, if any, in or about Landlord's Buildings which it is to construct or improve, as more specifically

Rev:10/18/14

described in Schedule B with regard to this Lease ("Landlord's Work"). Landlord's Work shall be performed in a good and workmanlike manner in accordance with all applicable laws.

Section 7.2. Tenant's Improvements.

Prior to the commencement of the Term, Tenant shall, at its sole cost and expense, complete all improvements and other work to be performed by it pursuant to Schedule B. Tenant will be permitted by Landlord to enter the Premises in accordance with Schedule B for the purpose of performing its obligations under Schedule B and for the purpose of installing its fixtures and other equipment, provided (a) Tenant shall have obtained Landlord's written approval of the plans and specifications for such work, (b) Tenant shall have obtained all necessary approvals and/or permits for construction of its improvements (with all costs related thereto to be paid by Tenant), (c) Tenant shall have deposited with Landlord the policies of insurance required in Sections 14.3 and 14.4, (d) Landlord shall have received full payment from Tenant for those items set forth in Section D of Schedule B and for such other items of work as Landlord may have undertaken at Tenant's written request, (e) Tenant shall have deposited with Landlord such additional information, documentation, funds or bonds as may be required by Schedule B or the terms of this Lease and (f) Tenant shall have met with Landlord's designee and shall have provided to such designee for Landlord's approval, a list of all general contractors, subcontractors and materialmen who will be working in or supplying materials to the Premises. In the event Tenant fails to submit its preliminary plans within sixty (60)days of execution of this Lease or its final plans within sixty (60) days following Landlord's approval of the preliminary plans, then after provision of notice and sixty (60) days opportunity to cure, in addition to any and all rights and remedies available to Landlord under this Lease, at law and/or in equity, Landlord may, in its sole and absolute discretion, cancel this Lease by giving a written notice of such election to Tenant. Tenant's activities shall be conducted so as not to unreasonably interfere with Landlord's construction activities or the construction activities of any other tenants, USRC or the District of Columbia Department of Public Works. Tenant shall maintain the Premises in a clean and orderly condition during construction and merchandising. All trash which may accumulate in connection with Tenant's construction and all initial setup or merchandising activities shall be contained within the Premises and deposited daily at a location to be determined by Landlord. Tenant, at its sole cost and expense, shall be responsible for the removal of all construction trash. During such period, Tenant shall perform all duties and obligations imposed by this Lease, including, without limitation, those provisions relating to insurance and indemnification, saving and excepting only the obligation to pay Rental (other than any Additional Rental arising out of any failure of Tenant to perform its obligations under this Lease), which obligation shall commence when the Term commences. Tenant hereby acknowledges receipt from Landlord of Tenant's Design Criteria/Architectural, Tenant's Design Criteria/ Mechanical and Engineering, and the Lease Outline Drawing.

Section 7.3. Intentionally Omitted.

Section 7.4. Effect of Opening for Business.

By opening the Premises for business, Tenant shall be deemed to have (a) accepted the Premises and (b) acknowledged that the Premises are Ready for Occupancy hereunder.

Rev:10/18/14

Provided, however, that the foregoing shall not be deemed (i) a waiver of Landlord's obligation to correct any Punchlist Items or a waiver of Tenant's rights and remedies in the event of Landlord's failure to correct Punchlist Items; or (ii) a waiver of any of Landlord's repairs and maintenance obligations with respect to the Premises and/or Landlord's Buildings as are expressly set forth elsewhere in this Lease.

Section 7.5. <u>Mechanic's Liens.</u>

No work performed by Tenant pursuant to this Lease, whether in the nature of erection, construction, alteration or repair, shall be deemed to be for the immediate use and benefit of Landlord so that no mechanic's or other lien shall be allowed against the estate of Landlord by reason of any consent given by Landlord to Tenant to improve the Premises. Tenant shall place such contractual provisions as Landlord may request in all contracts and subcontracts for Tenant's improvements assuring Landlord that no mechanic's liens will be asserted against Landlord's interest in the Premises or the property of which the Premises are a part. Tenant shall provide Landlord with copies of all filed mechanics' lien waivers before the commencement of any work in the Premises will be authorized by Landlord. Landlord shall have the right to post and keep posted in the Premises notices of non-responsibility, or such other notices as Landlord may deem to be proper for the protection of Landlord's interest in the Premises. Tenant shall pay promptly all persons furnishing labor or materials with respect to any work performed by Tenant or its contractors on or about the Premises. If any petition to establish a mechanic's lien, actual mechanic's lien or any other comparable lien shall at any time be filed against the Premises or the property of which the Premises are a part by reason of work, labor, services, or materials performed or furnished, or alleged to have been performed or furnished, to Tenant or to anyone holding the Premises through or under Tenant, Tenant shall forthwith (and in all events prior to foreclosure and so as not to in any manner affect the financing or sale of Landlord's Buildings or any construction loans or draws therefor) cause the same to be discharged of record or bonded to the satisfaction of Landlord. If Tenant shall fail to cause such lien forthwith to be so discharged or bonded within thirty (30) days (or such shorter period as may be required to prevent enforcement or foreclosure of the lien or so as not to affect the sale or financing of Landlord's Buildings or construction draws therefor) after notice of the filing thereof, then, in addition to any other right or remedy of Landlord, Landlord may bond or discharge the same by paying the amount claimed to be due. In the event that any proceeding is commenced against Landlord on any such lien, whether or not same has been bonded by Tenant, Tenant shall, at Landlord's election, either defend Landlord in such action and pay all costs of such defense or indemnify and hold Landlord harmless for all costs, including reasonable attorney's fees, incurred by Landlord in defending any such action. Any amount so paid by Landlord, including reasonable attorneys' fees incurred by Landlord either in defending against such lien or action or in procuring the bonding or discharge of such lien, together with interest thereon at the Default Rate, shall be due and payable by Tenant to Landlord as Additional Rental.

Section 7.6. <u>Tenant's Trade Fixtures.</u>

All trade fixtures and apparatus (as distinguished from leasehold improvements) owned by Tenant and installed in the Premises shall remain the property of Tenant and shall be removable at any time, including upon the expiration of the Term, and provided, further, that

Rev:10/18/14

Tenant shall repair any damage to the Premises caused by the removal of said trade fixtures and apparatus and shall restore the Premises to substantially the same condition as existed prior to the installation of said trade fixtures and apparatus. All such trade fixtures and apparatus installed in the Premises shall at the time of installation be new or reconditioned to have a like-new appearance.

<center>

ARTICLE VIII

<u>OPERATIONS</u>

</center>

Section 8.1. <u>Operations by Tenant.</u>

In regard to the use and occupancy of the Premises, Tenant will at its expense: (a) keep the inside and outside of all glass in the doors, windows and any skylights of the Premises clean; (b) keep all exterior store surfaces of the Premises clean, including, but not limited to, any awnings, canopies and/or store signs; (c) replace promptly any cracked or broken glass of the Premises with glass of like color, kind and quality; (d) maintain the Premises in a clean, orderly and sanitary condition, free of insects, rodents, vermin and other pests; (e) keep any garbage, trash, rubbish or other refuse in rat-proof containers within the interior of the Premises until removed; (f) have such garbage, trash, rubbish and refuse removed on a daily basis; (g) keep all mechanical apparatus free of vibration and noise which may be transmitted beyond the Premises; (h) keep clean and in good working order all hoods and maintain in good working order and inspect on a regular basis, the frequency of which shall be determined by Landlord, all fire protection equipment (including but not limited to, ansul hoods, fire extinguishers and all other items required by applicable codes) and cooperate with Landlord in Landlord's maintenance of all grease recovery units (the cost of said maintenance to be paid by Tenant as set forth in Schedule C-1); (i) comply with all laws, ordinances, rules and regulations of governmental agencies and authorities and all reasonable recommendations of Landlord's casualty insurer(s) and other applicable insurance rating organizations now or hereafter in effect; (j) light the show windows of the Premises and exterior signs and turn the same off to the extent required by Landlord for security purposes on special occasions as Landlord shall advise Tenant from time to time ; (k) comply with and observe all commercially reasonable rules and regulations established by Landlord from time to time which apply generally to all Retail Tenants in Landlord's Buildings; (l) maintain sufficient and seasonal inventory in accordance with Tenant's customary business practices and have a sufficient number of personnel to maximize sales volume in the Premises in accordance with Tenant's customary business practices; and (m) conduct its business in all respects in a dignified manner in accordance with high standards of store operation consistent with the quality of operation of Landlord's Buildings as determined by Landlord; and (n) pursuant to Sections 8.3 and 9.4, cosmetically refurbish the interior of the Premises (including, but not limited to, the floor and wall coverings and any damaged ceiling tiles of the Premises) when necessary to keep the Premises in a well-maintained and commercially reasonable condition in a manner consistent with Tenant's standard maintenance practices in the Washington, DC metropolitan area.

In regard to the use and occupancy of the Premises and the Common Areas, Tenant will not: (o) use the plumbing facilities for any other purpose than that for which they are constructed

Rev:10/18/14

and will not permit any foreign substance of any kind to be thrown therein and the expense of repairing any breakage, stoppage, seepage or damage, whether occurring on or off the Premises resulting from a violation of this provision by Tenant or Tenant's employees, agents or invitees shall be borne by Tenant; (p) place or maintain any merchandise, trash, refuse or other articles in any vestibule or entry of the Premises, on the footwalks or corridors adjacent thereto or elsewhere on the exterior of the Premises; (q) use or permit the use of any objectionable advertising medium such as, without limitation, loudspeakers, phonographs, public address systems, sound amplifiers, reception of radio or television broadcasts within Landlord's Buildings, which is in any manner audible or visible outside of the Premises; (r) permit undue accumulations of or burn garbage, trash, rubbish or other refuse within or without the Premises; (s) cause or permit objectionable odors in Landlord's opinion to emanate or to be dispelled from the Premises; (t) solicit business in any Common Area; (u) distribute handbills or other advertising matter in any Common Area; (v) permit the parking of vehicles within the Common Areas except in designated areas; (w) receive or ship articles of any kind outside the designated loading areas for the Premises; (x) use the mall, corridor, or any other Common Area adjacent to the Premises for the sale or display of any merchandise or for any other business, occupation or undertaking; (y) conduct or permit to be conducted any auction, fire sale, going out of business sale, bankruptcy sale, unless directed by a court order, or other similar type sale in or connected with the Premises (but this provision shall not restrict the absolute freedom of Tenant in determining its own selling prices, nor shall it preclude the conduct of periodic seasonal, promotional or clearance sales); (z) place or suffer to be placed on the exterior of the Premises, or in the interior of the Premises if visible from the exterior of the Premises, any signage relating to any bankruptcy or liquidation-type sale, notwithstanding any court order permitting such sale and Tenant further agrees that any signage which may be allowed by Court Order shall nevertheless comply with the signage requirements of this Lease and Schedules and Exhibits thereto, and shall in no event exceed 20"x24"; (aa) use or permit the use of any portion of the Premises for any unlawful purpose or for any activity of a type which is not generally considered appropriate for regional shopping centers conducted in accordance with good and generally accepted standards of operation; (bb) place a load upon any floor which exceeds the floor load which the floor was designed to carry; (cc) operate its heating or air-conditioning in such a manner as to drain heat or air-conditioning from the Common Area or from the premises of any other tenant or occupant of Landlord's Buildings; (dd) deface, damage or demolish any sign, light standard or fixtures, landscaping material or other improvement or property in the Common Areas; or (ee) sell, distribute, display or offer for sale (i) any freshly-popped popcorn, (ii) intentionally omitted, (iii) any roach clip, water pipe, bong, coke spoon, or paraphernalia commonly used in the use or ingestion of illicit drugs (provided that Tenant shall not be prohibited from selling cigarette papers or hypodermic syringes), or (iv) any pornographic, lewd, suggestive, or "adult" newspaper, book, magazine, film, picture, representation or merchandise of any kind. Additionally, Landlord and Tenant acknowledge the existence of the Lease dated June 30, 2011 by and between Landlord and Union Wine & Liquor, Inc. (the "Liquor Lease"), which is scheduled to expire September 30, 2021. Pursuant to the Liquor Lease, the tenant has the exclusive right to sell alcoholic beverages for off-premises consumption. During the time that the Liquor Lease shall be in full force and effect, Tenant agrees not to sell alcoholic beverages of any type (except restaurants where the sale of such beverages is included in its permitted use or has been approved in writing by Landlord and is for on-site consumption). Upon the expiration or termination of the Liquor Lease, Landlord shall notify Tenant thereof,

Rev:10/18/14

and Tenant shall have the option to commence the sale of alcoholic beverages for off-premises consumption by delivery of written notice to Landlord, provided that if Tenant so elects, Tenant shall thereafter be required to sell alcoholic beverages for off-premises consumption for the remainder of the Term of the Lease.

Section 8.2. Signs and Advertising.

Tenant shall have the right to place its store signs in the areas shown on Schedule I attached hereto and made a part hereof. Tenant will not place or suffer to be placed or maintained on the exterior of the Premises, on any awning or canopy, or within the Display Zone (as identified in Schedule C) any sign, advertising matter or any other thing of any kind and will not place or maintain any decoration, letter or advertising matter on any window, door, awning or canopy of the Premises unless the same is placed and maintained in accordance with plans approved in writing by Landlord (such approval not to be unreasonably withheld, delayed or conditioned), said plans prepared in conformity with Schedule C. From time to time, with Landlord's prior written approval (such approval not to be unreasonably withheld, delayed or conditioned), signs announcing special sales may be posted in the storefront. Signs must be professionally lettered and mounted on rigid backing. No "help wanted" signs or signs announcing events outside Landlord's Buildings are permitted. All signs must conform to Landlord's design criteria as set forth in Schedule C. Tenant shall, at its sole cost and expense, maintain such sign, decoration, lettering, advertising matter or other thing as may be permitted hereunder in good condition and repair at all times. Notwithstanding the foregoing, Tenant shall have the right to install its customary signage package including building signage and awnings, subject to the terms of this Section. Landlord shall provide Tenant the space for Temporary Signage as shown on Schedule J attached hereto and made a part hereof for a 60-day (two full calendar months) period, without any additional charge, to coincide with Tenant's "Grand Opening" as shall be determined in advance based upon the date Landlord delivers possession of the Premises to Tenant. In addition, it is the intention of Landlord that certain signage opportunities in Union Station as shown on Schedule K attached hereto and made a part hereof shall become digitalized. In such event, Tenant shall have the right to utilize up to two hundred (200) minutes a month for Walgreen signage at no additional charge to Tenant. The timing of such signage shall be reasonably determined by Landlord. All design and content shall be subject to the approval of Landlord, the USRC and any governing authorities having jurisdiction thereof.

Section 8.3. Painting and Displays by Tenant.

Tenant will not paint or decorate any part of the exterior of the Premises. Tenant will install and maintain at all times, subject to the other provisions of this Section, displays of merchandise in the show windows (if any) of the Premises, as may be required in accordance with Landlord's Design Criteria from time-to-time. All articles, and the arrangement, style, color and general appearance thereof, in the interior of the Premises including, without limitation, window displays, advertising matter, signs, merchandise and store fixtures, shall be in keeping with the character and standards of the improvements within Landlord's Buildings, as determined by Landlord.    Landlord reserves the right to require Tenant to correct any

Rev:10/18/14

nonconformity, after written notice to Tenant, and Tenant's failure to correct the same within thirty (30) days after such written notice.

Section 8.4. Trash Removal.

Tenant shall keep any garbage, trash, rubbish or other refuse in rodent-proof containers within the interior of the Premises and shall deposit any garbage, trash, rubbish or other refuse, on a daily basis, in designated or approved receptacles provided by Landlord. In addition, Tenant shall comply with any and all local, state or federal rules, laws or regulations relating to the recycling of any trash originating in, at or from the Premises and furthermore, shall cooperate with Landlord in the event Landlord shall, whether voluntarily or mandatorily, implement a program of recycling at Landlord's Buildings. In the event Tenant fails to remove any accumulation of rubbish within twenty-four (24) hours after notice to remove same, Landlord shall have the right to remove the same, in which event the cost thereof, in addition to administrative costs equal to ten (10%) per cent of the total costs and expenses thereof, shall be paid by Tenant except that Landlord shall at no time be obligated to remove the same. In the event Tenant fails to cooperate with any program of recycling implemented by Landlord in Landlord's Buildings, and such failure results in an increase of Landlord's expenses in implementing such program, Tenant shall be assessed the full amount of such increase in addition to those charges otherwise payable hereunder.

Landlord shall operate and maintain or arrange for trash removal service and/or recycling of all or part of the trash and refuse from Landlord's Buildings, the cost and expense of which is referred to herein as "Landlord's Trash Removal Cost." Tenant shall comply with all procedures designated by Landlord in order to implement the recycling program(s). "Landlord's Trash Removal Cost" means the cost of removal of trash by independent trash haulers, costs of recycling, costs of purchasing or leasing containers or compactor(s), costs of repair and maintenance of trash collection equipment, costs of collection and removal of trash and/or costs of recycling, labor and administrative costs equal to ten percent (10%) of the total costs and expenses thereof.

Tenant shall pay its proportionate share of Landlord's Trash Removal Cost as Additional Rental in monthly installments in advance of such amounts as are estimated and billed by Landlord at the beginning of each twelve (12) month period commencing and ending on the dates designated by Landlord, each installment being due on the first day of each calendar month. At any time during such twelve (12) month period Landlord may revise its estimate of Tenant's proportionate share of Landlord's Trash Removal Cost and adjust Tenant's monthly installments payable thereafter during such twelve (12) month period to reflect such revised estimate. Within ninety (90) days (or such additional time thereafter as is reasonable under the circumstances) after the end of each such twelve (12) month period, Landlord shall deliver to Tenant a statement of Landlord's Trash Removal Cost for such twelve (12) month period and the monthly installments paid or payable shall be adjusted between Landlord and Tenant, the parties hereby agreeing that Tenant shall pay Landlord or Landlord shall credit Tenant's account or (if such adjustment is at the end of the Term) pay Tenant, as the case may be, within fifteen (15) days of receipt of such statement, such amounts as may be necessary to effect adjustment to the proportionate share for such twelve (12) month period.

Rev:10/18/14

## ARTICLE IX
## REPAIRS AND ALTERATIONS

Section 9.1. Repairs to be Made by Landlord.

Landlord will make, or cause to be made:

(a)    repairs to any sprinkler system serving the Common Areas;

(b)    structural repairs to exterior walls, structural columns, roof, and roof penetrations and structural floors which collectively enclose the Premises (excluding, however, all doors, door frames, store-fronts, windows and glass); and

(c)    repairs to any electrical, mechanical and other systems to the point of entry to the Premises, unless such items exclusively serve the Premises, in which case Tenant shall be required to make the repairs to said items;

provided Tenant shall give Landlord notice of the necessity therefor and provided that the necessity therefor shall not arise from nor shall be caused by the negligence or willful acts of Tenant, its agents, concessionaires, officers, employees, licensees or contractors. Notwithstanding anything to the contrary contained in this Lease, Landlord shall not in any way be liable to Tenant for failure to make repairs as herein specifically required of it unless Tenant has previously notified Landlord in writing of the need for such repairs and Landlord has failed to commence and complete such repairs within a reasonable period of time following receipt of Tenant's written notification.

Landlord shall not be liable to Tenant for any damage to any merchandise, trade fixtures, or personal property of Tenant in the Premises caused by water leakage from water lines, sprinkler or heating or air conditioning equipment, sewer lines, or the roof membrane, occurring within or without the Premises.

If Landlord shall from time to time fail to perform any act or acts required of Landlord by this Article within the interior of the Premises and if such failure continues for thirty (30) days after receipt of notice from Tenant, Tenant shall then have the right, following a reminder notice to Landlord with an additional ten (10) days to cure, in addition to such remedies as may be available under law or in equity, at Tenant's option, to perform such act or acts, in such manner as Tenant deems reasonably necessary, and the full amount of the cost and expense so incurred shall immediately be owing by Landlord to Tenant; provided, however, that if such act or acts cannot reasonably be performed within such thirty (30) day period, Landlord shall have such additional time as shall be reasonably necessary provided Landlord promptly commences and diligently proceeds to perform the same. Additionally, if Landlord's failure to perform any act or acts required of Landlord by this Article and as a result thereof a condition exists which unreasonably interferes the proper operation of Tenant's business in the Premises, Tenant, in the

Rev:10/18/14

exercise of good business judgment shall have the right to close its store at the Premises until such interference shall be abated, and the Rental shall be abated during the period of time that such interference continues.

Section 9.2. Repairs to be Made by Tenant.

All repairs to the Premises or any installations, equipment or facilities therein, other than those repairs required to be made by Landlord pursuant to Section 9.1, Section 13.2 or Section 15.1, shall be made by Tenant at its expense. Without limiting the generality of the foregoing, Tenant will keep the interior of the Premises, together with all electrical, plumbing and other mechanical installations therein in good order and repair and will make all replacements from time to time required thereto at its expense. Tenant will surrender the Premises at the expiration of the Term or at such other time as it may vacate the Premises in as good a condition as when received, subject to ordinary wear and tear, damage by Casualty (other than such damage by Casualty which would be covered by insurance required to be carried by Tenant under Section 14.3 or is caused by the negligence of Tenant, its agents, concessionaires, officers, employees, contractors, licensees or invitees), or unavoidable accident or Act of God. Tenant will not overload the electrical wiring serving the Premises or within the Premises, and will install at its expense, subject to the provisions of Section 9.4, any additional electrical wiring which may be required in connection with Tenant's apparatus. Any damage or injury sustained by any person because of mechanical, electrical, plumbing, HVAC equipment or any other equipment or installations, whose maintenance and repair shall be the responsibility of Tenant shall be paid for by Tenant, and Tenant hereby agrees to indemnify, defend and hold Landlord and the owner and any manager of Landlord's Buildings harmless from and against all claims, actions, damages and liability in connection therewith, including, but not limited to attorneys' and other professional fees and any other cost which Landlord might reasonably incur.

Section 9.3. Damage to Premises.

Tenant will repair promptly at its expense any damage to the Premises and upon demand, shall reimburse Landlord (as Additional Rental) for the cost of the repair of any damage elsewhere in Landlord's Buildings, in addition to administrative costs equal to ten (10%) percent of the total costs and expenses thereof, caused by or arising from the installation or removal of property in or from the Premises, or otherwise caused by Tenant or its agents, employees or contractors and hereby agrees to indemnify, defend and hold harmless Landlord and the owner and any manager of Landlord's Buildings from and against all claims, actions, damages and liability in connection therewith, including, but not limited to reasonable attorneys' and other professional fees and any other cost which Landlord might reasonably incur, regardless of fault or by whom such damage shall be caused (except to the extent caused by Landlord, its agents, employees or contractors). If Tenant shall fail to commence such repairs within thirty (30) days after notice to do so, Landlord may make or cause the same to be made and Tenant agrees to pay to Landlord promptly upon Landlord's demand, as Additional Rental, the reasonable cost thereof with interest thereon at the Default Rate until paid. In the event of a bona fide emergency or in the event that repairs are necessary to any safety, fire or building basic systems, Landlord shall use reasonable efforts under the circumstances to contact Tenant, and if Landlord is unable to contact Tenant or Tenant fails to respond, or the emergency is of such a nature that immediate

Rev:10/18/14

action is required, Landlord shall be entitled to effectuate any necessary repairs without prior notice to Tenant and charge the cost of same to Tenant who shall pay said costs within thirty (30) days after receipt of Landlord's invoice.

Section 9.4. <u>Alterations by Tenant.</u>

Tenant will not make any alterations, renovations, improvements or other installations in, on or to any part of the Premises (including, without limitation, any alterations of the storefront, signs, structural alterations, or any cutting or drilling into any part of the Premises or any securing of any fixtures, apparatus, or equipment of any kind to any part of the Premises) unless and until Tenant shall have caused plans and specifications therefor to have been prepared, at Tenant's expense, by an architect licensed in the District of Columbia or other duly qualified person and shall have obtained Landlord's written approval thereof and issuance of any required permits; provided, however, Tenant shall be entitled to make interior, non-structural alterations that do not affect the mechanical, electrical or plumbing systems in Landlord's Buildings, not exceeding Two Hundred Thousand Dollars ($200,000.00) in any lease year. If such approval is granted, Tenant shall cause the work described in such plans and specifications to be performed, at its expense, promptly, efficiently, competently and in a good and workmanlike manner by duly qualified and licensed persons or entities, without interference with or disruption to the normal operations of Tenant's business in the Premises and to the operations of tenants or other occupants of Landlord's Buildings. All such work shall comply with all applicable codes, rules, regulations and ordinances.

Section 9.5. <u>Changes and Additions to Landlord's Buildings.</u>

Landlord reserves the right at any time and from time to time to (a) make or permit changes or revisions in the plan for Landlord's Building Area, Landlord's Buildings including but not limited to, additions to, subtractions from, rearrangements of, alterations of, modifications of, or supplements to, the building areas, walkways, driveways, parking areas, if any, or other Common Areas, (b) construct other buildings or improvements in Landlord's Building Area or demolish same (including any portion of the Common Areas), make alterations thereof or additions thereto (including any portion of the Common Areas), build additional stories on or in any such building(s) (or Common Areas) and build adjoining same, and construct additional double-deck, elevated or sub-surface parking facilities, (c) acquire additional property or properties which Landlord, at Landlord's sole election, may include within Landlord's Buildings as Common Area or otherwise, and (d) make or permit changes or revisions in Landlord's Building Area and Landlord's Buildings, including additions thereto, subtractions therefrom, relocations, rearrangements, and/or alterations thereof. No exercise by Landlord of any rights herein reserved shall entitle Tenant to any compensation, damages or abatement of Rental from Landlord for any injury, inconvenience or loss of business thereby, provided that Landlord makes reasonable efforts to complete any work or repairs in a timely manner.

Notwithstanding anything to the contrary set forth herewith, no such changes, alterations, rearrangements, modifications or diminishments of Common Areas by Landlord shall materially

Rev:10/18/14

adversely affect the visibility or frontage of the Premises, or materially adversely interfere with the conduct of Tenant's customary business.

Section 9.6.  Roof and Walls.

Landlord shall have the exclusive right to use all or any part of the roof of the Premises for any purpose; and to install, maintain, use, repair and replace within the Premises pipes, ducts, conduits, wires and all other mechanical equipment serving other parts of Landlord's Building Area, provided that Landlord shall give Tenant at least seven (7) days' prior written notice of the performance of any such work within the Premises, except in the event of an emergency. Landlord shall use reasonable efforts to install such pipes, ducts, conduits or wires in the space above Tenant's finished ceiling (or if Tenant does not have a finished ceiling, then in the space above the height where, in Landlord's opinion, a finished ceiling would otherwise exist) or in other locations which do not materially interfere with Tenant's use of the Premises and Landlord shall make commercially reasonable efforts to minimize any interference with Tenant's business operations.  Landlord's rights hereunder may be exercised by Landlord's designee.  Landlord may make any use it desires of the side or rear walls of the Premises, provided that such use shall not encroach on the interior of the Premises.

Section 9.7.  Intentionally Omitted.

ARTICLE X
COMMON AREAS

Section 10.1.  Use of Common Areas.

Landlord grants to Tenant and its agents, employees, and customers, a non-exclusive license to use the Common Areas in Landlord's Building Area in common with others during the Term, subject to the exclusive control and management thereof at all times by Landlord or others and subject, further, to the rights of Landlord set forth in Sections 9.5, 9.6 and 10.2.

Section 10.2.  Management and Operation of Common Areas.

Landlord will operate, maintain, and manage, or will cause to be operated, maintained and managed, the Common Areas in a manner deemed by Landlord to be reasonable and appropriate and in the best interests of Landlord's Buildings and Landlord's Building Area. Landlord will have the right (i) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas; (ii) to enter into, modify and terminate easement and other agreements pertaining to the use and maintenance of the Common Areas which shall be enforced on a non-discriminatory basis; (iii) to close all or any portion of the Common Areas to such extent as may, in the opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any rights to any person or to the public therein; (iv) to close temporarily or permanently, from time to time, any or all portions of the Common Areas; (v) to operate for its own account various income-producing facilities in the Common Areas; and (vi) to do and

Rev:10/18/14

perform such other acts in and to said areas and improvements as Landlord shall determine in the exercise of good business judgment. Notwithstanding the foregoing, within the area identified as the "Tenant Protected Area" on Schedule B-4, attached hereto and made a part hereof, Landlord shall not exercise any of the rights set forth above in a manner which would adversely impact: (i) the visibility of the Premises, (ii) the free flow of pedestrian traffic in and around the Premises, and or ingress and egress to and from the Premises; or (iii) the usage of the escalators and elevators in the Common Areas.

Tenant understands that Landlord may use or allow the use of the Common Areas of the Headhouse Building (including, but not limited to, the East and West Halls thereof) for various purposes including, by way of example, and not by way of limitation, public exhibitions. Such use shall not constitute an unreasonable interference with the operation of, access to or visibility of the Premises.

Tenant further understands that Landlord will be using, or allowing the use of, the Common Areas of the Headhouse Building for various functions, including, by way of example and not by way of limitation, benefit balls and private social functions. Landlord shall give Tenant reasonable advance notice of such affairs during which Tenant may be required to close the Premises for business. The use of the public areas for such functions, and any resultant required closings and/or limitation of access, shall not be deemed to be an unreasonable interference with the operation of, access to or visibility of the Premises. Notwithstanding the foregoing, Landlord shall make commercially reasonable efforts to minimize any interference with Tenant's business as a result of any functions occurring in the Common Area of the Headhouse Building.

No exercise by Landlord of any rights reserved in this Section shall entitle Tenant to any compensation, damages or abatement of Rental from Landlord for any injury, inconvenience or loss of business thereby, provided that Landlord makes reasonable efforts to complete any work or repairs in a timely manner.

Section 10.3.  Intentionally Omitted.

Section 10.4.  Intentionally Omitted.

Section 10.5.  Cross Easement Agreement.

Landlord may enter into cross-easement agreements with the owner of any adjacent land and buildings, which cross-easement agreements may provide for the non-exclusive general common use of the Common Areas of the adjacent land by the Retail Tenants and other occupants of Landlord's Buildings, their officers, agents, employees and customers, and reciprocally provide for the non-exclusive general common use of the Common Areas of Landlord's Buildings by the Retail Tenants and other occupants of the adjacent land, their officers, agents, employees and customers.

In order to effectuate the purposes of this Lease and the cross-easement agreements referred to herein, Tenant acknowledges and agrees that the provisions of this Lease relating to

Rev:10/18/14

the Common Areas shall apply with equal force and effect to the Common Areas of any adjacent land as to which a cross-easement agreement exists.

<div align="center">

ARTICLE XI
PARKING
</div>

Section 11.1.  Customer Parking.

Landlord has entered into a certain agreement (the "Parking Agreement") with USRC, owner of the parking garage adjacent to Landlord's Buildings.  In consideration of covenants made by Landlord, the Parking Agreement provides, among other things, that the garage will be open to the public during specified times and on specified conditions.  In addition, Landlord and USRC have agreed that USRC shall adopt a special rate structure and validation program to encourage short-term parking.

Section 11.2.  Intentionally Omitted.

Section 11.3.  Termination of Parking Agreement.

If the Parking Agreement is temporarily or permanently terminated, and such termination results in a complete loss of availability of parking, as provided in the Agreement, for Tenant's customers, such loss shall not constitute an eviction of Tenant or termination of this Lease nor shall such loss of parking be considered a default by Landlord under the terms of this Lease.

<div align="center">

ARTICLE XII
TRADE NAMES, LOGOS AND ADVERTISING MATERIAL
</div>

Section 12.1.  Intentionally Omitted.

Section 12.2.  Trade Names, Logos and Advertising Material.

In advertising Tenant's business in the Premises, Landlord shall have the right to the use of Tenant's logo (provided that Landlord may only use such logo as is then currently in use by Tenant in connection with the operation of its stores, of which Tenant agrees to advise Landlord upon written request) and to name Tenant's store in Landlord's Buildings.  In addition, within five (5) days of Landlord's request, Tenant shall provide Landlord with five (5) original copies of Tenant's most recent advertising material and menu (if applicable) for the use by Landlord in advertising Tenant's business in the Premises. In advertising its business in the Premises, Tenant shall have the right to use the name of Landlord's retail shopping center in Landlord's Buildings, but Tenant shall not sell any goods, wares or merchandise bearing such name without the prior written consent of Landlord.  Any permitted use of all or part of the name identifying Landlord's Buildings during the Term of the Lease shall not be construed to permit the continuance of such

Walgreens v.2
WUS-USI TRANSITION DOCS033648 05/31/24

- 29 -

Rev:10/18/14

use after such termination of the Lease or on locations other than the Premises, and Tenant agrees that such name or other identification of it or its business with the Landlord's Buildings shall not be used after the termination of the Lease or on other than the Premises. Tenant shall use Landlord's Building name, and not solely the street address of the Premises, in all advertising wherein the location of the Premises is mentioned.

Section 12.3.  Intentionally Omitted.

ARTICLE XIII
UTILITIES

Section 13.1.  Water, Electricity, Telephone and Sanitary Sewer.

Landlord will provide, or cause to be provided, the facilities necessary to enable Tenant to obtain for the Premises water, condenser water, electricity, telephone and sanitary sewer service, such facilities and their locations being more specifically described in Schedule B and the locations thereof set forth in the Lease Outline Drawing. Utility meters for utility services used in the Premises will be installed, maintained and repaired by Landlord in accordance with the provisions hereof, at Landlord's sole cost and expense. All utility meters installed in the Premises shall be of the standard, capacity, model and type specified in Schedules B and C-1. The use of any meters deviating in any manner from the specifications set forth therein must be approved in writing by Landlord prior to the installation of such meters in the Premises. Landlord reserves the right to alter the specifications set forth in Schedule C-1 from time to time during the Term of this Lease, following which Tenant, at its sole cost and expense, may be required to modify its existing meters and/or install new meters in place of existing meters to meet the new specifications. In the event Tenant fails to maintain and/or repair utility meters at the Premises in accordance herewith and/or the specifications set forth in Schedule C-1 as same may be revised from time to time, and such failure continues for a period of thirty (30) days following Tenant's receipt of the notification of the need for such repair from Landlord or the utility provider, Landlord may maintain or make such repairs or cause the same to be made and Tenant agrees to pay to Landlord promptly upon Landlord's demand, as Additional Rental the cost of such maintenance or repairs together with interest thereon at the default rate until paid. In the event of a bona fide emergency or in the event certain maintenance or repairs are necessary to any safety, fire or building basic systems, Landlord shall be entitled to effectuate any necessary maintenance or repairs without prior notice to Tenant and charge the reasonable cost of same to Tenant who shall pay said costs within thirty (30) days following receipt of Landlord's invoice therefor. In addition, Landlord shall have the right to test or monitor such meters from time to time during the Term of this Lease and to require maintenance or repairs thereto as set forth above.

Tenant shall arrange for such utility services and shall pay all charges for said services used by it and supplied by a public utility company or public authority or any other person, firm or corporation, including Landlord, supplying the same in the area in which the Landlord's Buildings are located. Tenant shall pay to Landlord monthly, in accordance with bills rendered by Landlord, the cost of any utility provided by Landlord together with its proportionate share of the cost of operating the base building systems to the Premises. If Tenant shall fail to maintain

Rev:10/18/14

or repair such utility meters at the Premises in accordance with the requirements set forth hereinabove, in addition to any other rights of Landlord set forth in this Lease, Landlord or its designee or such other person or entity which is supplying such utility services to the Premises shall be entitled to bill Tenant for utility usage in an amount estimated by Landlord in Landlord's reasonable discretion ("the Alternate Utility Charge"), in addition to administrative costs equal to ten (10%) percent of the total amount due. The Alternate Utility Charge shall be deemed to be final with regard to the month(s) in which it is charged.

Landlord, at its sole discretion, shall have the right, from time to time, to alter the method and source of supply of electricity to the Premises, and Tenant agrees to execute and deliver to Landlord such documentation as may be required to effect such alteration.

Section 13.2. Heating, Ventilating and Air Conditioning.

Landlord shall install the facilities for heating, ventilating and air-conditioning the Premises and Tenant, at Tenant's expense, shall maintain and repair Tenant's portions of the facilities serving the Premises ("the HVAC Maintenance Cost").

For each calendar month during the Term Tenant shall pay to Landlord an amount equal to $.38 per ton-hour of chilled water provided to the Premises and an amount equal to $3.65 per therm of hot water provided to the Premises. Subject to matters outside the reasonable control of Landlord, chilled water and hot water shall be provided to the Premises 24 hours per day, 7 days per week. Landlord represents and warrants that the aforesaid rates for chilled water and hot water are the rates which are, as of the date of this Lease, the rates charged to Landlord by the central plant of the Architect of the Capitol. Landlord and Tenant acknowledge agree that Tenant's rates for chilled water and hot water shall be at the same rates as Landlord's on-going costs and expenses of obtaining chilled water and steam from the central plant of the Architect of the Capitol or from any other third party provider as may be applicable ("HVAC Provider"). In the event and to the extent of any increase of the HVAC Provider rates, the rates payable by Tenant to Landlord shall be proportionately increased. The charges set forth in this paragraph are in payment of the utilities provided only and do not include any payment for repair and maintenance.

In the event Landlord is unable or elects not to obtain chilled water and hot water from the HVAC Provider, Landlord may cause other facilities to be constructed for the provision of chilled water for air-conditioning and energy for heating the Premises, in which event Tenant shall pay to Landlord, as Additional Rental, an Annual HVAC Equipment Charge in an amount equal to $1.90 per square foot of Tenant's Floor Area plus a portion of Landlord's utility and operating expenses in proportion to Tenant's consumption of such chilled water and energy (the "Annual HVAC Equipment Charge"). The fixed ($1.90) portion of the Annual HVAC Equipment Charge shall be increased annually (but never decreased) by the greater of the amount obtained by multiplying said fixed ($1.90) portion of the Annual HVAC Equipment Charge for the preceding Lease Year by a fraction, the numerator of which shall be the Consumer Price Index for the current Lease Year and the denominator of which shall be the Consumer Price Index for the preceding Lease Year, or the actual costs incurred by Landlord. The Annual HVAC Equipment Charge and utility and operating expense charges shall be paid by Tenant in

Rev:10/18/14

monthly installments in such amounts as are estimated and billed by Landlord at the beginning of each applicable billing period, each installment being due on the first (1st) day of each calendar month.  At any time during each such billing period, Landlord may revise its estimate of the Annual HVAC Equipment Charge and utility and operating expense charges and adjust Tenant's monthly installments payable thereafter during such period to reflect such revised estimate. Within one hundred twenty (120) days (or such additional time as is reasonable under the circumstances) after the end of each such billing period, Landlord shall deliver to Tenant a statement of such charges attributable for such period, and the monthly installments paid or payable shall be adjusted between Landlord and Tenant within thirty (30) days of receipt of such statement, and either paid by Tenant or credited to Tenant's account, as the case may be.  An administrative charge of ten percent (10%) shall be added to any of the fees set forth in this Section 13.02.

Section 13.3.  Natural Gas Service.

Natural gas is only available if specifically provided in Schedule B and identified by location on the Lease Outline Drawing. If and to the extent same shall be available to Tenant, natural gas shall be supplied to the Premises by Landlord at Tenant's sole cost and expense.  In addition, Tenant agrees to pay for any and all expenses which may be incurred by Landlord to cap off or seal the gas line to the Premises at such time that Tenant shall vacate the Premises, all such charges to be paid by Tenant within ten (10) days following its receipt of Landlord's invoice therefor.

Section 13.4.  Miscellaneous Utilities.

Tenant shall be solely responsible for and shall promptly pay all charges for miscellaneous utilities not furnished by Landlord under Sections 13.1 and 13.2, such as, but not limited to, telephone, electronic alarm services, or any other utility services used or consumed in the Premises.

Section 13.5.  Fire Protection Sprinkler System.

Landlord will provide and install, or cause to be provided and installed, a fire protection sprinkler system in the Premises as more specifically described in Schedule B, which system shall remain the property of Landlord.  Any revisions to said system, including but not limited to, relocation of heads or expansion of coverage, must be approved by Landlord and be performed by Landlord's contractor at Tenant's sole cost and expense (which cost shall include administrative costs of ten (10%) per cent of the total cost and expenses) as set forth in Schedules B and C-1.  Landlord shall, subject to the provisions of Section 9.1 of this Lease, cause said fire protection sprinkler system to be kept in good repair.  Tenant shall pay Landlord, as Additional Rental, for providing said fire protection sprinkler system, an amount determined by multiplying the Sprinkler Contribution Rate by Tenant's Floor Area, said annual sum ("the Sprinkler Contribution") to be payable in twelve (12) equal monthly installments, in advance on the first day of each calendar month.  The Sprinkler Contribution shall be increased, but never decreased, by the greater of the amount obtained by multiplying the Sprinkler Contribution for the preceding Lease Year by a fraction, the numerator of which shall be the Consumer Price

Rev:10/18/14

Index for the current Lease Year and the denominator of which shall be the Consumer Price Index for the preceding Lease Year, or the actual costs incurred by Landlord, all such increases to be apportioned for fractional years. Landlord represents and warrants to Tenant that the majority of all permanent tenants (i.e. excluding temporary tenants and kiosks) in Landlord's Buildings are charged, and do in fact pay, the Sprinkler Contribution, and acknowledges that Tenant would not agree to pay such Sprinkler Contribution unless a majority of all permanent tenant in Landlord's Buildings are similarly obligated to pay the same.

Landlord shall not be liable to Tenant for any damage to or loss of Tenant's inventory, equipment, fixtures, leasehold improvements or other property caused by or arising from Landlord's failure to make repairs as required of it by Section 9.1 of this Lease to the fire protection sprinkler system in the Premises provided or installed by Landlord.

Section 13.6. <u>Discontinuances and Interruptions of Utility Services.</u>

Landlord shall not be liable to Tenant in damages or otherwise in the event that (i) any utility shall be or become unavailable from any public utility company, public authority or any other person or entity (including Landlord) supplying or distributing such utility, or (ii) any interruption in any utility service caused by the making of any necessary repairs or improvements or by any cause beyond Landlord's reasonable control. Any such unavailability or interruption shall not constitute a termination of this Lease or a constructive eviction of Tenant, provided that Tenant shall be permitted to close its business in the Premises during any period of such unavailability or interruption, and during any such closure, Tenant shall not be obligated to pay any Rental. Tenant shall operate the Premises in such manner as shall not waste any utilities.

<div align="center">

ARTICLE XIV
<u>INDEMNITY AND INSURANCE</u>

</div>

Section 14.1. <u>Indemnity by Tenant.</u>

To the extent permitted by law and subject to Section 14.7., Tenant shall and does hereby indemnify Landlord, its agents, employees, servants and/or contractors and the owner and any manager of Landlord's Buildings and save it harmless and, at Landlord's option, defend it from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' and other professional fees, in connection with loss of life, personal injury and/or damage to property arising from or out of the occupancy or use by Tenant of the Premises or any part thereof or any other part of Landlord's Building Area, occasioned wholly or in part by any act or omission of Tenant, its officers, agents, contractors or employees.

Section 14.2. <u>Landlord Not Responsible for Acts of Others.</u>

Landlord shall not be responsible or liable to Tenant, or to those claiming by, through or under Tenant, for any loss or damage which may be occasioned by or through the acts or omissions of persons occupying space adjoining the Premises or any part of the premises

Rev:10/18/14

adjacent to or connecting with the Premises or any other part of Landlord's Buildings, or otherwise, or for any loss or damage resulting to Tenant, or those claiming by, through or under Tenant, or its or their property, from the breaking, bursting, stoppage or leaking of electrical cable and wires, or water, gas, sewer or steam pipes. To the maximum extent permitted by law, Tenant agrees to use and occupy the Premises, and to use such other portions of Landlord's Buildings as Tenant is herein given the right to use, at Tenant's own risk.

Section 14.3. Tenant's Insurance.

At all times after the Premises are released to Tenant for construction of its improvements, Tenant will carry and maintain, at its expense:

(a) broad form, commercial general liability insurance, including insurance against assumed or contractual liability under this Lease, against any liability arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto, to afford protection with limits, for each occurrence, of not less than Five Million Dollars ($5,000,000), combined single limit with respect to personal injury, death, and property damage, including products and completed operations coverage;

(b) all-risk property insurance, including theft coverage, written at no lesser than eighty percent (80%) of replacement cost value and with replacement cost endorsement, covering all of Tenant's personal property in the Premises (including, without limitation, inventory, trade fixtures, floor coverings, furniture and other property removable by Tenant under the provisions of this Lease) and all leasehold improvements installed in the Premises by or on behalf of Tenant pursuant to Schedule B or otherwise and naming Landlord as loss payee, as Landlord's interest may appear;

(c) comprehensive boiler and machinery equipment coverage, if applicable;

(d) Intentionally Omitted;

(e) If Tenant is permitted to and does sell or dispense alcoholic beverages, liquor liability insurance with limits of not less than One Million Dollars ($1,000,000);

(f) worker's compensation insurance in statutory form and amounts;

(g) employer's liability insurance in an amount not less than:

(i)     Five Hundred Thousand ($500,000.00) Dollars bodily injury by accident, each accident;

(ii)    Five Hundred Thousand ($500,000.00) Dollars bodily injury by disease, policy limit;

(iii)   Five Hundred Thousand ($500,000.00) Dollars bodily injury by disease, each employee;

Rev:10/18/14

(h) business interruption insurance in form and amounts deemed standard and customary in the industry based upon the manner and type of operation of Tenant's business; and,

(i) glass insurance on all plate and other glass (and Landlord may replace at the expense of Tenant any and all plate and other glass damaged or broken from any cause whatsoever in and about the Premises in the event that Tenant does not do so promptly in accordance with Section 8.1 above).

Notwithstanding the above, Tenant's insurance obligations hereunder shall be subject to additional and/or different types of insurance, including a change in the character and/or amount of insurance required hereunder, at any time, and from time to time, during the Term if Landlord, in the exercise of commercial reasonableness, shall deem same necessary. Within twenty (20) days after demand therefor by Landlord, Tenant shall furnish Landlord with evidence that such demand has been complied with by Tenant.

Section 14.4. <u>Tenant's Contractor's Insurance.</u>

Tenant shall require any contractor of Tenant performing work on the Premises to carry and maintain, naming Landlord and Tenant as additional insureds, at no expense to Landlord:

(a) commercial general liability insurance, including contractor's liability coverage, contractual liability coverage, products and completed operations coverage, broad form property damage endorsement and contractor's protective liability coverage, to afford protection, with limits for each occurrence, of not less than Five Million Dollars ($5,000,000);

(b) comprehensive automobile liability insurance with limits for each occurrence of not less than One Million Dollars ($1,000,000) combined single limit covering all owned and non-owned vehicles; and

(c) worker's compensation insurance in statutory form and amounts and employer's liability insurance in an amount not less than $500,000.00.

Section 14.5. <u>Policy Requirements.</u>

(a) The company or companies writing any insurance which Tenant is required to carry and maintain or cause to be carried or maintained pursuant to Sections 14.3. and 14.4., as well as the form of such insurance, shall have an AM Best Company rating of at least A- IX and licensed to do business in the District of Columbia. Public liability and all-risk casualty insurance policies evidencing such insurance shall name Landlord and/or its designee(s), including, without limitation, the property manager, as additional insured, shall be primary and non-contributory, and shall also contain a provision by which the insurer agrees that such policy shall not be cancelled, terminated, materially changed or allowed to lapse without at least thirty (30) days' advance notice to Landlord and/or its designee(s), correctly addressed, by certified mail, return receipt requested. If Tenant shall fail to perform any of its obligations under Sections 14.3., 14.4. or 14.5., Landlord may, upon notice to Tenant and five (5) days opportunity to cure, perform the same and the cost of same shall be deemed Additional Rental and shall be payable immediately upon Landlord's demand. Tenant may satisfy the insurance obligations under Sections 14.3 and 14.4 by use of blanket or umbrella policies,

Rev:10/18/14

provided that Tenant provides Landlord with a certificate of such insurance. Notwithstanding anything to the contrary herein, provided Tenant has a tangible net worth of at least Fifty Million Dollars, Tenant may self-insure any of the insurance obligations set forth above.

Section 14.6. Increase in Insurance Premiums.

Tenant will not do or suffer to be done, or keep or suffer to be kept, anything in, upon or about the Premises which will violate Landlord's policies of hazard or liability insurance or which will prevent Landlord from procuring such policies in companies acceptable to Landlord. If anything done, omitted to be done or suffered by Tenant to be kept in, upon or about the Premises shall cause the rate of fire or other insurance on the Premises or on other property of Landlord or of others within Landlord's Buildings to be increased beyond the minimum rate from time to time applicable to the Premises or to any such property for the use or uses made thereof, Tenant will pay, as Additional Rental, the amount of any such increase upon Landlord's demand.

Section 14.7. Waiver of Right of Recovery.

Neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income, or losses under worker's compensation laws and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees if, and to the extent, that any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to Sections 14.3 and 14.4.

The provisions of this Section shall prevail over any conflicting provision in the Lease or any Rider or amendment thereto, it being the intention of Landlord and Tenant that wherever applicable the waiver of subrogation contained in this Section shall take precedence over any other provision providing for the liability of one party to the other.

Section 14.8. Intentionally Omitted.

ARTICLE XV
DAMAGE AND DESTRUCTION

Section 15.1. Landlord's Obligation to Repair and Reconstruct.

If the Premises shall be damaged by fire, the elements, accident or other casualty, including damages or casualties of war (any of such causes being referred to herein as a "Casualty"), but the Premises shall not thereby be rendered wholly or partially untenantable, Landlord shall promptly cause such damage to be repaired and there shall be no abatement of Rental, but Tenant shall be permitted to close its business during any period that the Premises be rendered wholly or partially untenantable. If, as the result of Casualty, the Premises shall be rendered wholly or partially untenantable, then, subject to the provisions of Section 15.2, Landlord shall cause such damage to be repaired and all Rental (other than any Additional Rental

Rev:10/18/14

due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be abated equitably as to the portion of the Premises rendered untenantable during the period of such untenantability; provided, however, that the breakpoint for payment of Annual Percentage Rental referred to in Section 1.1.H shall also be proportionately reduced by an amount equal to the amount obtained by multiplying said product by a fraction, the numerator of which shall be the length of time the Premises is closed and the denominator of which shall be the length of the Lease Year in question. All such repairs shall be made at the expense of Landlord, but Landlord shall not be required to perform any work beyond providing Tenant with demising walls, in the Premises taped, spackled and ready for paint, and bringing utility services to the point of connection for use in the Premises. Landlord shall not be liable for interruption to Tenant's business or for damage to or replacement or repair of Tenant's personal property (including, without limitation, inventory, trade fixtures, floor coverings, furniture and other property removable by Tenant under the provisions of this Lease) or to any leasehold improvements installed in the Premises by or on behalf of Tenant pursuant to Schedule B or otherwise, all of which damage, replacement or repair shall be undertaken and completed by Tenant promptly.

Section 15.2. <u>Landlord's Option to Terminate Lease.</u>

If as a result of a Casualty (i) the Premises are (a) rendered wholly untenantable, (b) damaged as a result of any cause which is not covered by Landlord's insurance, or (c) damaged or destroyed in whole or in material part during the last three (3) years of the Term, or (d) the cost of replacement of the Premises shall exceed fifty percent (50%) of the then insured value thereof, or (ii) Landlord's Buildings shall be so substantially damaged that it is reasonably necessary in Landlord's sole judgment to demolish such buildings for the purpose of reconstruction, (iii) Landlord's Buildings are damaged to the extent of fifty percent (50%) or more of Landlord's Floor Area or fifty percent (50%) of the then insured value of Landlord's Buildings, or (iv) any Underlying Lease is terminated as a result of damage or destruction to Landlord's Buildings then, in any of such events, Landlord may elect to terminate this Lease by giving to Tenant notice of such election within one hundred twenty (120) days after the occurrence of such event. If such notice is given, the rights and obligations of the parties shall cease as of the date of such notice, and Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be adjusted as of the date of such termination.

Section 15.3. <u>Demolition of Landlord's Buildings.</u>

If Landlord does not elect to terminate this Lease under Section 15.2 (ii) above, but if Landlord's Buildings shall be so substantially damaged that it is reasonably necessary, in Landlord's sole judgment, to demolish such buildings for the purpose of reconstruction, Landlord may demolish the same, in which event the Rental shall be abated to the same extent as if the Premises were rendered untenantable by a Casualty.

Section 15.4. <u>Insurance Proceeds.</u>

If Landlord does not elect to terminate this Lease pursuant to Section 15.2 or if Landlord elects to demolish Landlord's Building as provided in Section 15.3, Landlord shall, subject to the

Rev:10/18/14

prior rights of any Mortgagee, disburse and apply any insurance proceeds received by Landlord to the restoration and rebuilding of Landlord's Buildings in accordance with Section 15.1 hereof. All insurance proceeds payable with respect to the Premises (excluding proceeds payable to Tenant pursuant to Section 14.3), shall belong to and shall be payable to Landlord.

## ARTICLE XVI
## CONDEMNATION

Section 16.1. <u>Taking Resulting in Termination of this Lease.</u>

In the event all or part of Landlord's Building Area is taken by right of eminent domain, whether by condemnation or deed in lieu thereof and either (i) in the opinion of Landlord, the portion so taken is such that a reasonable amount of reconstruction of Landlord's Building Area not so taken will not constitute the same a suitable and practical improvement for the remaining land, or (ii) the portion so taken is such that a reasonable amount of reconstruction of Landlord's Building Area not so taken (to the extent such reconstruction is permitted by the Mortgages and Underlying Ground Leases) will not reasonably allow Tenant to use the Premises for the purpose for which they were demised, then this Lease shall expire and terminate on the date when title vests in the condemning authority and Tenant shall not be responsible for any payments of Rental hereunder with respect to any period after such date. Notwithstanding the foregoing, in the event all or any portion of the Premises is required by the USRC to comply with any present or future governmental law, rule, regulation, requirement, order, direction or reconfiguration, Landlord shall notify Tenant that all or any such portion of the Premises is so required and Tenant shall deliver all or any such portion of the Premises so required to Landlord on the date specified in such notice.

Section 16.2. <u>Partial Taking.</u>

In the event that a portion (but not all) of the Landlord's Building Area is taken, by right of eminent domain, whether by condemnation or deed in lieu thereof, and both: (i) in the opinion of Landlord, a reasonable amount of reconstruction of Landlord's Building Area not so taken will constitute the same a suitable and practical improvement for the remaining land, and (ii) a reasonable amount of reconstruction of Landlord's Building Area not so taken (to the extent such reconstruction is permitted by the Mortgages and Underlying Ground Leases) will reasonably allow Tenant to use the Premises for the purpose for which they were demised, then this Lease shall not cease or terminate but shall remain in full force and effect with respect to the portion of the Premises not so taken or condemned. In the event of a partial taking described in this Section 16.2, if any reconstruction of the Premises is necessary as provided in this Section, then Landlord shall promptly undertake and complete such reconstruction to the extent of available condemnation proceeds. All Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be reduced in the same proportion as the portion of the floor area of the Premises so taken bears to Tenant's Floor Area.

Rev:10/18/14

Section 16.3. Effective Date of Termination.

If any notice of termination is given pursuant to this Section, this Lease and the rights and obligations of the parties hereunder shall cease as of the date of such notice and Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be adjusted as of the date of such termination.

Section 16.4. Condemnation Awards.

All compensation awarded for any taking of the Premises or Landlord's Buildings or any interest in either shall belong to and be the property of Landlord, Tenant hereby assigning to Landlord all rights with respect thereto; provided, however, nothing contained herein shall prevent Tenant from applying for reimbursement from the condemning authority (if permitted by law) for moving expenses or the expense of removal of Tenant's trade fixtures, but only if such action shall not reduce the amount of the award or other compensation otherwise recoverable from the condemning authority by Landlord, USRC or the owner of the fee simple estate in Landlord's Building Area.

## ARTICLE XVII
## ASSIGNMENTS AND SUBLETTING

Section 17.1. Landlord's Consent Required.

Tenant shall not assign this Lease, in whole or in part, nor sublet all or any part of the Premises, nor pledge or encumber by mortgage or other instruments its interest in this Lease, without first obtaining the written consent of Landlord. This prohibition includes any subletting or assignment which would otherwise occur by operation of law, merger, consolidation, reorganization, transfer or other change of Tenant's corporate or proprietary structure, or an assignment or subletting to or by a receiver or trustee in any federal or state bankruptcy, insolvency, or similar proceeding. Consent by Landlord to any assignment or subletting shall not constitute a waiver of the requirement for such consent to any subsequent assignment or subletting. In addition, if Tenant is a partnership and if at any time during the Term of this Lease any person who at the time of execution of this Lease owns a general partner's interest in Tenant ceases to own such general partner's interest, such cessation of ownership shall constitute an assignment of this Lease for all purposes of this Section.

During the first five (5) years of the Term, Landlord may grant or deny consent to any assignment or subletting proposed by Tenant in Landlord's sole and absolute discretion. Commencing on the first day of the sixth (6th) year of the term, Landlord agrees not to unreasonably withhold, delay or condition its consent to any proposed assignment or subletting, subject to the following conditions:

> (i) Upon such assignment or subletting, Landlord shall have the option (which option shall be exercised or waived in Landlord's written notice consenting to the proposed assignment or subletting) to modify the Rental

Rev:10/18/14

payable hereunder for the remainder of the Term, so that in lieu of any Percentage Rental payable for the remainder of the Term of the Lease, Tenant shall pay Annual Basic Rental in an amount equal to the greater of (x) the Fair Market Rental Value for the Premises; (y) the average Annual Percentage Rental (or Deemed Percentage Rental, as the case may be) during the preceding twenty four (24) month period prior to such assignment or subletting or (z) the sum of One Million Two Hundred Sixty Nine Thousand Four Hundred Five ($1,269,405.00) Dollars per annum, commencing as of the sixth (6th) Lease Year and increasing by three percent (3%) per annum for each year thereafter [This amount represents the Deemed Percentage Rent of $3,000/day for the first Lease Year increased by 3% per annum to the sixth Lease Year].

(ii)     In Landlord's reasonable judgment the proposed assignee or subtenant is engaged in a business or activity, and the Premises, or the relevant part thereof, will be used in a manner, which (a) is in keeping with the then standards of Landlord's Buildings, (b) is limited to the Permitted Use or some other first class retail use (such as, by way of example, a retailer of a caliber, price point and merchandizing of Zara, Uniqlo, H&M, and Forever 21) (not otherwise prohibited hereunder or by Schedule G hereof) consistent with the other retail uses within Landlord's Building, as reasonably determined by Landlord, and (c) will not violate any negative covenant as to use contained in any other lease of retail space in Landlord's Buildings or be reasonably determined by Landlord to be in competition with any other tenant or occupant of Landlord's Buildings;

(iii)    The proposed assignee or subtenant is a reputable person of good character and with sufficient financial worth considering the responsibility involved but no less than One Hundred Million ($100,000,000.00) Dollars, and Landlord has been furnished with reasonable proof thereof;

(iv)    Neither (a) the proposed assignee or sublessee nor (b) any person which, directly or indirectly, controls, is controlled by, or is under common control with, the proposed assignee or sublessee, is then an occupant of any part of Landlord's Buildings;

(v)     The proposed assignee or sublessee is not a person with whom Landlord is then negotiating to lease space in Landlord's Buildings;

(vi)    The form of the proposed sublease or instrument of assignment (a) shall be in form reasonably satisfactory to Landlord;

(vii)    There shall only be one (1) occupant of the Premises;

(viii)   The proposed occupancy shall not impose an extra burden upon services to be supplied by Landlord pursuant to this Lease; and

Walgreens v.2
WUS-USI TRANSITION DOCS033659 05/31/24

Rev:10/18/14

(ix)    The proposed subtenant or assignee shall not be entitled, directly or indirectly, to diplomatic or sovereign immunity and shall be subject to the service of process in, and the jurisdiction of the courts of the District of Columbia.

If Landlord consents to any such assignment or subletting, Tenant shall pay to Landlord: (i) the sum of One Thousand Dollars ($1,000.00) to cover Landlord's administrative costs, overhead and counsel fees in connection with such assignment or subletting; and (ii) any additional costs and expenses incurred by Landlord in connection with such assignment or subletting.

In the event of any sublease of the Premises, or assignment of the Lease for all or any portion of the Term, where the Rental reserved in the sublet or assignment exceeds the Rental or pro rata portion of the Rental, as the case may be, for such space reserved in the Lease, Tenant shall pay to Landlord monthly, as Additional Rental, at the same time as the monthly installments of Annual Basic Rental hereunder, one half of the excess of the Rental reserved in the sublease or assignment over the Rental reserved in this Lease applicable to the subleased or assigned space, after deducting Tenant's out of pocket expenses in connection with such assignment or subletting (including without limitation, brokerage commissions, rent concessions, construction allowances, and costs incurred in preparing the Premises for occupancy). No such assignment, subletting, use, occupancy or collection of such excess shall be deemed a waiver of the covenant herein against assignment, subletting, use or occupancy by others, or the acceptance of the assignee, subtenant, user or occupant as Tenant hereunder, or constitute a release of Tenant from the further performance by Tenant of the terms and provisions of this Lease. If this Lease or any interest of Tenant herein be assigned or if the whole or any part of the Premises be sublet or used or occupied by others, after having obtained Landlord's prior written consent thereto, Tenant shall nevertheless remain fully liable for the full performance of all obligations under this Lease to be performed by Tenant and Tenant shall not be released therefrom in any manner. No partial subletting of the Premises shall be permitted.

Tenant shall submit to Landlord a request for permission to assign or sublet this Lease, or any portion thereof or any portion of the Premises, setting forth a proposed commencement date ("Proposed Effective Date") of the sublease or assignment term, which date shall be not less than sixty (60) nor more than one hundred and twenty (120) days after the sending of said notice. Tenant shall include with said notice a copy of the proposed sublease or assignment and copies of all agreements collateral thereto together with a statement of the proposed assignee's or sublessee's business experience and copies of such financial reports or statements as Landlord may reasonably request. In addition to Landlord's right to approve or disapprove the proposed sublease or assignment, as hereinbefore set forth, Landlord shall have the right, to be exercised by giving notice to Tenant within thirty (30) days after receipt of Tenant's notice as aforesaid, to recapture the Premises described in the proposed sublease or assignment. If notice of recapture is given, it shall serve to cancel and terminate this Lease with respect to the proposed sublease or assignment space, or, if the proposed sublease or assignment covers the entire Premises and Term, it shall serve to cancel and terminate the entire Term of this Lease, in either case as of the Proposed Effective Date and as fully and completely as if that date had been definitely fixed as

Rev:10/18/14

the expiration of the Term of this Lease. The failure of Landlord to exercise its right of recapture shall not be construed in any manner to be an approval of Tenant's request to assign or sublet, such approval to be effective only if given in writing by Landlord to Tenant.

Notwithstanding anything to the contrary contained herein, Tenant shall have the right, without Landlord's prior consent, to assign this Lease to: (1) Tenant's parent; or (2) the holder of the majority of the issued and outstanding shares of Tenant or of the parent corporation of Tenant; (3) a bona fide wholly-owned or majority owned subsidiary of Tenant or of the parent corporation of Tenant; (4) any corporation with which Tenant is merged or consolidated; or (5) a purchaser of all or substantially all of Tenant's stock ((1) through (5) shall hereinafter be referred to as "Permitted Transfers"); provided that;

(i)      Tenant shall give Landlord due written notice of its intent to assign this Lease and shall identify such proposed assignee;

(ii)      Such proposed assignee or sublessee shall assume in writing, in form and substance acceptable to Landlord, all the obligations and liabilities of Tenant under this Lease;

(iii)      Tenant shall remain liable for all of its obligations and liabilities under this Lease;

(iv)      Tenant is not then in default of this Lease;

and, with respect to a transfer pursuant to subparagraph (3) through (5) above only, provided further that:

(v)      such proposed assignee (or the entity operating the Leased Premises) shall have substantial prior retail experience and a tangible net worth equal to or greater than Two Hundred Fifty Million Dollars ($250,000,000.00).

Notwithstanding anything to the contrary contained herein, Tenant shall have the right, without Landlord's prior consent, to license or permit a portion or portions of the Premises to be used for concessions, leased or licensed departments and demonstrations in connection with and as part of the operation of Tenant's business and permitted under the Permitted Use section of the Lease, and the Gross Sales therefrom shall be included in the Gross Sales of Tenant.

Section 17.2. Transfer of Corporate Shares.

If Tenant or Tenant's parent is a corporation (other than a corporation the outstanding voting stock of which is listed as of the date of execution of this Lease on a "national securities exchange", as defined in the Securities Exchange Act of 1934) and if, at any time after execution of this Lease, any part of the corporate shares shall be transferred by sale, assignment, bequest, inheritance, operation of law or other disposition (including, but not limited to, such a transfer to or by a receiver or trustee in federal or state bankruptcy, insolvency, or other proceedings) so as to result in a change in the present control of said corporation by the person(s) now owning a majority of said corporate shares, Tenant shall give Landlord notice of such event, and whether or not Tenant has given such notice, Landlord may elect to terminate this Lease at any time

WUS-USI TRANSITION DOCS033661 05/31/24

Rev:10/18/14

thereafter by giving Tenant notice of such election, in which event this Lease and the rights and obligations of the parties hereunder shall cease as of a date set forth in such notice which date shall not be less than sixty (60) days after the date of such notice.  In the event of any such termination, all Rental (other than any Additional Rental due Landlord resulting from Tenant's failure to perform any of its obligations hereunder) shall be adjusted as of the date of such termination.  Landlord and Tenant acknowledge that, as of the date of this Lease, Tenant has publicly announced its intentions to consummate a merger with Alliance Boots, which merger, if consummated, will result in Tenant being a wholly-owned subsidiary of Walgreen Boots Alliance, a Delaware corporation, the outstanding voting stock of which will be listed on a "national securities exchange", as defined in the Securities Exchange Act of 1934 (the "Walgreen Alliance Boots Merger").  Notwithstanding anything to the contrary contained in this Lease, Landlord hereby acknowledges that the Walgreen Alliance Boots Merger shall not require the consent of Landlord, nor shall said merger result in any change in the rights or remedies of Landlord and Tenant under this Lease.

Section 17.3.  Acceptance of Rent from Transferee.

The acceptance by Landlord of the payment of Rental following any assignment or other transfer prohibited by this Article shall not be deemed to be a consent by Landlord to any such assignment or other transfer nor shall the same be deemed to be a waiver of any right or remedy of Landlord hereunder.

Section 17.4.  "Tenant's Bankruptcy" Defined.

"Tenant's Bankruptcy" means (1) the application by Tenant or its or their consent to the appointment of a receiver, trustee or liquidator of Tenant or a substantial part of its assets, (2) the filing of a voluntary petition in bankruptcy or the admission in writing by Tenant of its inability to pay its debts as they become due, (3) the making by Tenant of an assignment for the benefit of its creditors, (4) the filing of a petition or an answer seeking a reorganization or an arrangement with its creditors or an attempt to take advantage of any insolvency law, (5) the filing of an answer admitting the material allegations of a petition filed against Tenant in any bankruptcy, reorganization or insolvency proceedings, (6) the entering of an order, judgment or decree by any court of competent jurisdiction finding Tenant to be a debtor or an insolvent, approving a petition seeking such a reorganization, or appointing a receiver, trustee or liquidator of Tenant or of all or a substantial part of its assets, (7) the commencing of any proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership or similar law, and the continuation of such order, judgment, decree of proceeding unstayed for any period of sixty (60) consecutive days after the expiration of any stay thereof, or (8) the admitting by Tenant, in writing, of its inability to pay debts when due.

Neither Tenant's interest in this Lease, nor any estate created hereby in Tenant nor any interest herein or therein, shall pass to any trustee or receiver or assignee for the benefit of creditors or otherwise by operation of law except as may specifically be provided by the Bankruptcy Code, Title 11 U.S.C. (the "Bankruptcy Code").

Rev:10/18/14

<div align="center">

ARTICLE XVIII

DEFAULT

</div>

Section 18.1. "Event of Default" Defined.

Any one or more of the following events shall constitute an "Event of Default":

(a) The sale of Tenant's interest in the Premises under attachment, execution or similar legal process.

(b) The admission in writing by Tenant of its inability to pay its debts when due.

(c) Tenant's Bankruptcy as defined in Section 17.4, unless any action or proceeding as set forth therein is withdrawn or dismissed within thirty (30) days after the date of filing.

(d) The failure of Tenant to pay any Rental or other sum of money within ten (10) days after the same is due hereunder.

(e) Default by Tenant in the performance or observance of any covenant or agreement of this Lease (other than default involving the payment of money), which default is not cured within thirty (30) days after the giving of notice thereof by Landlord, unless such default is of such nature that it cannot be cured within such thirty (30) day period, in which case no Event of Default shall occur so long as Tenant shall commence the curing of the default within such thirty (30) day period and shall thereafter diligently prosecute the curing of same but in no event later than ninety (90) days after the date notice is given by Landlord to Tenant.

(f) The vacating or abandonment of the Premises by Tenant at any time during the Term of this Lease.

(g) A failure by Tenant to conduct and operate its business in accordance with Section 4.4 hereof.

(h) If Tenant or an agent of Tenant shall knowingly falsify any report to be furnished to Landlord pursuant to the terms of this Lease.

(i) Intentionally omitted.

(j) The occurrence of any other event described as constituting an "Event of Default" elsewhere in this Lease.

Section 18.2. Bankruptcy.

Upon the filing of a petition by or against Tenant under the Bankruptcy Code and upon such filing of the petition, Tenant, as debtor or as debtor in possession, agrees:

WUS-USI TRANSITION DOCS033663 05/31/24

Rev:10/18/14

(a) To perform promptly and fully each and every obligation of Tenant under this Lease, including but not limited to the obligations set forth in Section 5.1 of this Lease, until such time as this Lease is either rejected or assumed by order of a United States Bankruptcy Court or other United States Court of competent jurisdiction; or deemed rejected by operation of law, pursuant to 11 U.S.C. §365.

(b) Notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord hereunder, whether or not expressly denominated as rent, shall constitute "rent" for the purposes of Section 502(b)(6) of the Bankruptcy Code, including, without limitation, reasonable attorney's fees incurred by Landlord by reason of Tenant's bankruptcy.

(c) It is understood and agreed that this is a "lease of real property in a shopping center" and a lease of "non-residential property" as such terms are used in the Bankruptcy Code.

(d) Included within and in addition to any other conditions or obligations imposed upon Tenant in the event of assumption and/or assignment are the following:

(1)     In the event of assignment, the execution and delivery to Landlord of an instrument by which the assignee assumes all of the obligations arising under this Lease from and after the date of assignment pursuant to the provisions of the Bankruptcy Code.

(2)     The cure of any defaults resulting from any such default, within thirty (30) days after assumption.

(3)     The use of the Premises as set forth in Section 1.1.E hereof and the maintenance of the quality, quantity and/or lines of merchandise of any goods or services required to be offered for sale, it being understood and agreed that compliance with the provisions of Section 1.1.E is essential to preserve the tenant mix in Landlord's Buildings.

(4)     In the event of assignment, the assignee may not exercise any option to extend the Term of the Lease.

(5)     Adequate assurance of future performance under the Lease, for the purposes of assumption and/or assignment, shall include adequate assurance:

(i)     of the source of rental and other consideration due under the Lease, and in the event of assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be at least equal to the financial condition and operating performance of the Tenant, as of the time the Tenant became the lessee under the Lease;

(ii)     that any percentage rental due under the Lease will not decline substantially;

(iii)     that assumption or assignment of the Lease is subject to all the provisions thereof, including (but not limited to) provisions such as radius, location, exclusivity

Walgreens v.2                                    - 45 -

WUS-USI TRANSITION DOCS033664 05/31/24

Rev:10/18/14

provisions, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to Landlord's Buildings;

(iv)    that assumption or assignment of the Lease will not disrupt any tenant mix or balance in Landlord's Buildings.

(6)    The adequate assurance and demonstration in writing by a debtor, debtor in possession or assignee of such debtor in possession of such party's sufficient background, including, but not limited to, substantial retailing experience in shopping centers of comparable size and financial ability to operate out of the Premises pursuant to the terms and conditions of this Lease and to meet all other reasonable criteria of Landlord as did Tenant upon execution of this Lease.

(7)    The Premises, at all times, remain a single store and no physical changes of any kind are made thereto unless in compliance with the applicable provisions of this Lease.

(e) Nothing contained in this Section 18.2 shall be deemed in any manner to limit Landlord's rights and remedies under the Bankruptcy Code, as presently existing or as may hereafter be amended.

(f) No default of this Lease by Tenant, either prior to or subsequent to the filing of any such petition, shall be deemed to have been waived unless expressly done so in writing by Landlord.

Section 18.3.  Remedies.

Upon the occurrence of an Event of Default, Landlord, without notice to Tenant in any instance (except where expressly provided for below or by applicable law) may do any one or more of the following:

(a) Intentionally omitted;

(b) perform on behalf and at the expense of Tenant, any obligation of Tenant under this Lease which Tenant has failed to perform and of which Landlord shall have given Tenant notice, the reasonable cost of which performance by Landlord, together with interest thereon at the Default Rate from the date of such expenditure, shall be deemed Additional Rental and shall be payable by Tenant to Landlord upon demand;

(c) elect to terminate this Lease and the tenancy created hereby by giving notice of such election to Tenant, and reenter the Premises, by summary proceedings or otherwise and remove Tenant and all other persons and property from the Premises, and store such property in a public warehouse or elsewhere at the cost of and for the account of Tenant without resort to legal process and without Landlord being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby; or

(d) without terminating this Lease, and from time to time, make such alterations and repairs as may be necessary in order to relet the Premises, and relet said Premises or any part thereof upon

such term or terms (which may be for a term extending beyond the Term of this Lease) at such rental or rentals and upon such other terms and conditions (which may include concessions or free rent and alterations of the Premises) as Landlord in its sole discretion may deem advisable; and, upon each such reletting all rentals received by Landlord shall be applied, first, to the payment of any indebtedness other than Rent due hereunder from Tenant to Landlord; second, to the payment of all costs and expenses of such reletting (including, but not limited to, brokerage fees, attorney's fees and costs of alterations and repairs); third, to the payment of Rent due and unpaid hereunder, and the balance, if any, shall be held by Landlord and applied in payment of future Rent as the same may become due and payable hereunder; or

(e) commence actions for distraint and/or possession as provided by applicable law; or

(f) exercise any other legal or equitable right or remedy which it may have.

Notwithstanding anything in this Lease to the contrary, Tenant waives any and all right to notice to quit from Landlord upon the occurrence of an Event of Default or upon termination of the Lease for any other reason. No reentry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease unless a written notice of such intention be given to Tenant or unless the termination thereof be decreed by a Court of competent jurisdiction. Notwithstanding that Landlord may have relet the Premises without termination, Landlord may at any time thereafter elect to terminate this Lease for any previous breach.

Notwithstanding the provisions of clause (b) above and regardless of whether an Event of Default shall have occurred, Landlord may exercise the remedy described in clause (b) without any notice to Tenant if Landlord, in its good faith judgment, believes it would be materially injured by failure to take rapid action or if the unperformed obligation of Tenant constitutes an emergency.

Any costs and expenses incurred by Landlord (including, without limitation, reasonable attorneys' fees) in enforcing any of its rights or remedies under this Lease shall be deemed to be Additional Rental and shall be repaid to Landlord by Tenant upon demand.

Section 18.4.  Damages.

If this Lease is terminated by Landlord pursuant to Section 18.3., Tenant nevertheless shall remain liable for any Rental and damages which may be due or sustained prior to such termination, all reasonable costs, fees and expenses including, but not limited to, reasonable attorneys' fees, costs and expenses incurred by Landlord in pursuit of its remedies hereunder, or in renting the Premises to others from time to time (all such Rental, damages, costs, fees and expenses being referred to herein as "Termination Damages") and additional damages (the "Liquidated Damages"), which, at the election of Landlord, shall be either:

(i)    an amount equal to the Rental which, but for termination of this Lease, would have become due during the remainder of the Term, less the amount of Rental, if any, which Landlord shall receive during such period from others to whom the Premises may be rented

Rev:10/18/14

(other than any Additional Rental received by Landlord as a result of any failure of such other person to perform any of its obligations to Landlord), in which case such Liquidated Damages shall be computed and payable in monthly installments, in advance, on the first day of each calendar month following termination of the Lease and continuing until the date on which the Term would have expired but for such termination; any suit or action brought to collect any such Liquidated Damages for any month shall not in any manner prejudice the right of Landlord to collect any Liquidated Damages for any subsequent month by a similar proceeding; or

(ii)    an amount equal to the present worth (as of the date of such termination) of the excess of the Rental for the remainder of the Term (presuming that said Term will expire without the exercise by Tenant of any options to renew that are provided herein) over the fair market rental value of the Premises (as determined as of the date of such termination), in which case such Liquidated Damages shall be payable to Landlord in one lump sum on demand and shall bear interest at the Default Rate until paid.  For purposes of this clause (ii), "present worth" shall be computed by discounting such amount to present worth at a discount rate equal to the discount rate then in effect at the Federal Reserve Bank nearest to the location of Landlord's Buildings.

If such termination shall take place after the expiration of two (2) or more Lease Years then, for purposes of computing the Liquidated Damages, the Annual Percentage Rental payable with respect to each Lease Year following termination (including the Lease Year in which such termination shall take place) shall be conclusively presumed to be equal to the average Annual Percentage Rental payable with respect to each complete Lease Year preceding termination.  If such termination shall take place before the expiration of two (2) Lease Years then, for purposes of computing the Liquidated Damages, the Annual Percentage Rental payable with respect to each Lease Year following termination (including the Lease Year in which such termination shall take place) shall be conclusively presumed to be equal to the Percentage Rental which would have been due for the twelve (12) full calendar months immediately preceding the month in which the termination occurs with said twelve (12) month period constituting a Lease Year for the purposes hereof and Percentage Rental calculated as otherwise set forth in this Lease. Termination Damages shall be due and payable immediately upon demand by Landlord following any termination of this Lease pursuant to Section 18.3.

If this Lease is terminated pursuant to Section 18.3, Landlord may relet the Premises or any part thereof, alone or together with other premises, for such term(s) (which may be greater or less than the period which otherwise would have constituted the balance of the Term) and on such terms and conditions (which may include concessions or free rent and alterations of the Premises) as Landlord, in its sole discretion, may determine, but Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet the Premises or any failure by Landlord to collect any rent due upon such reletting.

Section 18.5.  Waiver.

Tenant hereby expressly waives, for itself and all persons claiming by, through or under Tenant, any right of redemption, reentry or restoration of the operation of this Lease under any present or future law including without limitation any such right which Tenant would otherwise

Rev:10/18/14

have in case Tenant shall be dispossessed for any cause or in case Landlord shall obtain possession of the Premises as herein provided.

<div align="center">

ARTICLE XIX
SUBORDINATION AND ATTORNMENT
</div>

Section 19.1. Subordination.

Unless a Mortgagee (as hereinafter defined) shall otherwise elect as provided in Section 19.2., Tenant's rights under this Lease are and shall remain subject and subordinate to the operation and effect of:

(a)     any lease of land only or of land and buildings in a sale-lease-back or lease-sublease-back transaction involving the Premises or Landlord's interest therein;

(b)     any and all Underlying Leases now or hereafter in force with respect to the Premises or Landlord's interest therein as set forth in Schedule E hereto as the same may be extended, modified or amended from time to time, and if the holder of a mortgage or deed of trust on the leasehold estate created by any such Underlying Lease, or such holder's designee or nominee, should ever become a party to a new lease in replacement or substitution of such leasehold estate, to such new lease in each case at the election of the lessor under such Underlying Lease and any extensions, modifications or amendments thereof, each such new lease being deemed, for purposes of this Article XIX, to be an Underlying Lease; and

(c)     any mortgage, deed of trust or other security instrument constituting a mortgage lien upon the Premises or Landlord's interest therein, whether the same shall be in existence at the date hereof or created hereafter, any such lease, mortgage, deed of trust or other security instrument being referred to herein as a "Mortgage", and the party or parties having the benefit of the same, whether as lessor, mortgagee, trustee or noteholder, being referred to herein as a "Mortgagee."  The respective rights to subordinate this Lease at the election of any such Mortgagee shall continue during any renewal, modification, consolidation, replacement or extension of each such Underlying Lease or Mortgage, and shall apply to any and all advances made or hereafter made on the security of each such Mortgage.  Tenant's acknowledgment and agreement of subordination provided for in this Section are self-operative and no further instrument of subordination shall be required; however, Tenant shall execute such further assurances thereof as shall be requisite or as may be requested from time to time by Landlord or any Mortgagee.  Notwithstanding anything to the contrary herein, Landlord shall obtain a duly executed Subordination, Nondisturbance and Attornment Agreement in a commercially reasonable form from Landlord's Mortgagee within ninety (90) days of the Effective Date.

Section 19.2. Mortgagee's Unilateral Subordination.

If a Mortgagee shall so elect by notice to Tenant or by the recording of a unilateral declaration of subordination, this Lease and Tenant's rights hereunder shall be superior and prior in right to the Mortgage of which such Mortgagee has the benefit, with the same force and effect

Rev:10/18/14

as if this Lease had been executed, delivered and recorded prior to the execution, delivery and recording of such Mortgage, subject, nevertheless, to such conditions as may be set forth in any such notice or declaration.

Section 19.3. Attornment.

If any person shall succeed to all or part of Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease or otherwise, this Lease shall remain in full force and effect unless such successor in interest elects to terminate this Lease by serving notice to Tenant of such termination, and if so requested or required by such successor in interest, Tenant shall attorn to such successor in interest and shall execute such agreement in confirmation of such attornment as such successor in interest shall reasonably request.  If this Lease shall continue in full force and effect after a transfer of Landlord's interests in the Premises, Tenant shall not be credited with any Rental allocable to the period after such transfer of interest that had been paid more than thirty (30) days in advance of its due date.

Section 19.4. Landlord's Financing

This Lease is hereby made subject to financing, acceptance, revision, alteration, amendment or supplement thereto as may be required by any party or parties having the benefit, whether as Lessor, Mortgagee, trustee or note-holder, of any lease, mortgage, deed of trust or other security instrument.  If Landlord can obtain financing or refinancing only upon the basis of modifications of the terms and/or provisions of this Lease, Landlord shall have the right to cancel this Lease if Tenant refuses to approve in writing any such modifications within thirty (30) days after the Landlord's request therefor.  In the event Landlord exercises such right to cancel this Lease, it shall constitute a valid cancellation thereof and this Lease shall cease and terminate as of the date of the notice of cancellation by Landlord to Tenant.

Notwithstanding anything to the contrary set forth in this Section 19.4., Tenant reserves the right to refuse to sign a modification of this Lease and Tenant's possession hereunder shall in no way be disturbed or interfered with in the event that the modification submitted would alter to Tenant's detriment:  (a) the Term of this Lease, including any renewal Terms; (b) Rent; or (c) Tenant's use of the Premises as permitted under this Lease.

<div align="center">

ARTICLE XX
NOTICES

</div>

Section 20.1. Sending of Notices.

Any notice, request, demand, approval or consent given or required to be given under this Lease shall be in writing and shall be given by United States registered or certified mail, return receipt requested, or by a nationally recognized overnight delivery service, with all delivery and postage charges prepaid, and shall be deemed to have been given on the day such notice is actually received or refused, or if unclaimed, on the third day following the day on which the same shall

Walgreens v.2

- 50 -

have been sent by a nationally recognized overnight delivery service or deposited with the United States Post Office. Any such communication if intended for Landlord, shall be addressed to Landlord at Landlord's Notice Address, with copies forwarded to the parties designated in Section 1.1.D, except that payment of Rental and sales reports shall be delivered to the address designated on the Rental invoice prepared by Landlord, or if no address is so designated, then **if By Wire**:

Safra National Bank
ABA# 026003023
Account #: 07215436
Account Name: Union Station Investco LLC f/b/o  Banque J. Safra Sarasin (Luxembourg) SA Collection Account

**Or if By Check**:
Safra National Bank
546 Fifth Avenue
New York, New York 10036
Attention: Branch
Reference: For deposit to account #: 07215436 (account name: Union Station Investco LLC f/b/o  Banque J. Safra Sarasin (Luxembourg) SA Collection Account)

or such other address as shall be designated by Landlord in writing, or if intended for Tenant, to Tenant at the Tenant Notice Address identified in Section 1.1.D. If the Tenant Notice Address is a box number, Tenant shall also provide to Landlord in Section 1.1.D. an alternate Tenant Notice Address which shall be an address for personal service and/or delivery by overnight delivery services (i.e. a "street address").

Either party may, at any time, change its Notice Address for the above purposes by sending a notice to the other party stating the change and setting forth the new address, provided, that in all instances the Notice Address must be within the continental United States.

Section 20.2. Notice to Mortgagees and Right to Cure.

Landlord hereby notifies Tenant that the Premises and Landlord's Building Area are subject to the Mortgage and Underlying Leases set forth on Schedule E attached hereto and made a part hereof and Landlord agrees promptly to notify Tenant of the placing of any additional Underlying Leases and Mortgages against the Landlord's Buildings or leasehold estate therein. Tenant shall give the mortgagees and lessors shown on Schedule E, and any other mortgagee under any Mortgage or lessor under any Underlying Lease, by certified or registered mail, or by nationally recognized overnight delivery service (e.g. FedEx and UPS), a copy of any notice of default served by Tenant upon the Landlord, provided that with respect to such other mortgagee under any Mortgage or lessor under any Underlying Lease not listed in Schedule E, prior to such default Tenant has been notified, in writing (by way of notice of Assignment of Rents and Leases, or otherwise) of the address of such mortgagee or lessor and of such mortgagee's or lessor's desire to receive such notices from Tenant. Tenant shall not terminate this Lease because of a default that with notice and the passage of time would constitute a default by Landlord unless Tenant has given, to all such mortgagees and lessors who have so requested notice, notice of such default and the time as specified for the curing of such default as permitted by this Lease

Rev:11/12/14

shall have expired after the giving of such notice without such default having been cured. If Tenant exercises any of its other remedies under this Lease because of a default by Landlord without having given each such mortgagee and lessor the notice and period of time to cure as set forth in the immediately preceding sentence, then any mortgagee or lessor not receiving such notice and time to cure shall not be bound by the Tenant's exercise of such remedies nor the costs associated therewith. The performance by any such mortgagee or lessor of any condition or agreement on the part of Landlord to be performed hereunder shall be deemed to have been performed with the same force and effect as though performed by Landlord.

## ARTICLE XXI
## MISCELLANEOUS

Section 21.1. Option to Terminate Lease.

Notwithstanding any provision herein to the contrary, if, despite Landlord's commercially reasonable efforts, Landlord fail or be unable able to make the Premises Ready for Occupancy within two (2) years following execution and delivery of the Lease by Landlord, Landlord or Tenant may elect to terminate this Lease by giving notice of such election to the other party. If such notice is given, this Lease and the rights and obligations of the parties hereunder shall thereupon cease and terminate without need for the execution of any further or other instrument but, if Landlord shall request, Tenant shall execute an instrument, in recordable form, whereby Tenant releases and surrenders all right, title and interest which it may have in and to the Premises under this Lease or otherwise.

Section 21.2. Excuse of Landlord's Performance.

Anything in this Lease to the contrary notwithstanding, provided such cause is not due to the willful act or gross neglect of Landlord, Landlord shall not be deemed in default with respect to the performance of any of the terms, covenants and conditions of this Lease if the same shall be due to any strike, lock-out, civil commotion, war-like operation, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, inability to obtain any material, service or financing, through Act of God or other cause beyond the control of Landlord.

Section 21.3. Estoppel Certificates.

At any time and from time to time on no more than three (3) occasions in any Lease Year, within ten (10) days after Landlord shall request the same, Tenant will execute, acknowledge and deliver to Landlord and to such Mortgagee or other party as may be designated by Landlord, a certificate in a form requested by Landlord or in the form attached hereto as Schedule D with respect to the matters set forth in Schedule D and such other matters relating to this Lease or the status of performance of obligations of the parties hereunder as may be reasonably requested by Landlord. The matters as set forth in said certificate may be relied upon by the requesting party and any other party for whose benefit such certificate is requested if referred to in the request. If Tenant fails to provide such certificate within ten (10) days after

WUS-USI TRANSITION DOCS033671 05/31/24

Rev:11/12/14

request by Landlord therefor, Tenant shall be deemed to have approved the contents of any such certificate submitted to Tenant by Landlord and Landlord is hereby authorized to so certify.

Section 21.4.  Inspections and Access by Landlord.

Tenant will permit Landlord, its agents, employees and contractors to enter all parts of the Premises (provided that, in the event that Tenant operates a pharmacy in the Premises, Landlord shall not have the right to enter said pharmacy) during Tenant's business hours upon reasonable advance notice and in a manner to minimize disruption to Tenant's business to show them to prospective purchasers of the Building and potential lessees of the Premises (but as to lessees only during the last six (6) months of the Term or if Tenant is in default of the terms of this Lease and has been notified thereof,) and to inspect the same and to enforce or carry out any provision of this Lease, including, without limitation, any access necessary for the making of any repairs which are Landlord's obligation hereunder.  If Tenant shall not be personally present to open and permit an entry into said Premises at any time when a bona fide emergency exists, Landlord or Landlord's agents may forcibly enter the same, without rendering Landlord or such agents liable therefor, and without in any manner affecting the obligations and covenants of this Lease.

If an excavation shall be made upon land adjacent to the Premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation license to enter upon the Premises for the purpose of doing such work as Landlord shall deem necessary to preserve the wall or the building of which the Premises are a part from injury or damage and to support the same by proper foundation.  Except in the event, but only to the extent, of the negligence of Landlord, Landlord shall not be liable for any personal injury or damage to or loss of Tenant's inventory, equipment, fixtures, leasehold improvements or other property caused by or arising from the exercise of Landlord's rights hereunder.

Section 21.5.  Memorandum of Lease.

The parties hereby agree that, upon the request of Landlord or Tenant, the parties hereto will execute, acknowledge and deliver a short form or memorandum of this Lease in recordable form.  Recording, filing and like charges and any stamp, charge for recording, transfer or other tax resulting from Landlord's recordation of any such document shall be paid by Landlord.  In the event of termination of this Lease, within thirty (30) days after written request from Landlord, Tenant agrees to execute, acknowledge and deliver to Landlord an agreement removing such short form of lease from record.  If Tenant fails to execute such agreement within said thirty (30) day period or fails to notify Landlord within said thirty (30) day period of its reasons for refusing to execute such agreement, Landlord is hereby authorized to execute and record such agreement removing the short form of lease from record.  The provisions of this Section 21.5 shall survive any termination of this Lease.

Section 21.6.  Remedies Cumulative.

No reference to any specific right or remedy shall preclude Landlord from exercising any other right or from having any other remedy or from maintaining any action to which it may

Rev:11/12/14

otherwise be entitled at law or in equity. No failure by Landlord to insist upon the strict performance of any agreement, term, covenant or condition hereof, or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial Rental during the continuance of any such breach, shall constitute a waiver of any such breach, agreement, term, covenant or condition. No waiver by Landlord of any breach by Tenant under this Lease or of any breach by any other tenant under any other lease of any portion of Landlord's Buildings shall affect or alter this Lease in any way whatsoever.

Section 21.7. Successors and Assigns.

This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord, its successors and assigns, and shall be binding upon Tenant, its successors and assigns and shall inure to the benefit of Tenant and only such assigns and subtenants of Tenant to whom the assignment or subleasing of this Lease by Tenant has been consented to in writing by Landlord. Upon any sale or other transfer by Landlord of its interest in the Premises and in this Lease, and the assumption by Landlord's transferee of the obligations of Landlord hereunder thereafter arising, Landlord shall be relieved of all obligations accruing thereafter.

Section 21.8. Compliance with Laws and Regulations.

Tenant, at its sole cost and expense, shall comply, and shall cause the Premises to comply with (a) all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations and ordinances affecting any part of the Premises, or the use thereof, including, but not limited to, those which require the making of any unforeseen or extraordinary changes, whether or not any such statutes, laws, rules, orders, regulations or ordinances which may be hereafter enacted involve a change of policy on the part of the governmental body enacting the same, and (b) all rules, orders and regulations of the National Board of Fire Underwriters, Landlord's casualty insurer(s) and other applicable insurance rating organizations or other bodies exercising similar functions in connection with the prevention of fire or the correction of hazardous conditions which apply to the Premises.

The parties acknowledge that the Americans With Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.) and regulations and guidelines promulgated thereunder, as all of the same may be amended and supplemented from time to time (collectively referred to herein as the "ADA") establish requirements for business operations, accessibility and barrier removal, and that such requirements may or may not apply to the Premises and Landlord's Buildings depending on, among other things: (1) whether Tenant's business is deemed a "public accommodation" or "commercial facility", (2) whether such requirements are "readily achievable", and (3) whether a given alteration affects a "primary function area" or triggers "path of travel" requirements. The parties hereby agree that: (a) Landlord shall be responsible for ADA Title III compliance in the Common Areas, except as provided below, (b) Landlord shall be responsible for ADA Title III compliance in the Premises in connection with Landlord's Work, including any leasehold improvements or other work to be performed in the Premises under or in connection with this Lease, and (c) Landlord may perform, or require that Tenant perform, and, in either case, Tenant shall be responsible for the cost of, ADA Title III "path of travel" requirements triggered by

WUS-USI TRANSITION DOCS033673 05/31/24

Rev:11/12/14

improvements or alterations in the Premises subsequent to the Commencement Date. Tenant shall be solely responsible for requirements under Title I of the ADA relating to Tenant's employees.

Section 21.9. Environmental Requirements.

(a) Tenant shall not use any portion or all of the Landlord's Building Area or the Premises for the generation, treatment, storage, accumulation, release or threat of release or disposal of "hazardous materials", "hazardous waste", "hazardous substances", "pollutants", "toxic materials" or "oil" (collectively, "Materials") as such terms are used in or defined under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601 et seq., as amended, the Resource Conservation and Recovery Act of 1976, 42 U.S.C. 6901 et seq., as amended, the Toxic Substance Control Act, and any and all other present or future "environmental statutes" which regulate the use of hazardous and/or dangerous substances, and the regulations promulgated thereunder and any and all present or future state and local laws, rules and regulations, without the express prior written consent of Landlord, and then only to extent that the presence and/or discharge of the Materials is (i) properly licensed and approved by all appropriate governmental officials and in accordance with all applicable laws and regulations and (ii) in compliance with any terms and conditions stated in said prior written approval by the Landlord. Tenant may use such Materials in the ordinary course of business, provided that such use is in accordance with all applicable statutes, laws, rules and regulations, and any manufacturer instructions, and provided further that Tenant may not discharge any Materials except as provided by the applicable statutes, laws, rules and/or regulations, and specifically may not discharge any Materials in any public sewer or any drain and/or drainpipe leading or connected thereto. Tenant shall hold Landlord harmless from any such improper discharge by Tenant, including any costs of all necessary clean up activities occasioned by Tenant's actions, whether during the Term or after termination of this Lease.

The provisions of the foregoing paragraph to the contrary notwithstanding, Tenant may employ the normal and reasonable amounts of cleaning and pest control supplies reasonably necessary for maintenance of the Premises so long as such materials are properly, safely and lawfully stored and used by Tenant and the quantity of same does not equal or exceed a "recordable quantity" as defined under 40 C.F.R. 302 and 305, as amended. Tenant shall not be entitled to install any tanks under, on or about the Premises for the storage of Materials without the express written consent of Landlord, which may be given or withheld in Landlord's sole discretion.

(b) Tenant acknowledges that the use, maintenance or storage of chlorofluorocarbons (including but not limited to freon and other so-called CFC's) may hereafter be prohibited or limited by law. In the event use, maintenance or storage of chlorofluorocarbons is hereafter prohibited or limited:

(1) After the use or maintenance of chlorofluorocarbons is prohibited or limited, Tenant shall not thereafter allow, cause, suffer or permit any chlorofluorocarbons to be either placed, stored, maintained, used or kept within the Premises or at any other part of

Rev:11/12/14

Landlord's Buildings which is within or subject to Tenant's rights to control or use, except or in compliance with all applicable laws, regulations, rules and ordinances; and

(2) Tenant shall forthwith contain or otherwise abate (as required by applicable law) all chlorofluorocarbons placed in the Premises after the date of the Lease and Tenant shall pay its pro rata share of the cost to contain or abate chlorofluorocarbons placed or present in the Common Areas at the time or after Tenant took possession of the Premises; and

(3) Landlord shall have the right to abate any chlorofluorocarbons placed in the Premises prior to the date on which Tenant first took possession of the Premises. Landlord shall have no obligation to so abate unless required by law. In conjunction therewith, Landlord shall be entitled to access to the Premises for the purposes of performing any necessary containment or abatement in accordance with applicable law. Furthermore, Tenant shall not be entitled to terminate this Lease or to receive any Rent abatement or to hold Landlord liable for any incidental or consequential damages (such as, but not limited to, damages for business interruption) arising by reason of the fact that any chlorofluorocarbons are present in the Premises at the date of this Lease so long as Landlord performs its obligations under this subparagraph (3) within a reasonable time after the effective date of any law which prohibits further use, storage or maintenance of chlorofluorocarbons within the Premises; and

(4) In addition to the foregoing, Tenant agrees that Tenant shall, at the end of the Term or sooner termination thereof, remove all chlorofluorocarbons which have been placed in the Premises during the Term (regardless of whether the use, storage or maintenance of chlorofluorocarbons is prohibited within the Premises at the end of the Term) unless requested not to do so by Landlord.

(c) Tenant shall notify Landlord immediately upon learning that any provision of this Section has been violated, that there has been a release, discharge or disposal of any Hazardous Substance on a part of the Premises or Landlord's Buildings, that radon gas or urea formaldehyde has been detected on or in the Premises, or that the Premises are subject to any third party claim or action, or threat thereof, because of any environmental condition in or originating from the Premises or Landlord's Buildings. Tenant shall promptly provide Landlord with copies of all correspondence to or from third parties regarding such claims or actions or regarding environmental conditions in or originating from Tenant's operations in the Premises or at Landlord's Buildings.

(d) Tenant shall give to Landlord immediate verbal and follow-up written notice of any actual or threatened spills, releases or discharges of Materials on the Premises, caused by the acts or omissions of Tenant or its agents, employees, representatives, invitees, licensees, subtenants, customers or contractors. In the event of a release, leaking, spilling or deposit (collectively "leak") of any Materials on, in or from the Premises, Tenant shall, at its sole cost and expense, immediately investigate, clean-up and otherwise remediate such leak caused by Tenant, its agents, employees, representatives, invitees, licensees, subtenants, customers or contractors and restore the Premises to the condition that existed prior to commencement of this Lease or the date Tenant took possession of the Premises, whichever is earlier, such investigation, clean up and remediation to be performed in accordance with all Environmental laws and to the satisfaction of Landlord and after Tenant has obtained Landlord's written consent, which shall not be unreasonably withheld. Landlord shall have

Rev:11/12/14

the right, but not the obligation, to enter the Premises and remediate any environmental condition on the Premises to comply with all laws, regulations and ordinances during which time Tenant shall not be entitled to any abatement of Rent. In the event of a release, leaking, spilling or deposit (collectively "leak") of any Materials on, in or from any portion of Landlord's Buildings other than Premises, Landlord shall, at its sole cost and expense, investigate, clean-up and otherwise remediate such leak and restore Landlord's Buildings, such investigation, clean up and remediation to be performed in accordance with all Environmental laws.

(e) Tenant warrants that it will promptly deliver to the Landlord, (i) copies of any documents received from the United States Environmental Protection Agency and/or any state, county or municipal environmental or health agency concerning the Tenant's operations upon the Premises, (ii) copies of any documents submitted by the Tenant to the United States Environmental Protection Agency and/or any state, county or municipal environmental or health agency concerning its operations on the Premises, including but not limited to copies of permits, licenses, annual filings, registration forms and, (iii) upon the request of Landlord, Tenant shall provide Landlord with evidence of compliance with Environmental Laws.

(f) Landlord shall have the right but not the obligation, at all times during the Term of this Lease to (i) inspect the Premises, (ii) conduct tests and investigations and take samples to determine whether Tenant is in compliance with the provisions of this Article, and (iii) request lists of all Hazardous Materials used, stored or located on the Premises; the cost of all such inspections, tests and investigations shall be borne by Tenant.

(g) Tenant shall indemnify, defend and hold harmless Landlord (as well as Landlord's officers, directors, shareholders, employees, partners, servants and agents) [the "Indemnified Parties"] of and from any and all liabilities (including strict liabilities), penalties, demands, actions, costs and expenses (including without limitation legal fees), remediation and response costs, remediation plan preparation costs and any continuing monitoring or closure costs, incurred or suffered by the Indemnified Parties, or asserted by a third party against the Indemnified Parties, directly or indirectly arising due to the breach of Tenant's obligations set forth in this Section. Such indemnification shall survive expiration or earlier termination of this Lease.

(h) In the event of (i) a violation of an Environmental Law, (ii) a release, spill or discharge of Materials on or from the Premises, or (iii) the discovery of an environmental condition requiring response which violation, release, or condition is attributable to the acts or omissions of Tenant, its agents, employees, representatives, invitees, licensees, subtenants, customers or contractors, or (iv) an emergency environmental condition, (collectively referred to as "Environmental Defaults"), Landlord shall have the right, but not the obligation, to immediately enter the Premises and/or to supervise and approve any actions taken by Tenant to address the violation, release or environmental condition; and in the event Tenant fails to immediately address such violation, release or environmental condition, and/or if the Landlord deems it necessary, then Landlord may perform, at Tenant's expense, any lawful actions necessary to address the violation, release, or environmental condition. In addition, Landlord has the right but not the obligation to cure any Environmental Defaults, has the right to suspend some or all of the operations of the Tenant until it has determined to its sole satisfaction that appropriate measures have been taken, and has the right to terminate the Lease upon the occurrence of an Environmental Default.

Rev:11/12/14

(i) Notwithstanding anything to the contrary in this Lease, the Landlord may condition its approval of any assignment or subletting by Tenant to an assignee or subtenant that in the sole judgment of the Landlord does not create any additional environmental exposure.

(j) At the expiration or sooner termination of this Lease, Tenant shall return the Premises to Landlord in substantially the same condition as existed on the Commencement Date or the date Tenant took possession of the Premises, whichever is earlier, free of any leaked Materials in, on or from the Premises. Landlord may require, at Tenant's sole cost and expense at the end of the Term, a clean-site certification, environmental audit or site assessment. However, Landlord represents that it has received no notices of violations of any Environmental laws with regard to the Premises and/or Landlord's Buildings on or before the Commencement Date of this Lease.

(k) Landlord represents to Tenant that upon delivery of possession of the Premises by Landlord, they shall be free of all hazardous materials.

Section 21.10. Captions and Headings.

The Table of Contents and the Article and Section captions and headings are for convenience of reference only and in no way shall be used to construe or modify the provisions set forth in this Lease.

Section 21.11. Joint and Several Liability.

If two or more individuals, corporations, partnerships or other business associations (or any combination of two or more thereof) shall sign this Lease for Tenant, the liability of each such individual, corporation, partnership or other business association to pay Rental and perform all other obligations hereunder shall be deemed to be joint and several and all notices, payments and agreements given or made by, with or to any one of such individuals, corporations, partnerships or other business associations shall be deemed to have been given or made by, with or to all of them. In like manner, if Tenant shall be a partnership or other business association, the members of which are, by virtue of statute or federal law, subject to personal liability, the liability of each such member shall be joint and several.

Section 21.12. Broker's Commission.

Each of the parties represents and warrants that there are no claims for brokerage commissions or finders' fees in connection with the execution of this Lease except as set forth in Section 1.1T and agrees to indemnify the other against, and hold it harmless from, all liability arising from any such claim including, without limitation, the cost of counsel fees in connection therewith. Landlord shall be responsible to pay the brokerage commission pursuant to a separate agreement.

Rev:11/12/14

Section 21.13. No Discrimination.

It is intended that Landlord's Buildings shall be developed so that all prospective tenants thereof, and all customers, employees, licensees and invitees of all tenants shall have the opportunity to obtain all the goods, services, accommodations, advantages, facilities and privileges of Landlord's Buildings, without discrimination because of race, creed, color, sex, age, national origin or ancestry. To that end, Tenant will not discriminate in the conduct and operation of its business in the Premises against any person or group of persons because of the race, creed, color, sex, age, national origin or ancestry of such person or group of persons.

Section 21.14. No Joint Venture.

Any intention to create a joint venture or partnership relation between the parties hereto is hereby expressly disclaimed. The provisions of this Lease in regard to the payment by Tenant and the acceptance by Landlord of a percentage of Gross Sales of Tenant and others is a reservation for rent for the use of the Premises.

Section 21.15. No Modification.

This writing is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms thereof, all negotiations, considerations and representations between the parties having been incorporated herein. No course of prior dealings between the parties or their officers, employees, agents or affiliates shall be relevant or admissible to supplement, explain, or vary any of the terms of this Lease. Acceptance of, or acquiescence in, a course of performance rendered under this or any prior agreement between the parties or their affiliates shall not be relevant or admissible to determine the meaning of any of the terms of this Lease. No representations, understandings, or agreements have been made or relied upon in the making of this Lease other than those specifically set forth herein. This Lease can be modified only by a writing signed by the party against whom the modification is enforceable.

Section 21.16. Severability.

If any portion of any term or provision of this Lease, or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

Section 21.17. Third Party Beneficiary.

Nothing contained in this Lease shall be construed so as to confer upon any other party the rights of a third party beneficiary except rights contained herein for the benefit of a Mortgagee or underlying lessor.

Rev:11/12/14

Section 21.18. Corporate Tenants; Fictitious Names.

If Tenant is a corporation, the persons executing this Lease on behalf of Tenant hereby covenant and warrant that: Tenant is a duly constituted corporation qualified to do business in the District of Columbia; all of Tenant's franchisee and corporate taxes have been paid to date; all future forms, reports, fees and other documents necessary for Tenant to comply with applicable laws will be filed by Tenant when due; and such persons are duly authorized by the board of directors of such corporation to execute and deliver this Lease on behalf of the corporation.

Tenant certifies that if it is operating under a fictitious name that said name has been duly recorded according to the laws of the District of Columbia.

Section 21.19. Applicable Law.

This Lease and the rights and obligations of the parties hereunder shall be construed in accordance with the laws of the District of Columbia.

Although the printed provisions of this Lease were drawn by Landlord, this Lease shall not be construed for or against Landlord or Tenant, but this Lease shall be interpreted in accordance with the general tenor of the language in an effort to reach the intended result.

Section 21.20. Performance of Landlord's Obligation by Mortgagee.

Tenant shall accept performance of any of Landlord's obligations hereunder by any Mortgagee of Landlord.

Section 21.21. Waiver of Jury Trial.

Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding at law or in equity in any court of competent jurisdiction, including, without limitation, any proceeding regarding this Lease or the Landlord-Tenant relationship.

Section 21.22. Limitation of Right of Recovery Against Landlord.

Tenant acknowledges and agrees that the liability of Landlord (which for purposes of this Section shall include all partners, both general and limited, of any partnership, the officers, directors and shareholders of any corporation, and the members of any limited liability company) under this Lease shall be limited to its interest in Landlord's Buildings and any judgments rendered against Landlord shall be satisfied solely out of the proceeds of the sale of its interest in Landlord's Buildings. No personal judgment shall lie against Landlord upon extinguishment of its rights in Landlord's Buildings and any judgment so rendered shall not give rise to any right of execution or levy against Landlord's assets. The provisions hereof shall inure to Landlord's successors and assigns including any Mortgagee. Notwithstanding anything to the contrary in this Lease, in no event shall either Landlord or Tenant be liable for any consequential, punitive,

Rev:11/12/14

special or indirect damages under this Lease. Nothing contained herein shall in any way limit either Landlord or Tenant's right to injunctive relief, if such remedy is otherwise available in accordance with applicable law.

Section 21.23. Intentionally Omitted.

Section 21.24. Intentionally Omitted.

Section 21.25. Intentionally Omitted.

Section 21.26. Conflicts.

If there is any conflict between or among the provisions of this Lease, the provisions of the documents described in Section 1.3 hereof or the provisions of any Rider attached hereto, the provisions of the Rider shall supersede the provisions of said documents and this Lease and the provisions of said documents, as amended from time to time, shall supersede the provisions of this Lease.

Section 21.27. No Accord and Satisfaction.

The acceptance by Landlord of any sums from Tenant (whether as Rental or otherwise) in amounts which are less than the amounts due and payable by Tenant hereunder is not intended, nor shall be construed, to constitute an accord and satisfaction of any dispute between Landlord and Tenant regarding sums due and payable by Tenant hereunder, unless Landlord specifically deems it as such in writing.

Section 21.28. Time of Essence.

Time is of the essence in each and every instance hereunder with respect to the covenants, undertakings and conditions to be performed hereunder by Landlord and Tenant.

Section 21.29. "Person(s)" Defined.

The words "person" or "persons," as used herein, shall mean individual(s), corporation(s), partnership(s), firm(s), other business association(s), or governmental entity or entities, whichever is required by the context, or all of the foregoing if the context so requires.

Section 21.30. Execution of Lease.

THE SUBMISSION OF THIS LEASE FOR EXAMINATION DOES NOT CONSTITUTE A RESERVATION OF OR OPTION FOR THE PREMISES OR ANY OTHER SPACE WITHIN LANDLORD'S BUILDINGS. THIS LEASE SHALL BECOME EFFECTIVE ONLY UPON EXECUTION AND LEGAL DELIVERY THEREOF BY THE PARTIES HERETO. THIS LEASE MAY BE EXECUTED IN MORE THAN ONE COUNTERPART, AND EACH SUCH COUNTERPART SHALL BE DEEMED AN ORIGINAL DOCUMENT.

Rev:11/12/14

Section 21.31. <u>OFAC COMPLIANCE.</u>    Landlord and Tenant each represents and warrants to the other that it is not listed, nor is it owned or controlled by, or acting for or on behalf of any person or entity, on the list of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Assets Control of the United States Department of the Treasury, or any other list of persons or entities with whom Landlord is restricted from doing business with ("OFAC List"). Notwithstanding anything to the contrary herein contained, Tenant shall not permit the Demised Premises or any portion thereof to be used, occupied or operated by or for the benefit of any person or entity that is on the OFAC List. Tenant shall provide documentary and other evidence of Tenant's identity and ownership as may be reasonably requested by Landlord at any time to enable Landlord to verify Tenant's identity or to comply with any legal requirement.   Notwithstanding anything to the contrary herein contained, in the event that Landlord shall sell, assign or otherwise dispose of its interest in this Lease or in Landlord's Buildings, Landlord shall perform commercially reasonable due diligence in order to assure that Landlord's interest in this Lease or in Landlord's Buildings shall not be conveyed to any person or entity on the OFAC List.

Section 21.32. <u>Expedited Arbitration.</u>  In the event of any instance in this Lease where Landlord's consent is required, and such consent is expressly stated to not be unreasonably withheld, delayed or conditioned, any dispute between Landlord and Tenant regarding the withholding of such consent may be submitted by either party to binding Arbitration pursuant to the provisions of this Section.  Any such arbitration shall be held in the District of Columbia before a single arbitrator under the Expedited Procedures provisions of the Commercial Arbitration Rules of the American Arbitration Association or its successor, presently Rules E-1 through E-10.  The arbitrator conducting any such arbitration shall be bound by the provisions of this Lease (including, without limitation, this Section) and shall not have the power to add to, subtract from or otherwise modify such provisions, and the arbitrator shall consider only the specific issues submitted to it for resolution. The arbitrator shall be a qualified, disinterested and impartial person who shall have had at least ten (10) years' experience in the matter being arbitrated.  Landlord and Tenant shall each have the right to appear and be represented by counsel before said arbitrator and to submit such data and memoranda in support of their respective positions in the matter in dispute as may be reasonably necessary or appropriate in the circumstances.  The decision of the arbitrator shall be conclusively binding on the parties, and judgment upon the decision may be entered in any court having jurisdiction.

Section 21.33. <u>Transfer of Title.</u> In the event that Landlord conveys its interest in the Premises to any other person or entity, Tenant shall have no obligation to pay rents or any other charges under this Lease to any such transferee until Tenant has been so notified and has received evidence of such conveyance together with (i) a written direction from such transferee as to the name and address of the new payee of rents and other charges, (ii) such transferee's FEIN or social security number and (iii) the name and address of the party to receive a 1099 from Tenant.  It is understood and agreed that Tenant's withholding of rent and other charges until its receipt of such evidence shall not be deemed a default under this Lease.

Rev:10/18/14

IN WITNESS WHEREOF, the parties hereto intending to be legally bound hereby have executed this Lease as of the day and year first above written.

WITNESS or ATTEST:

Jamika Jenkins

UNION STATION INVESTCO, LLC

By: _____

Name:    Alexander Levine

Title:    Authorized Signatory

LANDLORD

WITNESS or ATTEST:

Barbara J. Francout RNS

WALGREEN CO.

By: _____ (SEAL)

Name: Michael G. Redstone

Title: Director & Managing Counsel

The Tenant

KR, via e-mail

11/4/14

If Tenant is a corporation, the authorized officers must sign on behalf of the corporation, and by doing so such officers make the covenants and warranties contained in Section 21.16. hereof. The Lease must be executed for Tenant, if a corporation, by the president or vice president and be attested by the secretary or assistant secretary, unless the bylaws or a resolution of the board of directors shall provide that other officers are authorized to execute the Lease, in which event, a certified copy of the bylaws or resolution, as the case may be, must be furnished. Tenant's corporate seal must be affixed.

Walgreens v.2

WUS-USI TRANSITION DOCS033682 05/31/24

Rev:10/18/14

### ACKNOWLEDGMENT OF INDIVIDUAL TENANT

STATE OF _Illinois_ )

)SS

COUNTY OF _Lake_ )

BEFORE ME, a notary public in and for said county, personally appeared the above named _Michael P. Redstone_ who acknowledged that he/she/they did sign the foregoing instrument, and that the same is his/her/their free act and deed.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name, and affixed my official seal at _Deerfield, Il._ this _4th_ day of _November_, 20_14_.

_Jane A. Poulos_
Notary Public

My commission expires on _5-28_, 20_17_.

OFFICIAL SEAL
JANE A POULOS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/28/17

### ACKNOWLEDGMENT OF CORPORATE TENANT

STATE OF _New York_ )

)SS

COUNTY OF _New York_ )

Before me, _Tamika Jenkins_ of the state and county aforesaid, personally appeared _Alexander Levine_, with whom I am personally acquainted, (or proved to me on the basis of satisfactory evidence) and who, upon oath, acknowledged him(her)self to be the _____ President (or other officer authorized to execute the instrument) of _Union Station Investco, LLC_, the within named bargainor, a corporation, and that he/she as such _Authorized Signatory_, being authorized so to do, executed the foregoing instrument for the purpose therein contained, by signing the name of the corporation by him(her)self as _Authorized Signatory_.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my official seal at _New York, New York_ this _12th_ day of _November_, 20_14_.

_Tamika Jenkins_
Notary Public

TAMIKA JENKINS
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01JE6205941
Qualified in New York County
Commission Expires May 11, 20 17

My Commission expires _May 11_, 20_17_.

Rev:10/18/14

# UNION STATION

## SCHEDULE A-1

### DESCRIPTION OF LANDLORD'S BUILDING AREA

**Those portions of Lots 171 and 172 in Square 720 known and designated as Union Station in Washington DC described as Parcel A and Parcel B from a Plat of Computation recorded in the office of the Surveyor for the District of Columbia in Survey Book 191, page 21. Reserving and excepting perpetual and assignable easements for the location, construction, and replacement and/or removal of rapid transit facilities and appurtenances, and for the operation and maintenance of the aforesaid rapid transit facilities and appurtenances, within the described land areas to the extent that the same are located beneath and through or over and across Parcels A and B, together with non-exclusive rights of ingress and egress to and from said areas as provided.**

This conveyance is further subject to the following reservations and conditions for and on behalf of Grantor, its successors and assigns:  (a) The continued right of use, possession, operation and maintenance of the Union Station Building concourse, concession areas and related areas presently used for commercial operation by The Washington Terminal Company, its lessees, concessionaires, licensees, passengers, officers, employees, contractors, invitees, and visitors during the period of alteration and construction of the parking facility contemplated by Public Law 90-264 and until the taking of full occupancy by the United States of America pursuant to a lease covering the property herein described, and (b) The right to use, operate, and maintain, as long as required for railroad purposes, the existing tunnel, approaches, and their appurtenances (including, but not limited to, the tracks, signals, catenary, platforms, stairways, passageways, walkways, ramps, all utilities, communication facilities, offices, locker rooms, shops and other miscellaneous facilities) across and below the Union Station Building at the easterly side of the property, and (c) The right to continue as long as required, to use, operate, and maintain with The Washington Terminal Company officers, employees, contractors, invitees and the necessary United States Post Office personnel, the mail conveyor system in the basement of the Union Station Building and the connections thereto, the use of the tunnel connecting the east and west concourse basements to transport mail, the use and access to the adjacent mail buildings and public streets, and the use of the basement truck dock and adjacent floor area to load, unload, sort and transport mail, and (d) The right to continued use of the passageway, roadways, walkways, stairways, and ramps for purposes of access to and from and between The Washington Terminal Company points of operation and the public streets by its passengers, lessees, licensees, concessionaires, officers, employees, contractors, invitees, and visitors and to similar rights of access by means of similar facilities, properly provided for in the plans and specifications of the alterations and construction contemplated by Public Law 90-264, for joint use of these facilities to serve the National Visitor Center, the parking facility, The Washington Terminal company points of operation and other operations, if any, and the right to grant use of these facilities to others, and (e) The right to use, operate, maintain, construct , and reconstruct the utility and communication lines and appurtenances, and access to them, now existent, and as required, for The Washington Terminal Company operations both within and outside the limits of this property, so as to maintain the integrity of the distribution systems in the Union Station

Rev:10/18/14

Building, and (f) The continued right, so long as required for railroad purposes, to use, operate, maintain, construct, and reconstruct the railroad facilities and appurtenances thereon, including but not limited to, the tracks, signals, catenary, platforms, stairways, passageways, walkways, roadways, ramps, all utilities, communication facilities, offices, locker rooms, shops, buildings, and other miscellaneous facilities as are now existent, and as may be required for future railroad operations, uninterrupted by the alterations and construction contemplated by Public, Law 90-264 and with due consideration to the maintenance of, and efficiency of, the railroad operations, and (g) The right to use, operate and maintain a passenger station as long as required for railroad operations, and to lease or license the use of space therein for any lawful purposes so long as the passenger station is required for railroad purposes, and to retain any income derived therefrom, and (h) The right of The Washington Terminal Company's passengers, officers, employees, lessees, licensees, concessionaires, contractors, invitees and visitors to have similar access to and from such passenger station as set forth above.

A-1-3

Rev:10/18/14

## SCHEDULE A-2

# SCHEDULE A-2

WUS-USI TRANSITION DOCS033687 05/31/24



26'-0"  18'-7"

STOREFRONT

EXISTING 39" GRADE
CHANGE, TYP.

165'-7"

PROPOSED
STAIR & RAMP
LOCATIONS

*Walgreens*

(PROPOSED)
± 14,778 SF

100'-6"

STORAGE
± 523 SF

SHARED EGRESS VESTIBULE
± 134 SF



TRAIN
TUNNEL

NOTE:
1. IT IS THE RESPONSIBILITY OF THE TENANT'S ARCHITECT TO FIELD VERIFY
DIMENSIONS, UTILITY LOCATIONS, AND CONDITIONS PRIOR TO EXECUTION OF THE
CONSTRUCTION DRAWINGS. THIS DRAWING IS NOT TO BE USED AS VERIFICATION OF
EXISTING CONDITIONS.
2. ENGINEERING AND LIFE SAFETY ANALYSIS TO BE PERFORMED PRIOR TO ANY
ADDITIONAL DESIGN OR CONSTRUCTION WORK.

N



# UNION STATION
### WASHINGTON D.C.

FOR ILLUSTRATIVE PURPOSES ONLY.
THIS SCHEDULE A-2 SHOULD NOT BE RELIED UPON TO SHOW THE DIMENSIONS OF ANY ITEM LABELED HEREIN, AND IS NOT DRAWN TO SCALE.

# UNION STATION

## SCHEDULE B

## DESCRIPTION OF LANDLORD'S WORK AND TENANT'S WORK

## (CONCOURSE RETAIL)

DELIVERY OF POSSESSION

(a)     (i)     Landlord shall Substantially Complete the Premises no later than 210 days from receipt of all permits and approvals required in connection with the performance of Landlord's Work and at the same time deliver to Tenant a full set of keys to the Premises. Tenant shall accept possession of the Premises upon such Substantial Completion, and the date upon which Tenant accepts possession of the Substantially Completed Premises shall be referred to herein as the "Possession Date".  Tenant shall have no obligation to accept possession of the Premises during the period between the third Monday in October and January 1 (the "Blackout Period"), provided, however, that if Landlord shall so put Tenant into possession during said Blackout Period, then the Possession Date shall be deemed to be January 1 (regardless that physical possession of the Premises has been delivered and accepted prior thereto).  If Tenant shall elect to enter into possession of the Premises during the Blackout Period and opens for business within the Blackout Period, then notwithstanding the foregoing, the Possession Date shall not be delayed to January 1st and, instead, the Possession Date shall be the date that Tenant so entered into possession of the Premises during the Blackout Period.  Subject to the Blackout Period and to Landlord's compliance with the notice provisions of this Article, Tenant shall be required to accept possession of the Premises on the date that the Premises is Substantially Complete (as defined below).  Landlord shall send written notice to Tenant, Attn.: Divisional Vice President of Construction, 106 Wilmot Road, MS 1630, Deerfield, Illinois 60015, with a copy to the Community & Real Estate Law Department, 104 Wilmot Road, MS 1420, Deerfield, Illinois 60015 at least forty-five (45) days (but not more than sixty [60] days) before such possession is to be delivered, provided, however, such notice shall not be sent until Landlord has completed those items set forth on Exhibit "D-45" attached hereto, and if such items are not complete, then said notice shall be ineffective.  Such notice shall set forth the date of delivery of possession, which shall be on a Monday (unless such date is a legal holiday, in which case possession shall be delivered the next business day).  Additionally, as a condition precedent to the delivery of possession of the Premises to Tenant, Landlord shall send written notice to Tenant which shall be certified by Landlord's architect, at least fourteen (14) days prior to the date of delivery of possession which notice shall confirm the date that possession shall be delivered and that the Premises is Substantially Complete and ready for occupancy.  In the event Landlord shall fail to deliver possession of the Premises on the date set forth in such notice, Tenant may hold Landlord liable for any direct additional expenses reasonably incurred by Tenant as a result of such failure.  The Premises upon delivery shall (1) be in good condition and repair; (2) be free of Hazardous Substances (as defined below) ) below; (3) shall fully comply with all lawful requirements (including, without limitation, the Americans With Disabilities Act, 42 U.S.C. Section 12101 et seq. ("ADA"); all municipal laws, ordinances, rules and regulations pertaining to the accommodation of disabled persons; all zoning laws and ordinances; and all building, fire, health and safety codes) with all necessary inspections having been completed in accordance with applicable laws; and (4) shall be constructed in accordance with the provisions

Walgreens v.2

of this Schedule B. Tenant shall have the right, without being deemed to have accepted possession, to enter upon the Premises as soon hereafter as practical to take measurements, and to deliver and install its exterior signs (including, but not limited to, the installation of permanent and temporary signs), and freezer and cooler boxes, upon reasonable prior notice to Landlord provided such entry or delivery shall not delay or interfere with the performance of Landlord's Work, but such entry (or the opening for business) shall not constitute a waiver as to the condition of the Premises or as to any work to be done or changes to be made by Landlord, or as to any other obligations of Landlord hereunder. Any such delivery by Tenant prior to the Possession Date shall be at Tenant's sole risk and Landlord shall have no liability for any loss or damage to such property. Landlord shall secure from the appropriate governmental authority and provide to Tenant prior to delivery of possession of the Premises, such documents as may be required to enable Tenant to lawfully occupy the Premises (such as, by way of example, a final Certificate of Occupancy, or Temporary Certificate of Occupancy permitting occupancy pending the issuance of the final Certificate of Occupancy).

The term "Substantially Complete," as used herein, shall be defined to mean Landlord's delivery of possession of the Premises to Tenant with the following conditions fully performed, satisfied and complied with: (i) Landlord's construction shall have been fully completed in accordance with the requirements of the Plans approved by Tenant [and Tenant's Criteria (as defined below)], subject to only minor punchlist items which in Tenant's good faith determination shall not interfere with Tenant's ability to fixture and merchandise the Premises upon acceptance or to conduct its business therein in accordance with Tenant's business practice; (ii) a certificate from Landlord's architect or engineers observing the construction (in form and substance reasonably acceptable to Tenant) shall be delivered to Tenant certifying that all construction work has been performed in accordance with ADA requirements and the Plans approved by Tenant and Tenant's Criteria; (iii) such documents as may be required to enable Tenant to lawfully occupy the Premises (such as, by way of example, a final Certificate of Occupancy, or Temporary Certificate of Occupancy permitting occupancy pending the issuance of the final Certificate of Occupancy) shall have been issued and delivered to Tenant; (iv) water and other utilities shall have been connected to, and are available to the Premises; and (v) all conditions and obligations of Landlord under this Lease to be then performed by Landlord have been completed and satisfied (including but not limited to Landlord's obligation to provide a Subordination, Nondisturbance and Attornment Agreement pursuant to Section 19.1 hereof). Landlord and Tenant agree that Tenant shall be obligated to accept possession of the Premises after performance by Landlord of each of Landlord's prepossession obligations under this Lease, subject to the timing and notice requirements set forth in this Schedule B.

(ii)    In the event that there are Punchlist Items (hereinafter defined) as of the date of delivery of possession of the Premises to Tenant, Landlord shall promptly and properly complete the same as provided in subparagraph (iii) below. For purposes hereof "Punchlist Items" shall be defined as those incomplete items which, in Tenant's determination  do not materially interfere with Tenant's ability to fixture and merchandise the Premises or open or occupy the same for Tenant's business in accordance with Tenant's customary business practices. None of the items listed on Schedule B-3 shall be considered punchlist items and all of the same must be satisfactorily completed prior to the date of delivery of possession of the Premises to Tenant. Tenant shall provide Landlord with a written statement of Punchlist Items (a "Punchlist Notice") no later than sixty (60) days after the Possession Date.

Walgreens v.2

(iii)   Landlord shall complete the Punchlist Items within sixty (60) days of Landlord's receipt of the Punchlist Notice from Tenant, and upon such completion, Landlord shall send written notice thereof to Tenant's Divisional Vice President of Construction, 106 Wilmot Road, MS 1630, Deerfield, Illinois 60015. Tenant shall re-inspect the Premises within thirty (30) days of Landlord's notice (a "Tenant Re-Inspection") and if Tenant determines as a result of a Tenant Re-Inspection that Landlord has failed to complete the Punchlist Items to Tenant's reasonable satisfaction, Tenant shall notify Landlord of the same within fifteen (15) days of the Tenant Re-Inspection (a "Re-Inspection Notice"), identifying in such notice the then outstanding Punchlist Items which Landlord must complete. If Landlord shall not complete the Punchlist Items within sixty (60) days after receipt of the Punchlist Notice or within thirty (30) days after receipt of a Re-Inspection Notice, as the case may be, then Tenant, at Tenant's option, may correct and complete the Punchlist Items on behalf of Landlord in a commercially reasonable manner, and the full cost and expense reasonably incurred by Tenant in doing so shall be due by Landlord to Tenant within thirty (30) days after receipt of invoice for same from Tenant.

(b)   (i)   (A)   Landlord represents that it has no knowledge concerning any current or previous use of the Premises which would lead a reasonable person to suspect that Hazardous Substances (as defined below) were deposited, stored, released, disposed of or placed upon, about or under the Premises. In order to make the foregoing representation, Landlord states that it has made due inquiry or investigation as appropriate. In the event any Hazardous Substances are otherwise discovered, Landlord, at Landlord's sole cost and expense, prior to the date Landlord delivers possession of the Premises to Tenant, as provided in this Schedule B, shall properly remove and dispose of any such Hazardous Substances and remediate the Premises.

(B)   Any such disposal, removal and remediation required pursuant to this Schedule B shall be conducted in accordance with all applicable Environmental Laws. In the event of any such removal, disposal or remediation by Landlord hereunder, upon completion of the same Landlord shall deliver evidence of necessary governmental inspections and approvals with respect to such removal, disposal and remediation, and any final environmental closure documentation (i.e. a no further action letter) if required. The Premises shall not be Substantially Complete until, and Tenant shall have no obligation to accept delivery of possession of the Premises until Landlord has complied with the provisions of this Subsection (b); provided, however, that Tenant may, at Tenant's option, accept possession of the Premises prior to the completion of remediation if Landlord provides Tenant with the final remediation plans and Tenant determines that the effectuation of said remediation will not adversely impact Tenant's full use and enjoyment of the Premises.

(ii)   "Hazardous Substances" shall mean any hazardous or toxic chemical, waste, byproduct, pollutant, contaminant, compound, product or substance, including, without limitation, asbestos, polychlorinated biphenyls, petroleum (including crude oil or any fraction or by-product thereof), underground storage tanks, and any material the exposure to, or manufacture, possession, presence, use, generation, storage, transportation, treatment, release, disposal, abatement, cleanup, removal, remediation or handling of which is prohibited, controlled or regulated by any Environmental Law.

Walgreens v.2

(iii)   "Environmental Law" shall mean any federal, state, regional, county or local governmental statute, law, regulation, ordinance, order or code or any consent decree, judgment, permit, license, code, covenant, deed restriction, common law, or other requirement presently in effect or hereafter created, issued or adopted, pertaining to protection of the environment, health or safety of persons, natural resources, conservation, wildlife, waste management, and pollution (including, without limitation, regulation of releases and disposals to air, land, water and ground water), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. 9601 et seq., Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Solid and Hazardous Waste Amendments of 1984, 42 U.S.C. 6901 et seq., Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 U.S.C. 1251 et seq., Clean Air Act of 1966, as amended, 42 U.S.C. 7401 et seq., Toxic Substances Control Act of 1976, 15 U.S.C. 2601 et seq., Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. 651 et seq., Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. 11001 et seq., National Environmental Policy Act of 1975, 42 U.S.C. 300(f) et seq., and all amendments as well as any similar state or local statute or code and replacements of any of the same and rules, regulations, guidance documents and publications promulgated thereunder.

(c)   Notwithstanding anything contained in this Lease to the contrary, Tenant's acceptance of physical possession of the Premises in the absence of Substantial Completion, or otherwise in the absence of full satisfaction of any condition precedent to such acceptance or as otherwise provided in this Lease shall in no manner be deemed a waiver of any such requirements.

## LANDLORD'S WORK

(a)   Before delivering possession of the Premises to Tenant, Landlord shall obtain all required zoning and permits (other than Tenant's business licenses) for the construction and operation of the Premises.  If a conditional use permit, special use permit, PUD or other similar approval/variance requiring the review and sanction of an applicable governmental authority is required in order for Landlord to construct the Premises in accordance with this Lease, and to procure the necessary zoning and permits required herein, the form of such conditional use permit, approval or other such document(s), and in particular any covenants and conditions set forth therein, must be pre-approved by Tenant, in writing, and shall not, in any event, impair or restrict Tenant's ability to operate its business for any lawful purpose.  Landlord shall promptly notify Tenant, in writing, of the issuance/granting of such final conditional use permit, special use permit, PUD or other similar approval/variance when issued by the applicable governmental authority in such form as pre-approved by Tenant, and shall provide Tenant with a copy of the same.  Such zoning shall not prohibit the operation of a 24-hour store, the sale of alcoholic beverages or the operation of an in-store health clinic, subject to any applicable licenses or approval that Tenant is obligated to obtain.  In addition, throughout the Term, Landlord shall cooperate with Tenant in securing any necessary permits and approvals required for the operation of Tenant's business, if any.  The Premises shall be completed by Landlord, in accordance with the plans and specifications described below, and shall contain Tenant's specific requirements for the operation of Tenant's business as set forth on Schedule B-2 attached hereto

Walgreens v.2

and made a part hereof, which requirements will include, among other things, the items and installations listed in the Walgreens criteria specifications dated January 2012 the ("Specifications") and criteria drawings dated January 2012 (the "Drawings") as referenced on Exhibit "C" attached hereto, heretofore delivered to Landlord and incorporated herein by reference and made a part hereof. The Specifications and Drawings are hereinafter collectively referred to as "Tenant's Criteria". All such work by Landlord shall be done by contractors selected by Landlord (and in any event compliant with the applicable requirements of subparagraph (g) below). Such work shall comply with the requirements of public authorities, and shall be done in a good, and workmanlike manner, free and clear of all liens and encumbrances for labor and materials furnished to Landlord. Landlord shall secure the manufacturer's warranties as required by Tenant's Criteria described above and shall assign to Tenant each such warranty that pertains to any item or component thereof which Tenant is responsible to maintain or repair under this Lease.

(b)    (i)    Landlord shall deliver to Tenant the CAD files for the Premises within sixty (60) days after execution and delivery of this Lease. Within one (1) month after receipt of the CAD files from Landlord, Tenant shall furnish a fixture plan for the Building to the Landlord, so that the Landlord may prepare and furnish to Tenant plans and specifications covering Tenant's specific requirements. Paper copies of the plans and specifications (collectively the "Plans") prepared by Landlord shall be furnished to Tenant for Tenant's approval within ninety (90) days after receipt of the fixture plan from Tenant. All areas of design and engineering must be certified by and under the direct supervision of architects and engineers licensed and registered in the District of Columbia. Tenant agrees to review said Plans within thirty (30) days of Tenant's receipt thereof and, if not approved or rejected within said period, said Plans shall be deemed approved. Tenant shall not unreasonably withhold its approval of the Plans. In the event Tenant shall reject such Plans within the period provided above, Tenant shall return said Plans to Landlord stamped "Not Approved" indicating the items so rejected. Landlord shall then have thirty (30) days to resubmit the Plans to Tenant, and Tenant shall have thirty (30) days after resubmittal to approve or reject the same. If not approved or rejected within said period, said Plans shall be deemed approved; provided, however, that in no event shall the standards of quality of approved Plans, or of those deemed approved hereunder, be less than those required by Tenant's Criteria, which shall control. If said Plans are rejected after being resubmitted to Tenant, either party may cancel this Lease.

(ii)    If local statute, ordinance, rule or regulation prohibits or requires modifications to Tenant's sign drawings or any other element of the Plans, Landlord or its architect shall (i) so advise Tenant, (ii) revise the Plans as necessary to comply with governmental requirements, and (iii) submit the revised Plans to Tenant for its review and approval.

(iii)    After approval of Plans, Tenant, at Tenant's sole cost and expense, shall have the right to make changes, substitutions and eliminations in said Plans provided, however, that, upon delivery of possession of the Premises, Tenant shall pay all costs and expenses incurred by Landlord on account of any such changes, substitutions and eliminations. As a condition precedent to Tenant's obligation to remit payment to Landlord for such costs and expenses, Landlord shall furnish Tenant reasonably detailed documentation indicating such cost and expenses. The failure of Landlord to furnish such request and documentation within one (1)

Walgreens v.2

year of the Possession Date shall be deemed a waiver by Landlord of Landlord's right to demand payment by Tenant.

(c)    Upon delivery of possession of the Premises, Landlord shall provide a set of construction documents on compact disk including Plans in AutoCAD 2004.dwg format, a full set of photographs (minimum 40) in .jpg format including exterior, site work, interior and roof, and a drawing submittal form.

(d)    All Plans may be used and reused by Tenant regardless of by whom prepared; Landlord shall obtain a license from the design professional who prepared said Plans granting Tenant the unrestricted right to use all or portions of the Plans, provided that all reference to the said design professionals and their practices is removed from subsequently altered Plans. Such Plans may be used by Tenant in their approved form or as modified by Tenant in connection with any alteration or renovation of the Premises. Landlord may use the Plans only in connection with a Walgreen store.

(e)    (i)    Landlord shall notify Tenant (Attn.: Project Manager, Construction Dept.) prior to the commencement of construction. In addition, upon notice to Landlord, Tenant may, from time to time, and at any time prior to the Possession Date, enter upon the Premises for the purpose of inspecting any of the work required to be completed by Landlord hereunder. The foregoing notwithstanding, Tenant shall have the right to make the following inspection (the "Required Inspection"):

(A)    Intentionally Omitted.

(B)    Rough Inspection:  The Rough Inspection shall occur (a) after Landlord has completed all interior plumbing and electrical rough; and (b) prior to the installation of any insulation or drywall.

(ii)    Landlord shall send written notice to Tenant, Attn.: Project Manager, Construction Dept., with a copy to Tenant's field superintendent, at least seven (7) days and not more than fourteen (14) days prior to the date that the work is ready for inspection. Such notice shall set forth the date that all such work is to be completed (the "Anticipated Completion Date"). Tenant shall have the right to inspect the work on the Anticipated Completion Date or such other date as the parties hereto shall agree. In the event that Tenant shall fail to inspect the work on the Anticipated Completion Date (or on such other date as the parties hereto had otherwise agreed) and provided further that any extension of such date would result in a delay in the construction of the Premises, then the right of Tenant to perform such Required Inspection hereunder shall be waived and Landlord shall have the right to continue construction of the Premises as if such Required Inspection had been performed. Any waiver of a Required Inspection shall not be construed so as to waive (a) Tenant's right to any other Required Inspection hereunder; or (b) any of Landlord's obligations under this Lease (including but not limited to Landlord's obligation to correct defects or nonconforming aspects of the work).

(iii)    In the event that a Required Inspection reveals any defective work or work which is not in conformance with the Plans, then Landlord shall, at Landlord's sole cost and expense, and within ten (10) days following such Required Inspection correct all such work to

Walgreens v.2

the reasonable satisfaction of Tenant. Any entry upon the Premises by Tenant or Tenant's failure to identify a defect in construction during any Required Inspection, shall not waive any of Landlord's obligations under this Lease (including but not limited to Landlord's obligation to correct defects or nonconforming aspects of the work). Each Required Inspection is for the sole benefit of Tenant and shall not be relied upon by any other party. Nothing herein contained shall be construed as a waiver of or limitation on any additional rights of Tenant hereunder.

(f)     Landlord warrants that (a) as of the Possession Date, the Premises as constructed shall be structurally sound, well built and fit for Tenant's intended use; and (b) as of the Possession Date, the Premises shall be constructed in accordance with applicable law and the Plans. The foregoing warranties shall terminate one (1) year after the Possession Date, except that such warranties shall survive as provided by applicable law as to defective conditions (including without limitation conditions which do not comply with the Plans or applicable law) which could not be discovered by Tenant in the exercise of reasonable care within one (1) year after the Possession Date.

(g)     Landlord certifies to Tenant that: (i) Landlord is in full compliance with the immigration laws of the United States relating to Landlord's employees assigned by Landlord to perform services for Tenant hereunder; (ii) all of Landlord's employees are authorized by law to work in the United States and Landlord's employees have presented documentation to Landlord that establishes both identity and work authorization in accordance with applicable immigration regulations (and to the best of Landlord's knowledge, information and belief, the documentation presented to Landlord is genuine and accurate); and (iii) Landlord complies with all federal, state and local labor and employment laws, and wage and hour laws, as these laws may relate to Landlord's employees performing services for Tenant (collectively the laws referenced in this Paragraph shall be referred to as the "Immigration and Employment Laws"). After the date hereof, Landlord shall fully comply with all Immigration and Employment Laws in connection with Landlord's performance of services for Tenant hereunder. As of the date of delivery of possession of the Premises, Landlord shall be deemed to have certified to Tenant that Landlord has complied with the Immigration and Employment Laws during the period of time from the date of this Lease through and including the date of delivery of possession of the Premises to Tenant. Commercially reasonable efforts shall be made to award the work to a "responsible employer." A "responsible employer" is an employer who provides workers' compensation insurance for any employees working on the Project, and does not misclassify any such employees as "independent contractors." A reasonable employer shall also comply with any and all legal requirements relating to providing health insurance for its employees (e.g. Patient Protection and Affordable Care Act). Landlord agrees to include language mirroring the foregoing requirements for bidding and the use of a responsible employer in its own contracts with its developer, general contractor or any other contractor; and to require that such language be included in all contracts for work performed on the Project (as defined above).

# SCHEDULE A-2

WUS-USI TRANSITION DOCS033695 05/31/24

26'-8"   18'-4"

STOREFRONT

69'-10"

EXISTING 39" GRADE
CHANGE, TYP.

PROPOSED
STAIR & RAMP
LOCATIONS

166'-6"

*Walgreens*

(PROPOSED)
± 14,778 SF

99'-9"

STORAGE
± 523 SF

SHARED EGRESS VESTIBULE
± 134 SF



NOTE
1. IT IS THE RESPONSIBILITY OF THE TENANT'S ARCHITECT TO FIELD VERIFY
DIMENSIONS, UTILITY LOCATIONS, AND CONDITIONS PRIOR TO EXECUTION OF THE
CONSTRUCTION DRAWINGS. THIS DRAWING IS NOT TO BE USED AS VERIFICATION OF
EXISTING CONDITIONS.
2. ENGINEERING AND LIFE SAFETY ANALYSIS TO BE PERFORMED PRIOR TO ANY
ADDITIONAL DESIGN OR CONSTRUCTION WORK.

DRAFT - NOT A FINAL LEASE EXHIBIT.
FURTHER INVESTIGATION IS REQUIRED.
SUBJECT TO FINAL LIFE SAFETY,
EGRESS & ADA REVIEW.

 N

# UNION STATION
### WASHINGTON D.C.

For illustrative purposes only.
This Schedule A-2 should not be relied upon to show the dimensions of any item labeled herein, and is not drawn to scale.

**SCHEDULE B-1**
**APPROVED FLOOR PLAN AND FIXTURE PLAN**

Walgreens v.2



US-USLTRANSIT-WND-DOCS033697 05/31/24

## SCHEDULE B-2

### WALGREENS CRITERIA DRAWINGS & SPECIFICATIONS - Published January 23, 2012

| SHEET NO. | DRAWING TITLE | DATE |
|---|---|---|
| G-010 | Tile Sheet and Location Plan | Jan. 23, 2012 |
| D-111 | Fixture Floor Plan | Jan. 23, 2012 |
| C-100 | General Project Data and Site Plan | Jan. 23, 2012 |
| C-510 | Civil Engineering Requirements | Jan. 23, 2012 |
| C-520 | Accessible Parking Data | Jan. 23, 2012 |
| C-530 | Receiving Platform Details | Jan. 23, 2012 |
| C-720 | Accessible Grading Plan | Jan. 23, 2012 |
| L-100 | Landscaping Schematic | Jan. 23, 2012 |
| A-111 | General Floor Plan | Jan. 23, 2012 |
| A-121 | Reflected Ceiling Plan | Jan. 23, 2012 |
| A-131 | Roof Plan and Details | Jan. 23, 2012 |
| A-210 | Exterior Elevations | Jan. 23, 2012 |
| A-310 | Exterior Wall Sections | Jan. 23, 2012 |
| A-320 | Allowable Wall Systems | Jan. 23, 2012 |
| A-420 | Standard Details | Jan. 23, 2012 |
| A-510 | Exterior Wall Details | Jan. 23, 2012 |
| A-520 | Roof Details | Jan. 23, 2012 |
| A-530 | Roof, Curb and Door Details | Jan. 23, 2012 |
| A-610 | Door Schedule | Jan. 23, 2012 |
| A-710 | Drive-Thru Service Window Details (E.F. Bavis) | Jan. 23, 2012 |
| A-710 | Drive-Thru Service Window Details (Diebold) | Jan. 23, 2012 |
| A-720 | Free Standing Sign Details | Jan. 23, 2012 |
| A-730 | Exterior Sign Data | Jan. 23, 2012 |
| I-111 | Interior Finishes | Jan. 23, 2012 |
| I-211 | Interior Elevations | Jan. 23, 2012 |
| I-221 | Interior Elevations & Sections | Jan. 23, 2012 |
| I-231 | Interior Sections & Details | Jan. 23, 2012 |
| S-010 | General Structural Information | Jan. 23, 2012 |
| S-710 | Satellite Dish Antenna Supports | Jan. 23, 2012 |
| F-111 | Evacuation Map | Jan. 23, 2012 |
| F-510 | Fire Suppression Details and Schedule | Jan. 23, 2012 |
| M-010 | Mechanical Instructions to Architect and Engineer | Jan. 23, 2012 |
| M-111 | Floor Plan – Mechanical | Jan. 23, 2012 |
| M-510 | Mechanical Details | Jan. 23, 2012 |
| M-520 | Walk-in Cooler & Freezer Refrigeration Details | Jan. 23, 2012 |
| M-610 | Equipment Schedules | Jan. 23, 2012 |
| M-620 | HVAC Control Concept of Operation | Jan. 23, 2012 |
| P-111 | Floor Plan – Plumbing | Jan. 23, 2012 |
| P-610 | Plumbing Details and Schedules | Jan. 23, 2012 |
| E-010 | Electrical Instructions to Architect and Engineer | Jan. 23, 2012 |
| E-100 | Site Electrical Plan and LED Reader Board Details | Jan. 23, 2012 |
| E-101 | Site Photometric Calculations (Sample) and Details | Jan. 23, 2012 |
| E-111 | Floor Plan – Power | Jan. 23, 2012 |
| E-121 | Floor Plan – Lighting | Jan. 23, 2012 |
| E-131 | Floor Plan – Ethernet and Satellite Systems | Jan. 23, 2012 |
| E-141 | Floor Plan – Burglar Alarm and CCTV Systems | Jan. 23, 2012 |
| E-151 | Floor Plan – Telephone and Sound Systems | Jan. 23, 2012 |

Walgreens v.2

| E-161 | Floor Plan – Fire Alarm System | Jan. 23, 2012 |
|---|---|---|
| E-171 | Floor Plan – Channel Letter LED System (SLOAN) | Jan. 23, 2012 |
| E-510 | Feeder Diagram & Electrical Details | Jan. 23, 2012 |
| E-520 | Luminaire Schedule and Details | Jan. 23, 2012 |
| E-530 | Satellite System Details | Jan. 23, 2012 |
| E-540 | Electrical Details – Pharmacy | Jan. 23, 2012 |
| E-550 | Electrical Details | Jan. 23, 2012 |
| E-610 | Control Schedules | Jan. 23, 2012 |
| E-620 | Square D Control Diagram | Jan. 23, 2012 |
| E-630 | Siemens Control Diagram | Jan. 23, 2012 |
| E-640 | Square D Control Diagram | Jan. 23, 2012 |
| E-650 | Electrical Panel Schedules with Wall Heaters | Jan. 23, 2012 |
| E-650 | Electrical Panel Schedules without Wall Heaters | Jan. 23, 2012 |
| E-660 | Walk-In Cooler & Freezer Wiring Diagrams | Jan. 23, 2012 |
| E-670 | Air Curtain Wiring Diagrams | Jan. 23, 2012 |

Walgreens v.2

| SECTION | SPECIFICATIONS TITLE | DATE |
|---|---|---|
| 01 11 00 | Summary of Work | Jan. 23, 2012 |
| 01 45 00 | Quality Control | Jan. 23, 2012 |
| 01 81 00 | Sustainable Design Requirements | Jan. 23, 2012 |
| 01 91 00 | General Commission Requirements | Jan. 23, 2012 |
| 03 30 00 | Cast in Place Concrete | Jan. 23, 2012 |
| 03 35 00 | Concrete Polishing, Processing and Finishing | Jan. 23, 2012 |
| 04 20 00 | Unit Masonry & Stone | Jan. 23, 2012 |
| 05 10 00 | Structural Metal Framing | Jan. 23, 2012 |
| 05 20 00 | Metal Joists/Metal Decking | Jan. 23, 2012 |
| 06 10 00 | Carpentry | Jan. 23, 2012 |
| 07 21 00 | Thermal Insulation | Jan. 23, 2012 |
| 07 23 00 | Foamed In Place Insulation | Jan. 23, 2012 |
| 07 24 00 | Exterior Insulation Finish Systems | Jan. 23, 2012 |
| 07 31 00 | Shingles | Jan. 23, 2012 |
| 07 32 00 | Roofing Titles (Southern Prototype Only) | Jan. 23, 2012 |
| 07 46 00 | Metal Siding, Soffits and Trim | Jan. 23, 2012 |
| 07 50 00 | Membrane Roofing | Jan. 23, 2012 |
| 07 51 00 | Built Up Bituminous Membrane Roofing | Jan. 23, 2012 |
| 07 52 00 | Modified Bituminous Membrane Roofing | Jan. 23, 2012 |
| 07 53 00 | Flexible Sheet Roofing | Jan. 23, 2012 |
| 07 54 00 | Thermoplastic Membrane Roofing | Jan. 23, 2012 |
| 07 60 00 | Flashing, Sheet Metal, Specialties and Accessories | Jan. 23, 2012 |
| 07 61 00 | Metal Standing Seam Roofing | Jan. 23, 2012 |
| 07 90 00 | Joint Protection | Jan. 23, 2012 |
| 08 11 00 | Metal Doors and Frames | Jan. 23, 2012 |
| 08 14 00 | Wood Doors | Jan. 23, 2012 |
| 08 30 00 | Specialty Doors & Frames | Jan. 23, 2012 |
| 08 32 00 | Sliding Decorative Door System | Jan. 23, 2012 |
| 08 34 00 | Revolving Doors | Jan. 23, 2012 |
| 08 35 00 | Folding Grilles | Jan. 23, 2012 |
| 08 41 00 | Storefronts & Automatic Entrances | Jan. 23, 2012 |
| 08 70 00 | Hardware | Jan. 23, 2012 |
| 08 80 00 | Glazing | Jan. 23, 2012 |
| 09 24 00 | Exterior Portland Cement Plaster (Southern Prototype Only) | Jan. 23, 2012 |
| 09 29 00 | Gypsum Board | Jan. 23, 2012 |
| 09 31 00 | Thin Set Tiling | Jan. 23, 2012 |
| 09 51 00 | Acoustic Ceilings | Jan. 23, 2012 |
| 09 65 00 | Resilient Flooring | Jan. 23, 2012 |
| 09 68 00 | Carpeting | Jan. 23, 2012 |
| 09 77 00 | Special Wall Surfacing | Jan. 23, 2012 |
| 09 90 00 | Painting and Vinyl Wall Covering | Jan. 23, 2012 |
| 10 28 00 | Toilet Partitions and Accessories | Jan. 23, 2012 |
| 10 44 00 | Fire Protection Specialties | Jan. 23, 2012 |
| 12 24 00 | Motorized Roller Shades | Jan. 23, 2012 |
| 12 48 00 | Floor Mats and Frames | Jan. 23, 2012 |
| 14 24 00 | Hydraulic Elevators | Jan. 23, 2012 |
| 14 31 00 | Escalators | Jan. 23, 2012 |
| 20 05 00 | Common Work Results for Mechanical | Jan. 23, 2012 |
| 20 07 00 | Mechanical Insulation | Jan. 23, 2012 |

Walgreens v.2

| 20 08 00 | Mechanical Systems Commissioning | Jan. 23, 2012 |
|---|---|---|
| 21 10 00 | Water Based Fire Suppression | Jan. 23, 2012 |
| 22 10 00 | Plumbing | Jan. 23, 2012 |
| 23 08 00 | Testing, Adjusting and Balancing | Jan. 23, 2012 |
| 23 30 00 | HVAC Air Distribution | Jan. 23, 2012 |
| 23 80 00 | Decentralized HVAC Equipment | Jan. 23, 2012 |
| 26 05 00 | Common Work Results for Electrical | Jan. 23, 2012 |
| 26 08 00 | Electrical Systems Commissioning | Jan. 23. 2012 |
| 26 10 00 | Electrical Distribution | Jan. 23, 2012 |
| 26 50 00 | Lighting | Jan. 23, 2012 |
| 27 10 00 | Special Systems | Jan. 23, 2012 |
| 28 31 00 | Fire Detection and Alarm | Jan. 23, 2012 |
| 31 23 00 | Sitework/Excavation/Fill | Jan. 23, 2012 |
| 32 12 00 | Flexible Paving | Jan. 23, 2012 |
| 32 31 00 | Ornamental & Chain Link Fencing | Jan. 23, 2012 |
| 32 90 00 | Planting/Irrigation | Jan. 23, 2012 |
| 33 10 00 | Site Mechanical Utilities | Jan. 23, 2012 |

As Amended by and pursuant to any further bulletins/additions thereto heretofore published by Tenant as of the date hereof.

Walgreens v.2

**SCHEDULE B-3**

<u>WALGREENS NEW STORE REQUIREMENTS</u>

These items must be completed **10 days** before the proposed date of delivery of possession to Tenant. It is hoped that compliance with this checklist will assist both the Landlord and Tenant in the efficient fixturing, merchandising and opening of this new Walgreen store.

1. All permanent utilities to be complete and all meters installed.

2. All construction debris shall be removed and the floors must be prepared according to the Tenant floor care specifications, a copy of which has been provided to Landlord.

3. The roof is to be clean and free of leaks.

4. All doors are to be hung with the appropriate hardware installed.

5. All exposed concrete floors must be sealed and the moisture vapor emission test results shall be submitted to Tenant and shall not exceed the requirements indicated in Tenant's Criteria. The installation of all floor tile must be complete. The wall base may be installed after possession.

6. All ceiling work must be completed.

7. All painting and vinyl wall covering must be completed.

8. Restrooms must be complete with the toilet partitions and plumbing fixtures installed. The water heater shall be energized and operational.

9. The fire protection system is to be operational. This includes any and all remote systems or system monitoring that may be required by the local authority.

10. The HVAC systems must be operational. This includes any and all remote systems that may be required.

11. All interior lighting must be installed.

12. All receptacles and switches must be installed except for those, which are connected to tenant supplied fixtures and millwork.

13. The 25 pair telephone cable must be installed.

14. Sign circuits must be pulled and ready for the sign installer.

15. A certificate of occupancy shall be issued by Landlord before possession. Landlord shall be responsible for any and all <u>pre-opening</u> Plan reviews required under applicable laws,

Walgreens v.2

WUS-USI TRANSITION DOCS033702 05/31/24

rules or regulations as a condition of, or a prerequisite to, the issuance of a Certificate of Occupancy.

16.    Evidence of title must be provided to Tenant's Community & Real Estate Law Department.

*If a Certificate of Occupancy is required to bring in merchandise, Tenant must be notified as soon as possible.*  Please consult with the local building, fire and health inspectors early in the job as to this possibility.

Landlord's contractor will provide the resources and labor necessary to complete the leasehold work and obtain all municipal approvals required for Tenant to complete the installation of their fixtures and setting of merchandise to open 23 days from the date of possession.

These items must be completed **45 days** before the proposed date of delivery of possession to Tenant.   It is intended that compliance with this checklist will assist the Landlord in the completion of the site and off-site improvements required for this new Walgreen store location.

1.    Landlord shall pay all utility deposits required for the installation of permanent utilities. All permanent utility service lines shall be installed, tested, and inspected by the municipality and/or the governing party.

2.    Permanent electrical power shall be brought to the CT cabinet and the electrical meter installed. The main distribution panel and all electrical panels shall be installed, wired, and grounded.

3.    All storefront systems shall be installed and the automatic entrance doors must be operational.

4.    All exterior lighting must be installed.

Landlord's contractor will provide the resources and labor necessary to complete these items and obtain all municipal final inspections required for Tenant to schedule the delivery of possession.

.

**SCHEDULE B-4
TENANT PROTECTED AREA**

## Schedule B-4 – Tenant Protected Area



For illustrative purposes only.
The purpose of this Schedule B-4 is to show the approximate location of the Tenant Protected Area should not be relied upon to show the dimensions of any item labeled herein, and is not drawn to scale.

WUS-USI TRANSITION DOCS033705 05/31/24

C-3-1

# UNION STATION

# SCHEDULE C

Case 1:26-cv-02243-APM    Document 1-3    Filed 06/24/26    Page 95 of 185

SI TRANSITION DOCS033707 05/31/24



# UNIONSTATION
## WASHINGTON D.C.

## SCHEDULE C:
## TENANT DESIGN CRITERIA

June 2014 – Final Review No. 5

WUS-USI TRANSITION DOCS033708 05/31/24

# TABLE OF CONTENTS



UNION STATION FRONT COLONNADE

INTRODUCTION ... 1
    THE STORY OF UNION STATION ... 2
    TENANT DESIGN REQUIREMENTS ... 3
    FLOOR PLANS ... 4
GENERAL REQUIREMENTS ... 7
SPECIFIC AREA CRITERIA ... 14
HEAD HOUSE ... 15
    MAIN HALL ... 17
        ALCOVE ... 17
        ARCHWAY ... 19
        VESTIBULE KIOSK ... 21
        CENTER KIOSK ... 22
        RESTAURANTS ... 24
    WEST HALL ... 28
    EAST HALL ... 30
        IN-LINE STORE ... 30
        KIOSK ... 30
RETAIL CONCOURSE ... 32
    GENERAL REQUIREMENTS ... 34
    MAIN LEVEL ... 36
    MEZZANINE LEVEL ... 37
        CENTRAL CORNERS ... 39
        CAR RENTAL KIOSK ... 40
    CAFES ... 41
        WEST END CAFE ... 42
    ANCHORS ... 43
TRAIN CONCOURSE ... 44
    GENERAL REQUIREMENTS ... 45
    SOUTHSIDE ... 47
    NORTHSIDE ... 49
LOWER LEVEL ... 50
    FOOD COURT ... 52
        KIOSK ... 55
    METRO SHOPS ... 56
RMU CARTS ... 57
APPENDIX ... 58
    DESIGN REVIEW PROCEDURES
    BARRICADE & GRAPHIC GUIDELINES

WUS-USI TRANSITION DOCS033709 05/3/24

WUS-USI TRANSITION DOCS033710 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 98 of 185



UNION STATION

THE NATIONAL MALL

UNITED STATE CAPITAL

SUPREME COURT

LIBRARY OF CONGRESS

LOCATION MAP FOR UNION STATION, WASHINGTON DC

WUS-USI TRANSITION DOCS033711 05/31/24



# INTRODUCTION

This document, Schedule C: Tenant Design Criteria, is part of the Tenant Lease Package and applies to any leased space within Washington D.C. Union Station.

Throughout these criteria, the term "Landlord" refers to the Union Station Investco LLC and the Management Operations Office, which will be working with the "Tenant" and their design and construction team.

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 100 of 185

Commissioned in 1903, Union Station was designed by Daniel Burnham, a famous architect who envisioned the building as a monumental gateway to the city. The design of the building was inspired by ancient Rome's triumphal architecture. Opened in 1907, Union Station was proclaimed as the world's largest train station. Union Station's classical inspired architecture were part of the District of Columbia's grand scale transformation into a city of monuments and beauty.

Serving the Capital with distinction for decades, Union Station suffered from the 1950's declining rail travel. The Station's magnificent building fell into neglect and disrepair. But Union Station was loved and remembered by those who treasured its place in the history of the country and in the lives of so many people. In 1964, the Station was designated "an historic landmark of great importance which contributes significantly to the national cultural heritage and that of the District of Columbia and its environs and which must be preserved."

In 1981, Congress enacted the Union Station Redevelopment Act for the preservation of the building, restoration of its use as a passenger rail station, and commercial development of its grand interior. In 1982, Union Station Redevelopment Corporation (USRC) was established to rehabilitate and redevelop the station primarily as a multi-use transportation terminal and secondarily as a commercial complex. .

Following three years of renovation at a cost of $160 million, Union Station reopened on September 29, 1988 – restored to its former glory. This living and working museum was redeveloped as a bustling retail center and inter-modal transportation facility. In addition to housing over 130 unique shops and restaurants, Union Station is the hub for Amtrak's headquarters and executive offices.

The US Department of Transportation (USDOT) is the owner of Union Station. On behalf of USDOT, the Federal Railroad Administration (FRA) has leased the property to the private non-profit organization, Union Station Redevelopment Corporation (USRC). USRC has subleased the property for retail development to Union Station Investco LLC (Ashkenazy Acquisition Corporation and Management Operations Office). It is USRC's mission to preserve the exterior façade and other historic and architecturally significant characteristics of the building with the goal of financially supporting the continued operation and maintenance of the Station complex.

In accordance with the USDOT/USRC lease agreement, as well as the 1985 Memorandum of Understanding (MOU) this criteria has been reviewed and approved by the DC Historic Preservation Office (DCHPO) to ensure all historic standards are met and upheld. Should there be any proposed significant changes to this criteria, FRA and USRC will consult with DCHPO and provide them the opportunity to review and comment.

Today Union Station represents a unique destination for shopping and dining center with over 38 million visitors a year. As an significant architectural monument, it symbolizes the rebirth of a great American tradition, train travel. A multi-story structure, the Station is composed of several distinctive areas: the Head House, the Shopping Concourse, the Train Concourse, and the Lower Level with a Food Court.

The historic Head House consists of the Main Hall, East Hall, and West Hall. The Main Hall offers a cafe, tourist information, the train information schedule board, and many special events and exhibits. Visitors can dine at restaurants located on the Main and Mezzanine levels, shop at unique retailers located in the East Hall, or visit the West Hall stores and cafes. The Presidential Suite is located in the East Hall and houses a destination restaurant unlike any other in Washington, D.C.

The Shopping Concourse is the major retail center.



UNION STATION CIRCA 1910

Located on three levels, the Concourse shops offer a wide range of quality merchandise in an attractive and tasteful environment, oriented to the historic architecture of the Station. Cafes scattered throughout the shopping areas create a lively atmosphere for shoppers.

The Train Concourse, home to Amtrak, operates 12 gates for trains serving the Northeast Corridor and the nation. Adding to this multi-modal transportation center is DC's Metro, Maryland's MARC and Virginia's VRE commuter lines.

The Lower Level features the bustling Food Court offering quick service foods for the workers and tourists served in a lively Station atmosphere. The Metro Shops, located at the entrance to D.C.'s Metro system, are lined with retail stores offering practical and service-oriented shopping opportunities.

Please visit www.unionstationdc.com for additional information.



Each Tenant and Tenant's Design Team is responsible for complying to the Tenant's Lease; the intent, scope and requirements of all the Lease's exhibits relating to the tenant design, construction and operations.

The following Lease documents are key to the design and construction process:

- Lease Outline Drawing (LOD)
- Schedule C: Tenant Design Criteria
- Sch. C–1: MEP Design Criteria
- Schedule F: Fire Protection Criteria
- Union Station's Construction Rules & Regulations

This Design Criteria is intended to encourage high quality designs that are individualized, compatible with other Tenants, and sensitive to the Union Station historical restoration. Tenant spaces are designed to maximize the major architectural elements of the Station: vast impressive interior panoramas, dramatic archways and vaulted corridors; unique natural lighting; and grand historic public spaces.

The Tenant must engage the services of a professional Architect and Engineers licensed in the District of Columbia, Virginia or Maryland.

Each Tenant must comply to the Landlord Design Review Procedures located in the Appendix.

## Code Compliance

While Union Station is exempted from the District of Columbia's Regulatory Agency (DCRA) for building permit and inspections, each Tenant is required to comply to District of Columbia's current building code requirements.

Compliance to governing codes and regulations is the solely responsibility of the Tenant.

## Food Tenants

Any Tenant selling food must apply for D.C.'s Department of Health license and submit drawings for review and approval.

## Construction Rules and Regulations

The Tenant's General Contractor must read and comply to the 'Union Station's Construction Rules and Regulations.' See Appendix for additional info.

The Tenant is responsible for field verifying all conditions prior to the start of construction.

## Sustainable Practices

The Tenant is encouraged to incorporate sustainable practices in the design and operation of their space.

## Base Building

Tenants must <u>never alter or cover any base building</u> architectural elements without specific written approval from the Landlord.

## The Historic Building

<u>Union Station is an historic Federal building. Tenants must not alter, remove, or paint any existing historic building elements in any way</u> without specific written approval from the Landlord, USRC, and DCHPO.

This includes the trusses, any base building wall surfaces, sculptures, cast elements (including plaques), lighting, drinking fountains, or any material or finish applied to columns, floors, walls, or ceilings. Tenants must not alter in any way the granite, terra cotta, marble tile, scagliola, metal grilles, or other exposed historic surfaces, either temporarily or permanently. Tenants are not permitted to fasten elements to tie ropes around, or to penetrate the above-mentioned historic surfaces with nails, screws, etc.



RETAIL CONCOURSE UNDER HISTORIC TRAIN SHED CEILING

WUS-USI TRANSITION DOCS033713 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 101 of 185



SCHEDULE C: TENANT DESIGN CRITERIA

MAIN LEVEL FLOOR PLAN    4

MAIN LEVEL

UNIONSTATION
WASHINGTON D.C.
June 2014 - Final Review No. 5

WUS-USI TRANSITION DOCS033714 05/31/24

WUS-USI TRANSITION DOCS033715 05/31/24

Case 1:26-cv-02243-APM    Document 1-3    Filed 06/24/26    Page 103 of 185



PARKING

TRAIN CONCOURSE
(BELOW)

TRAIN CONCOURSE
(BELOW)

WEST RETAIL

CAR RENTAL KIOSK

EAST RETAIL

WEST
END
(BELOW)

OPEN TO
BELOW

RMU MARKET

OPEN TO
BELOW

Z201    Z207    Z213

Z225    Z227    Z233    Z237    Z241    Z243    Z245

OPEN TO
MAIN LEVEL
BELOW

OPEN TO
MAIN LEVEL
BELOW

Z202    Z205    Z208    Z210    Z214A

OPEN TO LOWER
LEVEL BELOW

OPEN TO LOWER
LEVEL BELOW

Z234    Z238    Z236    Z240

GALLERY SEATING

GALLERY SEATING

NW RESTAURANT
Z214

MAIN HALL
(OPEN TO BELOW)

NE RESTAURANT
Z232

CARRIAGE
PORCH
(BELOW)

WEST HALL
(OPEN TO BELOW)

EAST HALL
(BELOW)

WEST HALL GALLERY SEATING

GALLERY SEATING

SW
RESTAURANT
Z277

SW
RESTAURANT
(BELOW)

SE RESTAURANT
Z279

GALLERY SEATING

GALLERY SEATING

FRONT
COLONNADE
(BELOW)

## MEZZANINE LEVEL

WUS-USI TRANSITION DOCS033716 05/31/24

Case 1:26-cv-02243-APM    Document 1-3    Filed 06/24/26    Page 104 of 185

WEST LOADING DOCK

RMU MARKET

**FOOD COURT**

OPEN TO ABOVE

OPEN TO ABOVE

METRO MARKET

ATM

METRO STATION

TO METRO

ELECTRICAL ROOM

LOWER LEVEL

WUS-USI TRANSITION DOCS033717 05/31/24

Case 1:26-cv-02243-APM    Document 1-3    Filed 06/24/26    Page 105 of 185



# GENERAL REQUIREMENTS

The General Design Requirements delineate the design parameters that permit the Tenant's individual expression, while encouraging designs that enhance and respect the Station's historic character. The General Design Requirements refer to control zones, materials, signage, lighting, floors, walls, ceilings, and security on a project-wide basis.

Specific Area Criteria are explicit to defined locations within the Station.

Each Tenant must adhere to the General Design Requirements as well as their Specific Area Criteria.

WUS-USI TRANSITION DOCS033718 05/31/24

# DEFINITIONS

## Specific Area Criteria

There are distinctive areas in the Station that have unique Design Criteria requirements. Each Tenant must comply with the General Design Requirements and their Specific Area Criteria.

## ZONES

### Display Control Zone

The Display Control Zone (DCZ) is a strictly controlled zone located within the Tenant's premise. The zone is 3'-0" from the center line of a storefront back into the Tenant's space.

Every Tenant must adhere to the DCZ criteria. No exceptions allowed.

The DCZ's primary objection is create an active, lively and creative merchandise display window. All displays and signage in the display windows must be professionally designed using high quality and innovative display techniques, and materials.

The DCZ must be visual transparent to allow customers a view into the store.

The high volume of repeat visitors makes it





## DCZ PROHIBITIONS

- No partitions: full or half height
- No permanent fixtures of any height.
- No fixtures over 4'6" high.
- No equipment over 4'6" h. in food spaces.
- No equipment of any kind in retail.
- No illuminated sign or flashing lights.
- No video display monitors of any kind.
- No security camera or other devices.
- No vendor product decals allowed.
- No hours of operation or credit card decals.
- No oversized graphics.
- No graphic that is larger than 24" w x 48" l.
- No graphics reducing the transparency of a storefront's below criteria's minimum 80%.
- No slatwall or pegboard systems.
- No poor-quality materials.
- No mirrors or highly reflective materials.
- No trash cans.
- No stacked chairs, tables or umbrellas.

important that all DCZ's display and marketing graphics be updated on a regular basis, a minimum of six times per year.

The only temporary signage allowed in the DCZ is a Marketing Program that complies to the criteria section on page 13.

## Front Display Control Zone

Front Display Control Zone (Front DCZ) is a dedicated display area located in front of a Lease Line. Only a few Specific Areas have a Front DCZ.

Any element in the Front DCZ must receive Landlord's written approval, or the element will be removed.

All items in the Front DCZ must be stored within the Tenant's leased premise at the close of business or at any other time deemed necessary by the Landlord.

Refer to the LOD and the Specific Area Criteria for additional guidelines on location within the zone and items permitted there.

## Work Zone

Tenant's Work Zone (WZ) is the back-of-house space not publicly visible. Separated by a full-height partition, the WZ contains the work spaces, including cooking, offices, dishwashing and storage.

## Seating Zone

A Tenant with a designated Seating Zone (SZ) is responsible for securing, maintaining and storing of all seating areas. All SZ elements must be movable and stored within the Tenant's on or off-site storage area at any time as deemed necessary by the Landlord. No SZ element may be stacked or stored in any area viewed by the public. A Tenant cannot use a chain to secure SZ elements.

Exterior Seating Zone require removal of all exterior furniture and planters during non-seasonal use.

## Seating Zone Railing Systems

Every Seating Zone must be delineated by a planter/railing system. Certain Head House's Seating Zones area required to utilize the Landlord's railing system at Tenant's Expense. Seating not in the Head House may use a railings system designed and installed by the Tenant. The railing system must be movable, uniquely designed for the space and cannot exceed 2'-6" in height.

Conventional queue systems with post and retractable ropes are not permitted in any location in the Head House or Shopping Concourse.

WUS-USI TRANSITION DOCS033719 05/31/24

Case 1:26-cv-02243-APM    Document 1-3    Filed 06/24/26    Page 107 of 185

## Seating Zone Furniture

Tables, chairs, and hostess stands must complement the Tenant's design and comply with a Specific Area Criteria. All furniture elements must be of the highest quality material. Inexpensive aluminum finish street café furniture is not allowed in any interior Seating Zone.

Umbrellas are not allowed in any Seating Zone unless otherwise designated in the Specific Area Criteria.

Any element sitting on the building's marble floor must use non-marring wheels or a cushioned non-scratch material. The Tenant will be responsible for costs associated with repairing or replacing damaged areas for any reason.

# TENANT DESIGN ELEMENTS

## Landlord's Demising Frame

Landlord's Demising Frame separating a Tenant's' storefront must never be altered by Tenant. After Tenant's construction, the Tenant may be required to repaint the Demising Frame. In special conditions, the Tenant may be required to install a demising end cap, as specified by the Landlord.

## Demising Walls

The Tenant is responsible for installing and/or maintaining a one hour (1 hr.) fire rating on all demising walls, throughout the life of the lease.

## Storefront and Transparency

The Design Criteria's objective is creating open, transparent storefronts filled with lively merchandise displays. To maximize the transparency and visibility of a store's interiors, modern butt-jointed glass systems are required for all retail areas.

Eighty percent (80%) transparency is required for all storefronts. In others words, 20% of the storefront area maybe be filled with opaque elements such as signage or design elements. Signage, including any signs hanging in the DCZ, are counted in the transparency calculation, as determined by the Landlord.

In some areas, the Landlord provides storefronts. When a Tenant re-uses any existing storefront system, the storefront must be professionally cleaned and repaired to "As New" condition. New door entry hardware may be required.

Any storefront older than 20 years must be replaced by the Tenant. The new storefront must comply with the Landlord's specification. Refer to Specific

**ANY STOREFRONT OLDER THAN 20 YEARS MUST BE REPLACED BY THE TENANT.**

Area for specification details.

Typical shopping mall signband, rolling grill storefront, or typical aluminum storefront systems are not allowed.

## Closure and Security

A Tenant is responsible for securing their premises. All security devices must be reviewed and approved by Landlord. All security devices must be conceal within walls, floors, ceilings, etc. Roll-down grilles or side-stacking metal grilles are prohibited. Landlord-provided security items may not be altered in any way.

## Queue Line

A Tenant must design the space to contain any queue lines within their leased premise. Every Food Service Tenant must submit a queuing plan focused on peak hour lines at the first Tenant Design Submission. The queue plan must indicated the 'order to pick up' flow and location of queueing for peak hours. At no time should queue lines extend outside the leased premise .

## Floors

A Tenant is responsible for the installation of all flooring within their premise. All floors in public areas must be a high-quality, durable commercial material. Acceptable floor materials include thin-set commercial-grade non-slip surface stone, terrazzo, or ceramic tile; high-quality commercial carpet; solid hardwoods; or commercial-grade engineered wood floors with a wear-resistant surface.

Floor materials are prohibited in public areas include exposed or treated concrete slab or VCT

All floors must to match the elevation of adjacent finished floors. The setting depths will vary according to location.

All wet area, food preparation areas, kitchens,

WUS-USI TRANSITION DOCS033720 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 108 of 185

and restrooms, must be waterproofed per the Landlord's specifications. Refer to the 'Union Station's Construction Rules & Regulations'.

In some locations, a Tenant may be responsible for the installation of Landlord's Base Building flooring. These areas include floors in front of a front counter, storefront or storefront doors. A floor visible below a front counter gate must match the common area flooring up to the back of the front counter. Installation must align with existing floor.

## Mezzanine

A Tenant is not allowed to construct any mezzanine without the written approval of the Landlord.

## Ceilings

Drywall ceilings are required in all Display Control Zones.

Within any publicly viewed space, the Tenant may install either drywall ceilings or a high quality 2'x2' with (concealed spline system), wood ceiling systems such as Armstrong's Woodworks Vector, or a 2'x2' metal perforated ceiling tile such as Armstrong's Metalworks Vector. All ceiling tiles should be factory finished.  The Landlord will consider other top-quality, durable commercial-grade ceiling systems.

Any poor quality 2' x 2', 2' x 4' tile ceilings or open ceiling with exposed ducts and pipes is prohibited.

In locations where the Landlord provides a finished drywall soffit or ceiling, the Tenant shall be required to repair, and finish the soffit to "As New" condition.

The Tenant must coordinate the ceiling design with all mechanical, fire protection, and lighting systems, along with structural requirements as described in Schedule C–1 and Schedule F.  The Tenant must provide access panels to Landlord or Tenant equipment as required by Landlord.

The Tenant is responsible for maintaining the minimum ceiling height per the Specific Area Criteria.  No ceiling in any public area can be lower than eight feet height (8'-0" min.).

## DCZ Ceiling

The Display Control Zone's ceiling must be drywall. No other ceiling material is allowed.

## Lighting

Tenant must submit cut sheets (pdfs) for all lights for Landlord's review.  Selection of light fixtures must not clash visually with the Station, either in look or light quality.

The Landlord will evaluate the intensity, quantity, and quality of light since those sources of light could adversely affect the incandescent color-temperature balance in the Station.

The lighting levels  must comply with all current Energy Codes. Refer to the Lighting Prohibition box. Tenants are strongly encourage to use SSL or LED lighting where ever possible.

A Tenant is not allowed to over light their space. Lighting must not create any direct glare into the common areas or building exterior.

All lighting must maintain a 3200 degree Kelvin color-temperature and CRI above 80.

Period reproductions of historical light fixtures, which could be viewed as elements from the original design of the Station are not allowed.

Fluorescent lighting, warm-tube only, are only allowed in recessed cans with 7" maximum diameter, recessed track wall washing accent lights, or display case lighting.

## DCZ Lighting

All DCZ fixtures must be recessed. Only where structural beams or ducts interfere with recessed fixtures will a Tenant be allowed to surface mount light fixtures.

Track light fixtures in the DCZ should have the necessary glare shields.  No fluorescent lighting of any type is allowed in the DCZ.

All DCZ lights must be have a lockable dimmer and a time clock located at electric panel. Since the Station's is 24/7, the time clock must be set to established Landlord's hours.

Clear Exit Signs are prohibited in the DCZ.  A opaque white backing must be applied.

**LIGHTING PROHIBITIONS:**

- Any exposed lamp that is not recessed.
- Large-scale battery pack emergency lighting.
- Luminous ceilings.
- 2'x2' or 2'x4' office fixture in public viewed ceiling.
- Reproductions of period fixtures.
- Exposed neon.
- Flashing or animated lighting.
- Mirrored surfaces within the premises must not reflect exposed bulbs.
- Acrylic lenses.
- No Kelvin temperature less than 3000° or over 3500°.



NO CLEAR EXIT SIGN AT STOREFRONT

## GENERAL REQUIREMENTS

II

### SIGNAGE

A Tenant is required to design and maintain a professionally designed graphic identity program that meets the General Design and Specific Area Criteria requirements. Signs must be coordinated with the Tenant's design aesthetic.

Signs are limited to trading name, name listed on lease, and logo. Tag lines or generic product listing are not allowed on main identification sign.

All sign must hang behind the Tenant's lease line unless the sign is perpendicular to the lease line. Absolutely no signage can be applied to any Base Building architectural elements.

Daily specials or marketing signs must be integrated into the menu boards, promo boards or permanent sign holders.

All bolts, hangers, fasteners, and clips should be of stainless steel, aluminum, brass, or bronze. No sign maker's labels or other identification (including UL labels) are permitted on the exposed surface of signage, except those required by local ordinance. If required by local ordinance, such labels or other identification must be in an inconspicuous location on the sign.

On a Tenant Service Door, the Tenant is to provide, at the Tenant's expense, Tenant's name and space number in 2" high black vinyl lettering.

Only in very limited Specific Areas within the Station will internal illuminated signage be allowed.



TYPE A FLAT SIGN EXAMPLE

### SCHEDULE C: TENANT DESIGN CRITERIA

### FINISHES PROHIBITIONS

- Any material deemed unacceptable by Landlord.
- Barn board or Plywood panels.
- Brick and/or simulated brick.
- Simulated stone (any simulated material).
- Wood-grained plastic laminates.
- Roll down grilles.
- Pegboard panels.
- Exterior Insulation Finishing System (EFIS) or stimulated stucco.
- Textured paint or foamed plastics.
- Texture 1-11 or any other textured plywood.
- Vinyl floors.
- Concrete floor finishes.
- Standard aluminum sections for storefronts.
- Carpeting on vertical surfaces.

### Finishes

The design and use of high-quality, durable materials are required. A Tenant must terminate their finishes as indicated on Tenant's approved drawings. In no instance should a Tenant cover or alter Landlord's Base Building finishes.

### Fixtures

Fixtures, including display furnishings, display racks, millwork, merchandise shelving, and counters are to be provided by the Tenant unless otherwise noted. All fixtures must be of the highest quality and reflect the Tenant's aesthetic. Special attention must be given to selecting and/or designing these elements when located within historical important spaces. Refer to the Specific Area Criteria fixtures restrictions.

Any fixtures located in a Front Display Control Zone or Seating Zone must be movable and no taller than 4'-6".

### Customer Service Counters

In order to encourage front window displays and avoid queue lines at entrances, customer cash wraps or service counters must be located a minimum of 5 feet away from the lease line, unless otherwise stipulated in the Specific Area Criteria.

### Storage

A Tenant must store boxes, trash, unused fixtures, and other such items completely out of public view at all times.

Storage above a ceiling is strictly prohibited. Storage of supplies, trash and other equipment should be handled in a neat, attractive, and unobtrusive manner that does not detract from merchandise displays, obstruct views, or interfere with natural ventilation through openings in the structure.

Trash carts and bins must be covered and must be emptied before they reach capacity.

### Station's Special Condition

Union Station is subject to vibrations from underground rail traffic. Tenants must isolate all non-welded storefront or equipment connections with neoprene pads or washers.



GENERAL REQUIREMENTS I 2

SCHEDULE C: TENANT DESIGN CRITERIA

## SIGNS TYPES

Each Specific Area Criteria defines the Sign Type as a Required Sign Type or an Optional Sign Type.

**Type A,** Flat Sign, Wall Mounted or Hanging

**Type B,** Applied Letters

**Type C,** Letters or Logo on Glass

**Type D,** Freestanding Movable Sign

**Type E,** Easel Sign

**Type F,** Blade Sign

**Type G,** Backlight Graphic Wall

**Type H,** Umbrella Sign

**Type J,** Sign on Movable Fixture

**Type L,** Menu Board

**Type N,** Canvas Sign

**Type O,** Push-Through Letter Illuminated

**Type P,** Banner Sign

**Type Q,** Food Court Promo Board

Note: The Specific Area Criteria lists the Sign Type followed by abbreviation letters designating the Specific Area. For example, Type A-rc indicates sign Type A for the Retail Concourse (rc) Specific Area.





TYPE E, EASEL SIGN





TYPE H, UMBRELLA SIGN

TYPE N, CANVAS SIGN





TYPE Q, PROMO BOARD

TYPE P, BANNER SIGN




TYPE B, APPLIED LETTERS EXAMPLE

TYPE C, LETTERS OR LOGO ON GLASS

TYPE G, BACKLIGHT GRAPHIC WALL

TYPE L, MENU BOARD

TYPE O, PUSH-THROUGH ACRYLIC LETTER





TYPE F, OLD BLADE SIGN

TYPE D, FREESTANDING

UNION STATION  WASHINGTON D.C. ■ June 2014 - Final Review No. 5

WUS-USI TRANSITION DOCS033722 05/31/24

WUS-USI TRANSITION DOCS033723 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 111 of 185

## SIGNAGE PROHIBITIONS

- Any decal applied to storefronts including credit cards, hours or other messages
- Iridescent, animated or flashing lights.
- Foam or injection molded plastic or acrylic.
- Exposed neon, fluorescent tube or LED lights.
- Paper or cardboard signs.
- Commercial product trademark signs.
- Typical shopping mall sign bands or box signs.
- Pennants, posters, banners and flags.
- Help wanted signs.
- Metal channel letters with plastic faces.
- Listing of any merchandise or descriptions on storefront or front counter or in DCZ. .
- No plastic or plastic laminates material.
- Disorganized or handwritten temporary sign.
- Sale signs that are of cheap quality.
- Off the Shelf Sign Holders (Type E).
- Type E signs placed outside the lease line.
- Signs stuck on base building columns, front counters, or storefronts.

## Tenant Marketing Programs

Marketing Programs involve any Tenant graphics, photos, sale signs or any marketing graphics located within the Display Control Zone.

All Marketing Programs should be done with appropriate messages and imagery for the general public. Any graphics or message that may be construed as discriminatory or is detrimental to public health or safety as determined by the Landlord will be removed.

All Tenant Marketing are to be considered temporary and must change within 60 days.

Tenant cannot sell any part of the storefront space to a third party vendor or display any product not sold in the Tenant's store.

Only creative and semi-transparent vinyl decals are allowed to be mounted to inside of storefront glass if the graphic complies with the transparency rule.

All other graphics programs must hang at least 1'-6" away from the glass.

No Marketing Program will be allowed in front of the lease line.

All Tenant Marketing Programs must received written (email) Landlord approval based on the Tenant's submitting the installation and a description of element installed.

All Marketing Programs must be professional installed.



GOOD EXAMPLE OD TENANT MARKETING PROGRAM

SEMI-TRANSPARENT MARKETING

## MARKETING PROGRAM PROHIBITIONS

- Must not fill more than 5% of any storefront area.
- Any single graphic can not exceed 30" w x 60" h.
- No tape or other unprofessional installation.
- May not be up for more than 60 days.
- Must not be an internal illuminated box sign unless received  specific Landlord authorization.
- Cannot be mounted directly behind the storefront.
- Must not be mounted on front counters, wall in DCZ or bulkheads.
- May not include any handwritten signs.
- Must not market any vendor products other than the Tenant's own branded product.



WUS-USI TRANSITION DOCS033724 05/31/24

UNIONSTATION ■
WASHINGTON D.C.

SPECIFIC AREA CRITERIA

WUS-USI TRANSITION DOCS033725 05/31/24



# HEAD HOUSE

Built in 1907, the Head House is a great architectural and historical treasure that has been preserved and meticulously restored. The Head House's leasable area was restored and finished by the Landlord in accordance with plans reviewed and approved by several regulatory agencies, including Union Station Redevelopment Corporation (USRC), the Commission of Fine Arts (CFA) and the District of Columbia Historic Preservation Office (DCHPO).

A Tenant located in the Head House is required to create a design that respects the historic landmark building and to conform to the General Design Requirements and the Head House's Specific Area Criteria.

The Head House is composed on three spaces; Main Hall, West Hall and East Hall.



SCHEDULE C: TENANT DESIGN CRITERIA

HEAD HOUSE

I5

HEAD HOUSE MEZZANINE LEVEL

HEAD HOUSE MAIN LEVEL

UNIONSTATION
WASHINGTON D.C.
■ June 2014 – Final Review No. 5

## HEAD HOUSE – GENERAL REQUIREMENTS

## GENERAL REQUIREMENTS

### Historic Building Elements

As a significant historic Federal building in the Nation's Capitol, Tenants are not permitted to alter, remove, or paint existing Head House historic base building elements in any way. This includes the trusses, the exterior wall surface, interior wall surfaces, sculptures, cast elements (including plaques), lighting, drinking fountains or any material or finish applied to columns, floors, walls, or ceilings.

Tenants may not cover the granite, terra cotta, marble tile, scagliola, metal grilles, or other exposed historic surfaces, either temporarily or permanently.

Tenants are not permitted to fasten elements to, tie ropes around, or to penetrate the above-mentioned historic surfaces with nails, screws, etc. Any fixture or sign sitting on a building's marble floor must use non-marring wheels with brakes or a cushioned non-scratch material.

The Tenant may be responsible for costs associated with the Landlord repairing or replacing damaged areas of the marble floor or other surfaces caused by the Tenant's not maintaining any movable elements, such as seating, displays, or signs.

Only the Landlord is allowed to clean any surface of historic significance. Landlord may complete the work at Tenant's expense.

### Historic Review

The anchor restaurant Tenants in the four corners of the Main Hall, NE, NW, SE, and SW Restaurants and the Presidential Suite Tenant must submit their designs to the District of Columbia State Historic Preservation Office (DCHPO) for review and approval in a special review process.

### Display Control Zone

Unless otherwise stipulated in the Specific Area Criteria, the Display Control Zone (DCZ) shall be considered the area from the Lease Line back three feet (3'-0") into the demised premise. Full-height partition, equipment, fixtures over 4'-6" high or permanent fixtures are not permitted in the DCZ.

### Seating Zone

Any interior Seating Zone within the Head House must be designed with furnishing that complement the historic space, be of high quality, and complement the design of the Tenant's space.

Aluminum street cafe or food court furniture will not be allowed.

All elements in the Seating Zone must be movable and stored when deemed necessary by the Landlord. Bus stations must be hidden from public view. Any Tenant element outside the Tenant's designated Seating Zone will be removed.

### Lighting

Fluorescent lights or any exposed lamp is prohibited within any public Head House space. Any lighting creating glare for Head House visitors will be removed or redirected. All publicly visible lighting must have a Kelvin rating between 3000 to 3500 degree.

### Finishes

Any materials in the public areas of the Head House must be of the highest quality, must be durable, and must complement the architectural design. Natural

materials such as quality hardwoods finished to professional standards, stone, metals, and glass are appropriate finishes.

In Specific Areas, wood must match the base building mahogany in grain, color, and finish.

### Fixtures

Fixtures should reflect a strong, well-conceived design that highlights the Tenant's merchandise and be light and transparent wherever possible.

Special attention must be given to the selection and design of fixtures, with respect to the historic importance and architectural significance of the for any displays that appear in the Head House.

All the display fixtures in any historic space must be freestanding. No fixture can be attached to ANY historic surfaces in including the granite walls, marble floors, historic ceiling or historic wood door frames. The bases or feet of any fixture must provide the necessary protection to prevent mars or scratches to the marble floor.

Fixtures may line the walls but cannot block the entry bay openings or window.

The fixtures should not mimic Union Station's historic design, should be of the highest quality millwork standards and should be appropriate to the stately grandeur of the Station's architecture.

No slatwall or other off-the-shelf retail display will be allowed. If wood is used, the finish must be of the highest-quality grain and finish. Metal fixtures are allowed as long as the metal is finished to the highest standards.

### Tenant Marketing Programs

Any Tenant Marketing Program is prohibited in the Display Control Zone, Front Display Control Zone or Seating Zones in any space located in the Head House unless it has the Landlord's written approval.



MAIN HALL RESTAURANT SEATING ZONE

WUS-USI TRANSITION DOCS033727 05/31/24

WUS-USI TRANSITION DOCS033728 05/31/24

# MAIN HALL

With its 90-foot-high Roman gold-leaf barrel-vaulted ceiling, the Main Hall is the grand historic entry space for Union Station. The extensive architectural detail and legion of 46 Roman soldiers standing watch give every visitor a sense of awe. Dramatic arches and colonnades connect the East and West Halls. The Main Hall consists of;

Alcove,

Archway,

Vestibule,

Center Kiosk,

and Restaurants.



MAIN HALL ALCOVE

# ALCOVE

Flanking the Main Hall's front facade entrances are two Alcove spaces, extended semi-circle spaces. The Alcoves have unique stone column entrance, historic ceiling and lights, granite walls and marble floors.

An Alcove Tenant must not alter or attach any element or drill in to any historic surfaces including the granite walls, the wood door frames and windows, the marble floor, and the decorative ceiling and lighting. If a Tenant needs to core-drill through the Head House marble floor, the Tenant will be required to receive written approval by the Landlord and have the work completed by Landlord at the Tenant's expense.

Since the space is historic, the Tenant's design must not mimic the historic architecture of the Station. The grand architecture including the volumes of the openings, should be visually separated from any Tenant design elements

If the Alcove is used for a food operation, the Landlord may designate a Seating Zone for the Tenant's sole use. If the Alcove has a designated Seating Zone, it must comply with all Seating Zone criteria.

## Display Control Zone

The Alcove's Display Control Zone (DCZ) includes the entire premise.

No wall exceeding 72" may be built within the space unless approved by the Landlord. No walls of any height will be allowed within 5'-0" of the exterior window. Any wall or millwork must be freestanding and cannot be attached to the floor or granite walls.

## Work Zone

A separate Work Zone is not permitted in an Alcove. Plumbing and electrical services to an Alcove space are very limited. Cooking is not permitted. The Tenant may use the space for food preparation but is limited to using warming ovens.

## Storefront

The Alcove storefront consists of three wood-framed openings. The existing wood-framed openings and glass transoms above must remain as is. No alteration of any kind is allowed to the wood frame or the glass transoms

## Lighting

The Alcove has a historic ceiling with lights that cannot be altered. A Tenant may install additional accent or decorative lighting either incorporated into a fixture or using a grid system hanging behind header and mounted on freestanding supporters.

Any exposed electrical conduit must be laid in a neat way, painted to match adjacent surfaces and hidden from public view.

Any type of fluorescent lighting or exposed lamp lighting is prohibited.

No light fixture's lamp should be visible from any point in the Main Hall.

All track fixtures must have shields and be adjustable to avoid glare and hot spots. All lighting must be on lockable dimmers and set to the level as determined by the Landlord.



MAIN HALL SOLDIER

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 116 of 185

WUS-USI TRANSITION DOCS033729 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 117 of 185



**TYPE B-MH, APPLIED METAL LETTERS**

## Required Signage

Tenant is allowed one Type B, Applied Letters.

### TYPE B-mh, Applied Letters

Materials: Only Tenant's name allowed using metal individual letters finished on front and side matching satin bright brass finish.

Size: Maximum height of any letter is 6"and 1/4" thick.

Restrictions: Must be installed in the center bay, straight and centered within the sign fascia in both directions. Letters must be pin mounted 1/4" off face of sign transom.

### TYPE C-c, Lettering or Logo on Glass

Tenant is required to install a Type C sign on the center two section of the facade window.

Materials: Logo/Tenant's vinyl die-cutted and applied to the inside face of the glass.

Size: Maximum height of any letter is 8". Total graphic sign area cannot exceed the maximum 1.5 square feet.

Restrictions: Tenant's logo/name must be centered at 4'-6" AFF, must be made of high-quality vinyl and be professionally installed. Only two window panes may receive a Tenant's logo/name.



**TYPE C-C, NAME ON GLASS**

No other signs are allowed on the window or within the 5 feet of the window.

## Optional Signage

A Tenant may install one optional sign either a moveable sign Type D or Type J, within the designated Seating Zone.

### TYPE D—mh, Freestanding Movable Sign

Materials: Wood, acrylic, glass or metal. No plastics or plastic laminates.

Size: Maximum height of any lettering is 6". Maximum overall size is 6'-0" high x 1'-6" wide x 4" deep.

Sign base can not exceed 6" in height and a maximum footprint of 1.8 square feet.

Restrictions: Only the Tenant's logo/name is allowed on the sign.

No graphic holders, generic listing, or taglines are allowed on this sign.

No marketing graphics or menu holders allowed.

No illumination is allowed within or on the sign.

Sign must be movable with non-marring lockable wheels or heavy-duty felt.

### TYPE J-mh, Sign on Moveable Fixture

Materials: Sign painted or printed and applied to a display fixture.

Size: Maximum size of the any fixture is 3'-0" x 3'-0" x 4'-6" high. Maximum height of any letter is 6".

Restrictions: Only one per Tenant.

Only Tenant's logo/name is allowed on the sign.

No illumination allowed within or on the sign.

No marketing graphics or menu holders allowed.

Display fixture must be movable with non-marring wheels or heavy-duty felt.



**ALCOVE FACADE WINDOW FOR TYPE C-C SIGN**

# ARCHWAY

Two Archway spaces are located on Main Hall's north wall and act as the transition between the Main Hall and the Shopping Concourse/Amtrak Ticketing.

The storefront, doors, walls, grilles, floors, and ceiling of the Archway spaces are historic and must not be altered in anyway. Nothing can be attached to any of the surfaces within or adjacent to the space. The historic grilles must be left accessible.

## Display Control Zone

The Archway's Display Control Zone (DCZ) consists of the whole Tenant space. The key objective for the space is to provide a visual link between the Main Hall and the Shopping Concourse. The space should be transparent. A separate Work Zone or full-height walls are not permitted.

## Front Display Control Zone

The Archway is allowed to position no more than 3 freestanding display fixtures 2'-6" in front of the Tenant's storefront doors facing the Main Hall. Any fixtures placed in the Front DCZ cannot exceed 4'-6"



MAIN HALL ARCHWAY

in height, must be a high-quality,must be movable, and must be stored within the Tenant's premise at the close of business.

There is no display area in front of the Tenant's storefront doors that face the Shopping Concourse.

## Storefront

An Archway storefront consists of three (3) pairs of historic wood and glass doors facing the Main Hall and three sets facing the Shopping Concourse.

The Archway storefront doors, frames, hardware, or walls cannot be altered, marred, or damaged in any way. If they are damaged, Tenant will reimburse Landlord for full restoration.

All doors facing the Main Hall are required to be open during the Station operational hours. Fixtures placed in the door opening should not impede traffic outside the store or into the store.

One or two sets of the three sets of doors facing the Shopping Concourse may be permanently closed only under the following conditions.

- Either the center door or two outer doors may be closed as long as the other door(s) remain fully open and accessible to the public.

- The closed set of doors must be merchandised as an active display window, attaching nothing to windows or doors.

- Only Landlord approved graphic may be installed on the inside glass face of the closed doors.

## Lighting

The Archway has a historic ceiling with lights that cannot be altered. A Tenant may install additional accent or decorative lighting using a grid system hanging above the door's transom and supported by freestanding supporters. The grid may be secured to wood hidden from any public view.

Any electrical conduit running from the panels must be laid in a clean and neat way and hidden from public view. Conduit must be painted to match adjacent surfaces in order to conceal it.

Any type of fluorescent lighting or exposed lamp lighting is prohibited. No fixture's lamp should be visible from the Main Hall. All track fixtures must have shields and be adjustable to any hot spots.

All lighting must be on lockable dimmers and set to the level as determined by the Landlord.

ARCHWAY TYPE B-MH, APPLIED LETTER SIGN

WUS-USI TRANSITION DOCS033730 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 118 of 185

# MAIN HALL – ARCHWAY

## SCHEDULE C: TENANT DESIGN CRITERIA

### Required Signage

Tenant is required to install one Type B, Applied Letters, on the center bay sign fascia

### Type B-mh, Applied Letters

Materials: Only Tenant's name is allowed using metal individual letters finished on front and side matching satin bright brass finish.

Size: Maximum height of any letter is 6" and 1/4" thick.

Restrictions: Must be installed in the center bay, straight and centered within the sign fascia in both directions. Letters must be pin mounted 1/4" off face of sign transom.

### Optional Signage

A Tenant may install one optional sign, either a moveable sign Type D or Type J, in the designated Front Display Control Zone.

### TYPE D-mh, Freestanding Movable Sign

Materials: Wood, acrylic, glass or metal. No plastics or plastic laminates.

Size: Maximum height of any lettering is 6". Maximum overall size is 6'-0" high x 1'-6" wide x 64" deep. Sign base can not exceed 6" in height with a maximum footprint of 1.5 square feet.

Restrictions: Only the Tenant's logo/name is allowed on the sign. No graphic holders, generic listing, or taglines are allowed on this sign

No marketing graphics or menu holders allowed.

No illumination is allowed within or on the sign.

Sign must be movable with non-marring wheels or heavy-duty felt.

### TYPE J-mh, Sign on Movable Fixture

Materials: Sign painted or printed and applied to a display fixture.

Size: Maximum size of the any fixture is 3'-0" x 3'-0" x 4'-6" high. Maximum height of any letter is 6".

Restrictions: Only one per Tenant. Sign is only to be strictly used for Tenant's logo/name.

No illumination allowed within or on the sign.

No marketing graphics or menu holders allowed.

Display fixture must be movable with non-marring wheels or heavy-duty felt..

### TYPE C-mh, Lettering or Logo on Glass

Tenant may opt to install a Type C sign only on 2 doors (not center) facing the Shopping Concourse and Main Hall.

Materials: Tenant's logo/name in die-cutted vinyl and professionally applied to the inside face of the glass.

Size: Maximum height of any letter is 6". Total graphic sign area of each sign cannot exceed the maximum 1.5 square feet.

Restrictions: Tenant's logo/name must be centered at 3'-0" AFF. must be made of die cut vinyl and be professionally installed. Only one Tenant's logo/name per door and only on left and right doors.



TYPE B-MH, LETTER



TYPE D-MH SIGN

**ARCHWAY, TYPICAL ELEVATION**

Open Transom

Historic Doors by Landlord

Finish Floors by Landlord Throughout

Main Hall

Front Display Control Zone

Historic Ceiling

Historic Grilles

Display Control Zone

Shopping Concourse

**ARCHWAY, TYPICAL SECTION**

Open Transom Type B-MH

Historic Doors by Landlord

Finish Floors by Landlord Throughout

Main Hall

Front Display Control Zone

Historic Ceiling

Historic Grilles

Display Control Zone

Shopping Concourse



UNIONSTATION
WASHINGTON D.C.

■ June 2014 - Final Review No. 5

WUS-USI TRANSITION DOCS033731 05/31/24

WUS-USI TRANSITION DOCS033732 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 120 of 185

# VESTIBULE KIOSK

Vestibule Kiosks are scattered throughout the Main Hall. The location of a kiosk is predetermined and fixed by the Landlord. A Tenant must not move the kiosk for any reason. Kiosks may not be fastened to the floor or walls.

The Landlord's Banner for the East Hall is part of the Base Building and may not be altered in any way.

## Display Control Zone

As a freestanding element, the Display Control Zone encompasses the whole kiosk area. Refer to the General Design Requirements.

## Fixtures

Landlord supplies the display fixtures that comprise a Kiosk. A Tenant may request special kiosks by submitting plans and requesting prior approval before a Vendor, recommended by Landlord, completes the work at Tenant's expense.

Tenant is responsible for securing its merchandise every day at closing. Locks may be changed on individual Kiosk pieces with changeover of Tenants, at Tenant's expense; and will be done by Landlord.

Limited "counter top" displays are permitted on any Kiosk tops. The Kiosk top must be neat, ordering and merchandising only products approved by the Landlord. Any over-cluttered kiosk will be considered in violation of the lease.

Any displays above 4'-6" must be transparent to allow customers to view through the Kiosks. No freestanding display fixtures will be permitted without prior Landlord approval.

## Lighting

Interior display lighting is part of the fixture. The Tenant may install additional counter lamps only with Landlord's written permission. Landlord determines the number of lamps and will remove any lamps if the space is over lit.

Only incandescent bulbs are allowed in any display lighting. Prohibited from use in the Main Hall is any type of fluorescent lighting.

## Required Signage

The Tenant is required to install one Type B, Applied Letter, sign on the kiosk per the Landlord's designated location.

## Type B-mh, Applied Letters

Materials: Only Tenant's name allowed using metal individual letters finished on front and side matching satin bright brass finish.

Size: Maximum height of any letter is 6"and 1/4" thick.

Restrictions: Letters must be professionally mounted using removable double-sided adhesive tape and must be installed true and straight.



TYPE B-MH, LETTER

## TYPE C–v, Lettering or Logo on Glass

Tenant may opt to install a Type C sign on the center of the back display unit door

Materials: Tenant's logo/name in die-cutted vinyl and professionally applied to the inside face of the glass.

Size: Maximum height of any letter is 4". Max overall graphic size is 1 sq ft.

Restrictions: Only one Tenant's logo/name allowed.



TYPE C-V, NAME ON GLASS



MAIN HALL, VESTIBULE KIOSK

SCHEDULE C: TENANT DESIGN CRITERIA

# CENTER KIOSK

The Central Kiosk, located in the historic Main Hall, contains a café and other retail functions. Alterations, attachments, or reconfigurations to the Kiosk structure itself are not permitted without Landlord written approval.

## Display Control Zone

The Display Control Zone (DCZ) consists of the whole space on both levels of the kiosk. In addition, the DCZ extends eight (8) feet beyond the Kiosk's structure into the Main Hall and includes all Café seating area

The entire Kiosk area is visible to the public. Equipment, trash, cords and other unsightly elements be concealed with the casework and Kiosk walls. There are limits to the area where Tenant fixtures are allowed.

## Fixtures, Counters, and Display

The maximum height allowed for any fixture, equipment or furniture is 4'-6".

Tenants may not alter or make attachments to the historic marble flooring provided by the Landlord.

The Construction Limit Line, where fixtures such as counters are allowed, is specifically indicated on the Lease Outline Drawings (L.O.D.s'). Outside this line only seating, planters, and moveable displays are allowed.

## Seating Zoning Furnishing

Landlord shall approve all seating, planters, bus stations, and moveable displays. All seating-related furniture shall be freestanding and moveable and shall be maintained in a first class condition.

## Signage and Graphics

Tenant's signage is not allowed to be attached to the Central Kiosk structure in any manner. Amtrak's Information Board is built onto the Kiosk. Tenant may not install any signage at the kiosk's mezzanine level, either freestanding or attached to the railings.

### Required Signage

Each Tenant is required two Type D sign, located at the west and east side of the Kiosk.

### TYPE D–mh, Freestanding Movable Sign

Materials: Wood, acrylic, glass or metal. No plastics or plastic laminates.

Size: Maximum height of any lettering is 6". Maximum overall size is 6'-0" high x 2'-0" wide x 6" deep. Sign base can not exceed 6" in height with a maximum footprint of 1.5 square feet.

Restrictions: Only the Tenant's logo/name is allowed on the sign. No graphic holders, generic listing, or taglines are allowed on this sign

No marketing graphics or menu holders allowed.

No illumination is allowed within or on the sign.

Sign must be movable with non-marring wheels or heavy-duty felt.



TYPE D–MH SIGN



MAIN HALL CENTER KIOSK

WUS-USI TRANSITION DOCS033733 05/31/24

WUS-USI TRANSITION DOCS033734 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 122 of 185



AMTRAK'S MAIN SIGN

TRAIN DEPARTURES

EXISTING WOOD HANDRAIL

PAINTED STEEL PICKETS & SPHERES

NEWS    INFORMATION    TOURS

MAHOGANY WOOD PANELING

Lease Line
See L. O. D. s

Lease Line
See L. O. D. s

Limit of Fixtures by Tenant

4'- 6" Max.

Main Hall - Front Elevation of Central Kiosk   (Looking North)

11'-0"

13'-0"

Amtrak's Main Sign

THIN SET MARBLE TILE FLOOR

Fixtures by Tenant

4' 6"

VENEER PLASTER CEILING
PAINTED METAL COLUMN

WOOD CLAD COLUMN
WOOD STRINGER
PLASTERBOARD
@ LANDERSIDE
OF STAIR

Lease Line

Limit of Fixtures by Tenant

Lease Line

Limit of Display Zone

See L.O.D. s

4' 6" Max.

Limit of Display Zone

See L. O. D. s

Main Hall - Side Elevation of Central Kiosk (Looking East. Note: West Side Similar)

WUS-USI TRANSITION DOCS033735 05/31/24

# RESTAURANTS

The major Restaurants occupy significant historic sections of Union Station; the front facade, the Main Hall, the Presidential Suite, Columbus Club in the NE corner and the West Hall. Each Restaurant space is unique, and hence it will be critical for the Tenant's Design Team to work closely with the Landlord throughout the design phase.

A Restaurant Tenant must observe the following Specific Area Criteria as well as the General Design Requirements, and the detailed Lease Outline Drawings (LOD). Some LODs delineate the location of a Tenant's kitchen or service location of egress components as required by building code, or historic surfaces, such as restored ceilings or walls.

Many existing walls and ceilings in the Restaurants have been restored and refinished by the Landlord as part of the historic restoration project. These surfaces and their finishes must not be altered or damaged in anyway by the Tenant.

Significant changes to a space will require a separate review and approval process by District of Columbia State Historic Preservation Office. It is very important that the Restaurant Tenant refers to its LOD to understand detailed requirements and the historic importance of their space.

The Restaurants are located in the Main Hall's four corners - Southwest (SW), Southeast (SE), Northwest (NW), Northeast (NE) and the Presidential Suite, located at the east end. Each Restaurant has very unique historic elements and defined seating areas.

The NW and SW Restaurants have a Balcony and Gallery Seating overlooking the West Hall and in the Main Hall, respectively.

The NW and NE Restaurants are primarily located on the mezzanine level but do have Main Hall entrances.

The SW and SE Restaurants with direct access to the Front Colonnade facing Columbus Circle, have both Main Hall and Outdoor Seating Zones.

## Work Zone

Many of the Restaurant spaces have a clearly defined area for any kitchen locations. A Tenant may not extend its kitchen beyond the maximum extent of kitchen enclosures. Refer to the detailed LODs for clarifications special historic elements, fans, exhaust pathways, etc.

## Storefronts – Main Hall

The NE and NW Restaurants each have a pair of wood/glass doors facing into the Main Hall. The SW and SE Restaurants each have a pair glass doors with a clear-glass, arched transom above facing into the Main Hall which shall not be modified. No other storefronts will be allowed.

## Storefronts–Exterior Front Facade

The SW, SE, or Presidential Suite Restaurant with frontage along the historic Front Colonnade or East façade have historic elements, exterior wall, windows, doors, ceilings, and other façade elements, that cannot be altered or painted in any way.

The exterior windows along the Front Colonnade are part of the historic façade of Union Station. Any walls located in front of an exterior façade window must be set back at least 5'-0" feet from the inside face of the façade wall. No partition may intersect any window. A Tenant may not block any windows along any façade wall. A Tenant may never use any space in front of a façade window for the temporary or permanent storage of furniture, equipment, or supplies.

**NO MARKETING PROGRAMS ARE EVER ALLOWED IN ANY OF THE FRONT FACADE WINDOWS.**



FRONT COLONNADE STOREFRONT WITH SIGN TYPE C-C



RESTAURANT MAIN HALL

Case 1:26-cv-02243-APM Document 1-3 Filed 06/24/26 Page 123 of 185

## Ceilings

Any ceiling or skylights that is considered historic absolutely cannot be altered.

Ceilings in the public area of a Restaurant should be a minimum of 9'-0" high. In some places the Tenant may install a secondary ceiling. Refer to the LOD for clarification on the ceiling limitations.

## Stairs

The Tenant is responsible for finishing and maintaining any stairs between the Main and Upper Level of their space.

## Seating Zone - Main Hall
## SE and SW Restaurants

The SE and SW Restaurants have a dedicated Seating Zone in the Main Hall. The Tenant must install a railing system provided by the Landlord (at Tenant's expense) to delineate the seating area.

Tenant is responsible for providing seating as well as a hostess stand or bus station. Tenant's table and chairs located in any Seating Zone must received Landlord's approval. The furniture must compliment the Main Hall historic architecture as well as the restaurants design.

Aluminum or stainless steel metal finish is not permitted for any furniture located in the Main Hall.

Outdoor street cafe chairs, metal chairs or food court chairs are not permitted.

Tables must be either wood, stone or solid surfacing.

All elements must be freestanding and movable using feet or wheels that will not mar the marble flooring.

Tenant will be responsible for storing all furniture within the Tenant's interior space or work area when deemed necessary by the Landlord.

Plumbing and electricity do not serve these areas.

## Seating Zone - West Hall Balcony
## SW and NW Restaurants

The SW and NW Restaurants have a glass and mahogany balcony overlooking the West Hall. A Tenant may repair the existing railing but may not replace it. These areas are designated only for seating and may be filled with plants, 1/2 half walls, bus stations or any other function.

The Tenant may not use the balcony for any marketing messages or signs other than the Type C sign applied to the glass balcony.

## Seating Zone - Gallery Dining

Some Restaurant spaces have mezzanines with Gallery Dining offering spectacular views of the Main Hall and out to the Nation's Capitol.

The floors, ceiling, and walls are historic. Tenants are not permitted to alter or attach elements to the historic surfaces.

A clear zone must be maintained for egress as indicated on the space's LOD. A limited area may be partitioned off for a service area, but no partition may intersect a window.

Gallery Dining build-out is primarily limited to seating. Cooking services are not permitted in this area. In preparation areas, only warming ovens are

allowed. Any bus station must be located to minimize view from the public and may not be attached to the wall. No elements located in the Gallery Dining can exceed 4'-6" high.

## Outdoor Seating Zone

The SW and SE Restaurants are permitted to have an Outdoor Seating Zone. As the front of this magnificent structure, the Outdoor Seating Zone must comply with the highest quality standards for furnishing and maintenance. The Landlord strictly controls any element located in this area.

This furniture should be street cafe chairs and tables and should be light and airy and durable. The Tenant is responsible for maintaining its outdoor seating in first-class condition.

When the Outdoor Seating Zone is closed for the season, all fixtures, such as bus stations, seating, umbrellas, planters, and any signs, must be entirely removed from the exterior and stored in a storage room on or off site.

A Tenant may provide well landscape colorful planters along the edge of the Seating Zone. Planters should be well maintained during the seating area's seasonal use.



OUTDOOR SEATING ZONE



PRESIDENTIAL SUITE RESTAURANT

WUS-USI TRANSITION DOCS033736 05/31/24

## Signage

Depending on the location, a Restaurant may have several distinct sign opportunities. Design of all signs should compliment the Restaurant design using natural materials such as woods, glass or metals. No plastic or plastic laminates will be allowed.

No sign can be attached to any base building surface.

## Required Signage
### SE or SW Restaurants at Front Colonnade (c)

A Restaurant with a Front Colonnade entrance is required to install one Type D sign at the main exterior public entrance to the restaurant.

### Type D-c, Freestanding Movable Sign

Materials: Glass, wood or metal.

Size: Maximum height of any lettering is 8". Maximum overall size is 7'-0" h x 2'-0" w x 6" d. The base cannot exceed 1'-6" w x 2'-0" d.

Restrictions: The sign must have lockable wheels and be moved in each night.

The only part of the sign that may be illuminated is an edge-light menu display incorporated into the sign. The menu display should be located 4'6" centerline from the finished floor. The maximum total light menu display cannot exceed 2 square feet.

The illumination source must be hidden from public view or the illumination will not be allowed. The source of power must be a rechargeable battery pack located within the sign. No electric cords will be allowed.

## Main Hall Restaurant Entrances

The SW, SE, NE and NW Restaurants each have a main entry in the corner of the Main Hall. These restaurants are require to install either one Type B, Applied Letters or one Type C, Logo/Letters Applied to Glass on their sign transom above the doors.



TYPE B-MH-APPLIED LETTERING

## Type B-mh, Applied Letters

Materials: Only Tenant's name allowed using metal individual letters finished on front and side matching satin bright brass finish.

Size: Maximum height of any letter is 6"and 1/4" thick.

Restrictions: Must be installed in the center bay, straight and centered within the sign fascia in both directions. Front and side of the letters must be finished. Letters must be pin mounted 1/4" off face of sign panel.

## TYPE C–v, Lettering or Logo on Glass

Materials: Tenant's logo/name in die-cutted vinyl and professionally applied to the inside face of the glass.

Size: Maximum height of any letter is 6". Total graphic sign area cannot exceed the maximum 1.5 square feet.

Restrictions: Tenant's logo/name must be centered at 3'-0" AFF, must be made of die cut vinyl and be professionally installed. Only two window panes may receive Tenant's logo/name .

## Optional Signage
## Main Hall (mh)

The four restaurants located in the corners of the Main Hall may opt to install one Type D-mh sign.

## TYPE D-mh, Freestanding Movable Sign

A Restaurant Tenant is allowed one Type D-mh only at its Main Hall entry.

Size: Maximum height of any lettering is 8". Maximum overall size is 7'-0" high x 2'-0" wide x 6" deep with a 1'-6" x 2'-0" base.

Restrictions: The only sign part that may be illuminated is an edge-light menu display located 4'-6" centerline from the finished floor. The maximum total light menu display cannot exceed 2 square feet.

The illumination source must be hidden from public view or the illumination will not be allowed. The source



TYPE C- MH , NAME ON GLASS

of power must be a rechargeable battery pack located within the sign. No electric cords will be allowed.

## Outdoor Seating Zone (os)

A Tenant with an Outdoor Seating Zone is required to have either a Type D or a Type N sign located at the entrance. During the off-season, the sign must be stored inside Tenant's storage area.

## TYPE D-os, Freestanding Movable Sign

Materials: Wood, glass, or metal. No plastic or plastic laminates are permitted. Sign may incorporate etched acrylic LED edge lighting, as long as the total light sign area does not exceed 2 square feet.

Size: Maximum height of any lettering is 10". Maximum overall size is 7'-0" high x 2'-0" wide x 6" deep. The base cannot exceed 2'-0" w x 2'-0" d.

Restrictions: The sign must be movable using lockable wheels and may not be attached to the ground surface. The sign may incorporate a menu display.

The source of power must be a rechargeable battery pack located within the sign.



MAIN HALL RESTAURANT TYPE D-MH

WUS-USI TRANSITION DOCS033737 05/31/24

Case 1:26-cv-02243-APM    Document 1-3    Filed 06/24/26    Page 125 of 185

WUS-USI TRANSITION DOCS033738 05/31/24

## Type N-os, Banner Sign

Materials: Banners are vertical canvas or other type of durable fabric with applied graphics with the Tenant's logo/name.

Size: Maximum height of any letter is 10". Maximum size is 7'-0" h. x 2'-0" w. The weighted base shall not exceed 1'-6" x 1'-6".

Restrictions: Only one banner is allowed per Tenant. Sign must be located at the main entrance to the seating area. Banner may not be attached to any building elements, such as walls, columns, etc.

Sign shall be adequately weighed down to endure normal weather conditions.

## Type H-os, Umbrellas

Umbrellas may be installed in designated Outdoor SZ only.

Materials: Canvas umbrellas must be one solid color. Multi-colored or patterned umbrellas are not permitted. Color must be suitable to the historic building. No bright fluorescent colors are allowed.

Size: Umbrellas cannot exceed 9'-0" in height and 9'-0" in diameter. The maximum height of lettering is 8".

Restrictions: A Tenant's logo/name may be installed on no more than half of the all umbrellas. The Tenant's logo/name can only appear on one umbrella face and the overall graphic per umbrella cannot exceed 1.5 square feet.

Tenant must store all umbrellas within its interior space during the off season. Any ripped umbrellas must be immediately replaced or removed. Tenant will be responsible for closing all umbrellas at night or during bad weather. Each umbrella must be weighted down.

Areas with access to



TYPE H-OS, UMBRELLA

electric or to rechargeable battery packs may use lights installed on inside of the pole. Absolutely no twinkle lights will be allowed outside the

umbrellas or as wraparounds to the tables, railings, or any other elements.

## Front Colonnade (c) Exterior Windows

### Type C-c, Letters or Logo on Glass

The SW or SE Restaurant with façade windows at street level may install its logo or name on the glass windows.

Size: For each window bay, the total signage cannot exceed 3 square feet nor exceed 12" in height. Maximum height of any letter is 8". All signage must be located in the bottom section of panes and centered within the window area.

Materials: The sign may be painted or vinyl die cut on the interior glass face.

Restrictions: The window frame or glass cannot be marred in any way during the sign installation. No internal illuminated signage or any other type of hanging signage may be placed in the window area. The sign can be repeated in each window bay , but only in one window per bay.

## Balcony Seating Zone

### TYPE C–mh, Lettering or Logo on Glass

A Tenant with a balcony overlooking the West Hall may opt to install a Type C-mh sign.

TYPE N-OS, BANNER

Materials: Die-cut vinyl lettering or logo applied to the inside glass face of railing.

Size: Max height of any letter is 4" high.

Restrictions:

Tenant lettering must be centered within the balcony glass area centered 2'-0" AFF. Only two logos and two tenant names area allowed per each balcony bay.

## Gallery Dining

No signage is allowed in the south or north Gallery bays overlooking the Main Hall.

A Restaurant Tenant may opt to place a Type D, freestanding sign at the entry to the Gallery seating area. Sign may not exceed 5'-0" high x 1'-6" wide x 4" w with a 1'-0" base.



WEST HALL BALCONY

Case 1:26-cv-02243-APM  Document 1-3  Filed 06/24/26  Page 126 of 185

WUS-USI TRANSITION DOCS033739 05/31/24

# WEST HALL

From the Main Hall, eight Roman soldiers stand guard over the columned entrance to the West Hall. At the west end is access to the exterior Carriage Porch and Metro escalators. The grand space beneath the historic vaulted skylight ceiling was originally the Station's ticketing and baggage checking area.

## Display Control Zone

The Display Control Zone (DCZ) extends 3'-0" from the center line of the glass storefronts into the Tenant's space. Refer to the General Design Requirements.

## Seating Zone

A West Hall Food Tenant may have a designated Seating Zone (SZ) under the barrel skylight. The General Design Requirements and the Specific Area Criteria govern the Seating Zone.

The busy pedestrian traffic in the West Hall requires all Tenants to accommodate queue lines within their space or within the Seating Zone.



No food preparation or food dispensing, bus stations, menu boards, or counters are permitted within the Seating Zone. No electrical cords may run from the Tenant space out into the Seating Zone.

The prime entrance into the cafe seating must be a minimum of 5'-0" clear of any Tenant furnishings.

No marketing signs other than the required signage is allowed in the Seating Zone.

Landlord provides all railings located in the West Hall Seating Zone. The Tenant will be required to remove, store, and reposition railings in order to clear the West Hall Seating Zone for events as deemed necessary by the Landlord.

## Seating Zone Furniture

The Landlord will provide the tables and chairs for the West Hall Seating Zone at Tenant's expense.

The Tenant may provide a movable host stand to be located under the mahogany balcony at storefront entrance. The hostess stand cannot exceed 4'-6" in height and occupy no more than 5 square feet in floor area. The Tenant may place a non-illuminated sign (size not to exceed 1 square footage) on the stand with the maximum height of any lettering at 4".

## Carriage Porch Seating Zone

Outside the West Hall entry doors is the Carriage Porch, the exterior portico and entrance to the Metro Station. A Tenant with a designated Carriage Porch Seating Zone will be required to provide high-quality cafe furniture and a railing system consists of planters scattered along the SZ's edge.

The Tenant is responsible for maintaining the Seating Zone and railing system. Any Carriage Porch seating element must be approved by Landlord.

When this Seating Zone is closed for the season, all fixtures such as bus stations, seating, tables, and planters must be entirely removed from the exterior

and stored in a storage room on or off site.

## Storefronts

All West Hall storefronts consist of sliding-glass panels that side stack when the space is open. The storefront may not be altered in any way. Each Tenant is required to clean and maintain the storefronts to "As New" condition.



CARRIAGE PORCH SEATING ZONE



WEST HALL

Case 1:26-cv-02243-APM Document 1-3 Filed 06/24/26 Page 127 of 185

WUS-USI TRANSITION DOCS033740 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 128 of 185

## Required Signage

Tenant is required to install a Type B sign on the existing mahogany sign band in each bay. If the mahogany sign band is damaged, the Tenant will be required to replace the entire fascia with a new veneer that precisely matches the existing mahogany in grain, color, and finish.

### TYPE B—wh, Applied Letters

Materials: Individual metal channel letters painted Matthews MP20509 on the front and sides.

Size: Maximum letter height is 8" with a letter side return set at 2". Letters are pin-mounted off the mahogany by 1 ½". Overall length of the sign cannot exceed 11'-0" feet.

Restrictions: Milky white acrylic must infill the back of each letter to diffuse the light. A LED system, operating on a 12-volt DC system must be neutral white set at 3500 Kelvin's with luminous intensity of 60 lumens or less.

Any electrical wiring shall be by Landlord to the Tenant's panel. Tenant will install a sign timer set at Landlord's hours.

Electric must be installed through the spacer support for the letter and the number of supports shall be the minimum required. The letter supports should be



**WEST HALL TYPE B-WH SIGN**

painted to match the letters. Signs shall consist entirely of letters and contain no branding, logos or symbols.

## Optional Signage

### TYPE C—wh, Lettering or Logo on Glass

Materials: Tenant's logo may be installed inside face of glass using vinyl die-cuts.

Size: Maximum height of any letter is 6". Maximum size of total sign cannot exceed is 1 square foot.

Restrictions: Only two of the storefront door panels may receive logos per bay. Centerline of the sign must be located at 4'-0" (centerline of logo) to finish floor.

Listing of services or products is not allowed.

No other graphics will allowed on the glass doors.

### TYPE D—wh, Freestanding Movable Signs

Only one Type D sign is permitted in Seating Zone at the designated location.

Size: Only sign copy allowed is Tenant's name/logo. Maximum size of any single letter is 8". Maximum size of copy is 8" wide by 48" tall. The Tenant's logo is not to exceed 9" x 9".

Maximum overall size of the sign is 6'-0" h. x 1'-4" w. x 3" d. with a base no larger than 1'-6" diameter or a 1.8 sf shape with rounded corners.

Restrictions: Background is to be a light to mid-tone. No dark tones.

Non-marring wheels or heavy-duty felt should be installed on the base of any fixture that sits on the marble floor. Sign must be moved as required by Landlord.



1'-4"

9" x 9" Logo Laser cut from 1/4" acrylic.

1/4" Acrylic Tenant's name applied to glass. Max height of any letter is 8".

Graphic must be confined to 9" w x 48" high box.

White Glass Panel to match HVAC Stacks

9" | 3'-3" | 6'-0"

1'-6" | 3"

**TYPE D-WH SIGN - EXAMPLE**



Type C-wh Tenant Logo or Name. Max. Size of Any Lettering 10".

**CARRIAGE PORCH ELEVATOR**



SW or NW RESTAURANT BALCONY

RESTAURANT   2'-0"   RESTAURANT

MAHOGANY SIGNBAND

POTBELLY

TYPE B-wh

TYPE C-wh

LOGO   4'-0"   LOGO

GLASS STOREFRONT   TYPE D-wh

**WEST HALL, TYPICAL STOREFRONT ELEVATION**

# EAST HALL

The East Hall (EH) is a relatively small, classically detailed room adjacent to the Main Hall. The room is encircled by a series of Ionic columns and filled with a filtered, natural light from a series of high windows and ceiling skylights. In-Line Stores are located along the perimeter of the East Hall, while in the center is a grouping of Kiosks. The East Hall serves as the main entrance to the Restaurant located in the historic Presidential Suite, first used by President Taft.



EAST HALL KIOSKS

## East Hall Inline Retail Store

### Front Display Control Zone

The Front Display Control Zone (FDCZ) extends from the Lease Line out into the public space as designated on the Tenant's LOD. Within the FDCZ, a display fixtures cannot exceed 4'-6" in height. All elements in the Front DCZ must be movable, must have material on the wheels or feet that protects the marble floors from scratches or mars, and must be approved by the Landlord.

### Work Zone

A Tenant may enclose the alcove at the north of its store to create storage or utility space. Designs of enclosures must be approved in advance by the Landlord in order to confirm that the enclosure will not adversely affect the performance of the building's mechanical system.

### Storefronts

The sliding-glass door storefronts are provided by the Landlord and may not be altered. Each Tenant is required to clean the storefront to "As New" condition during construction.

### Ceiling and Lighting

A Tenant is provided with a finished ceiling and finished demising partitions. A Tenant may replace the existing lighting track with a new system, but it must be reviewed and approved by Landlord prior to the installation of lighting.

### Required Signage

Every Tenant is required to have one Type B sign located on sign fascia above the storefront.

### TYPE B-eh, Applied Letters

Materials: Only Tenant's name allowed using metal individual letters finished on front and side matching satin bright brass finish.

Size: Maximum height of any letter is 6"and 1/4" thick.

Restrictions: Must be installed in the center bay, straight and centered within the sign fascia in both directions. Front and side of the letters must be finished. Letters must be pin mounted 1/4" off face of sign panel.

Restrictions: No other type of signage is permitted.

### Optional Signage

Only one movable Type D sign is permitted in the Front Design Control Zone.

### TYPE D-eh, Freestanding Movable Sign

Materials: Wood, glass, or metal. No plastic or plastic laminates are permitted

Size: Maximum height of any lettering is 6". Maximum overall size is 6'-0" h. x 2'-0" w x 10" dp. To assure stability, a base may be a maximum of 1'-6" dp.

Restrictions: Non-marring wheels or heavy-duty felt should be installed on the base of any fixture that sits on the white marble floor.

## East Hall Kiosk

The Landlord provides each Tenant with a custom display Kiosk comprised of several movable fixture units. The Landlord shall determine which fixture units comprise a Tenant's Kiosk. No freestanding display fixtures will be permitted other than the fixtures provided by the Landlord.

### Display Control Zone

The whole Kiosk is in a Display Control Zone.

### Fixtures

Limited "counter top" units for the display of merchandise will be allowed if the display fixtures are transparent and do not exceed 1'-6" in height. The Landlord must approve any hutch top units desired by the Tenant. The limited "counter top" displays permitted on Kiosk tops must be transparent to allow customers to view the inside of each Kiosk display. Locks may be changed on individual Kiosk pieces with changeover of Tenants, at Tenant's expense, and will be done by the Landlord.

WUS-USI TRANSITION DOCS033741 05/31/24

Case 1:26-cv-02243-APM  Document 1-3  Filed 06/24/26  Page 129 of 185

WUS-USI TRANSITION DOCS033742 05/31/24

Case 1:26-cv-02243-APM    Document 1-3    Filed 06/24/26    Page 130 of 185

## Lighting

Interior display lighting is included with each fixture. Replacement bulbs are supplied by Landlord at Tenant's expense. Tenant may install additional counter-top brass lamps only with Landlord's written approval. The Landlord must approve the number of counter-top lamps and will remove any lamps if the space is over lit or creates glare for the customers.

## Bar Stool

Only the bar stool selected by the Landlord may be used inside the Kiosk. The stool may be purchased from Landlord by Tenant.

## Required Signage

A Kiosk Tenant must install letters to the designated sign panel provided by the Landlord.

### Type B-eh, Applied Letters

Materials: Only Tenant's name allowed using metal individual letters finished on front and side matching satin bright brass finish.

Size: Maximum height of any letter is 6"and 1/4" thick.

Restrictions: Must be installed in the center bay, straight and centered within the sign fascia in both directions. Front and side of the letters must be finished. Letters must be pin mounted 1/4" off face of sign pane

Restrictions: No other type of signage is permitted..



TYPE B-EH, APPLIED LETTERS



EAST HALL - COUNTERTOP LAMPS

EAST HALL IN-LINE STORE



Required Type 'B' Sign Bronze Letters by Tenant

Moveable Display by Tenant

Type 'D' Sign by Tenant

Finish Floor by Landlord

6'0" Max.

4'-6" Max

Finish Ceiling and Halo Track by Landlord

Sliding Glass Panels by Landlord

Finish Floor by Tenant

9'-0"

Front Display

D.C.Z

Merchandise Zone

Control Zone

Work Zone is option only at North Alcove

Lease Line

EAST HALL IN-LINE STORE

WUS-USI TRANSITION DOCS033743 05/31/24

Case 1:26-cv-02243-APM    Document 1-3    Filed 06/24/26    Page 131 of 185

WUS-USI TRANSITION DOCS033744 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 132 of 185

## SPECIFIC AREA CRITERIA



# RETAIL CONCOURSE

Union Station's Train Shed was once considered one of the largest in the world, housing 34 platforms. The shed's coffered ceiling was restored by the Landlord in accordance with plans approved by several regulatory agencies, including Union Station Redevelopment Corporation (USRC), the Commission of Fine Arts (CFA) and the District of Columbia Historic Preservation Office (DCHPO).

Today, the Retail Concourse fits under the Train Shed and is a lively first-class retail environment, which is both current in its design style and appropriate to its historic architectural setting. The Retail Concourse is a vibrant "street" of transparent storefronts with imaginative display windows that pop and convey the Tenant's unique identity.

The Retail Concourse's Specific Criteria Areas are Main Level, West End on the Main Level, Mezzanine Level and Anchors.



RETAIL CONCOURSE 33

SCHEDULE C: TENANT DESIGN CRITERIA





RETAIL CONCOURSE MAIN LEVEL

UNIONSTATION
WASHINGTON D.C.

■ June 2014 - Final Review No. 5

WUS-USI TRANSITION DOCS033745 05/31/24

# GENERAL REQUIREMENTS

## Display Control Zone

All Tenants have a Display Control Zone (DCZ) that is 3'-0" back from the center line of the storefront or 3'-4" from the Lease Line. All merchandise displays must be behind storefront windows.

## Storefront

A clear transparent storefront with at least 80% transparency is required. The objective is to maximize the visual impact of well merchandised window displays.

Signage is counted as opaque when determining transparency factor.

Any storefront older than 20 years must be replaced with new storefront. If Tenant opts to re-use an existing storefront less than 20 years, it must refinish the storefront to "As New" condition. New door handles must be installed and should reflect the Tenant's individual design.

If the existing storefront does not meet the Criteria, the Tenant will be responsible to replace the storefront per the Criteria.

Only two types of retail storefront entries will be allowed; two sliding doors resulting in a minimum opening of 6 feet but no larger than 8 feet or a pair of 36" swing doors recessed back 36" from the storefront face. No storefront opening shall exceed 8'-0". Doors are never to swing out beyond the lease line.

Every storefront shall consist of ½" clear tempered glass with clear anodized aluminum 4" square bottom rail and a 2" top rail.

Every storefront must be set back a minimum of 4" from the face of the Landlord's demising pier frame but no further than 1'-3" depth from the Lease Line.

## Storefront with Sliding Doors

Sliding doors shall have a 2" top rail and a clear anodized aluminum cover plate concealing the roller track and assembly. Storefront shall be equal to Dorma by Carolina Door's DRS 120 Series or C.R. Laurence Company's OTS top-hung system.

All door tracks must be flush to the adjacent floor surface. Tracks cannot be mounted directly to the top of a finish floor.

No door pulls will be permitted on sliding doors. The Tenant must provide strike plates to lock doors in the open position.

## Queue Line

A Tenant is required to incorporate queuing within its space and provide any necessary queuing stanchion in order to control queue lines.

## Ceilings

The overall ceiling height within all of the Tenant's Display Control Zone (DCZ) must be a minimum of 9'-0" in height, the only exception being where base building elements necessitate a lower ceiling for clearance.



DISPLAY CONTROL ZONE

ONE-HOUR RATED DEMISING PARTITION BY LANDLORD

FINISH BY TENANT

PAINTED STEEL DEMISING FRAME BY LANDLORD TO REMAIN AS IS

TENANT STOREFRONT

LEASE LINE

TENANT STOREFRONT MUST BE SET BACK MIN 4" FROM LEASE LINE

RETAIL CONCOURSE DEMISING PIER COLUMN



STOREFRONT – SWING DOORS



RETAIL CONCOURSE STOREFRONT



WUS-USI TRANSITION DOCS033746 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 134 of 185

WUS-USI TRANSITION DOCS033747 05/31/24

A drywall ceiling must be installed within the full 3'-0" DCZ depth. Ceiling height in all other areas shall be minimum 9'-0".

## Required Signage

Each Tenant will be required to install one Type A, Flat per non-contiguous storefront and one Type F, Blade sign.

## TYPE A-rc, Flat Sign

The Main and Mezzanine Levels have different Specific Area Criteria signage requirements for the Type A signs. See Specific Area Criteria Main Level or Mezzanine Level pertaining to your space.

## TYPE F-rc, Blade Sign

**Please note that this is a new sign design. All tenants must install this sign.**

Each Tenant is required to install one blade sign at Landlord's predetermined location on Landlord's bracket hanging perpendicular to the Lease Line.

Materials: The blade sign must be a push-through white acrylic dimensional lettering light with LEDs for internal illumination. Request detail shop drawings from Landlord for specific information.

Size: Maximum height of any letter is 6".

The sign box is a fixed dimension oval shape; 1'-11" h x 3'-10" w x 2 1/2" dp with a maximum 1/4" white relief for letters.

Restrictions: The Tenant is responsible for bringing power to the Blade Sign. LED power supply is class 2, 24vDC, 100W, 120/277 voltage, with two 3200K warm white LEDs per sign.

The face panel must be solid metal painted per Tenant's brand color. Edges must be neatly finished. Sign side should be banded with clear anodized aluminum. Tenant should use 1/8" polycarbonate backer panel for letters

Blade Sign must be placed on a timer set to Landlord's operational hours of 6 am to 11 p.m.

## Optional Signage

## TYPE C–rc, Lettering on Storefront Glass

Size: Maximum height of any single letter is 3" high. Maximum size of any sign cannot exceed 1 square foot.

Restrictions: <u>Centerline of sign must be located at 3'-0"</u> to finish floor. Only one Tenant sign per 8 feet (8'-0") of glass width will be allowed.

<u>No icons or decals are allowed on storefronts.</u>

## TYPE E,  Easel Marketing Sign

A Tenant may opt to place only one Easel Marketing Sign that must sit on the Lease Line at the entrance to the storefront. Signs that creep out into the public walkway will be removed.

Size: Height of any letter is 4" max. Maximum overall sign dimensions are 2'-0" w. x 4'-6" h. x 1'-6"d.

Restrictions: Easel sign must be uniquely designed to complement Tenant's store design.

Sign must have felt feet or equal to protect the marble floor. Easel must be located behind Lease Line.

An Easel Sign is only allowed at the Tenant's entrance and the sign must be on the Lease Line. Any sign that is outside Tenant's Lease Line will be removed.

Prohibited are standard mass-market easels, signs attached to the floor or illuminated signs.

TYPE E - SC EASEL

DRAFT
NOT APPROVED AT
THIS TIME.

EXISTING METAL BRACKET

NEW ELECTRICAL CONDUIT

1/4" CLEAR ANODIZED ALUMINUM

WHITE ACRYLIC TENANT LETTERING PUSH-THROUGH SOLID METAL FACE PAINTED PER TENANT LOGO COLOR. MAX. 1/4" PUSH-THROUGH OF LETTERS. ILLUMINATION TO CONSIST OF WARM LIGHT LED (KELVIN AT 3500 DEG). SIGN TO BE TIED TO TIMER LOCKED AT LANDLORD'S OPERATION HOURS OR 6 AM TO 11 PM, 7 DAYS A WEEK.

1'-11"

1'-5 1/2"

**TheTenant**

GRAPHIC LIMIT OF ANY LETTERING

MAX. HEIGHT OF ANY LETTER IS 6"

3'-4"

3'-10"

LANDLORD'S DEMISING FRAME

TENANT STOREFRONT SET 4" BACK FROM LEASE LINE. 2" TOP AND 4" BOTTON RAIL, CLEAR ANODIZED ALUMINUM FINISH WITH BUTT JOINT 1/2" CLEAR TEMPER GLASS

TYPE F - RC SIGN

# MAIN LEVEL

The public walkway on the Main Level is an intimate retail street, a busy thoroughfare between the Train Station, Metro, and the rest of Union Station. The most successful storefronts are those that maximize the storefront's transparency and create dynamic shop windows. Stores that address the low ceiling heights with recessed lighting and place strong design elements on the store's back wall, draw the customers' eyes into the store.

A Tenant must adhere to the General Requirements and the Retail Concourse Design Requirements, as well as the Specific Area criteria for the Main Level.

## Display Control Zone

In the Display Control Zone (DCZ), the Tenant must install a gypsum board ceiling AT 9'-0" AFF that is the full length of the demised premises and 3'-0" deep from the storefront. The soffit shall be painted Sherwin Williams Progreen 200, a low-VOC, low-odor paint, in Snowbound #SW7004 with eggshell finish.

## DCZ Lighting

Base building structural elements and HVAC systems may limit the ability of most Main Level tenants from installing recessed lighting in the DCZ.

Tenants should install either 3500K LED downlights with clear reflector finish and white flange, such as Lightolier #C4L10DL35KCCLW / C4L10N or LED track lighting located at the very edge of the storefront. Lights should be space 3'-0" to 3'-6" across length of demised premises and min. 2'-0" from any wall surface, and centered 1'-10" from front face of storefront.

At Main Level, due to the low ceiling height, all track heads located in the DCZ should have shields to prevent glare from the fixtures. Recessed adjustable lighting help maintains a clean ceiling look.

## Required Signage

Each Main Level Retail Concourse Tenant is required to install one Type A-rc1 sign and one Type F-rc Blade sign (described earlier).

## Type A-rc1, Flat Sign

Materials: The non-illuminated sign is a flat hanging sign located behind the storefront glass. It may be incorporated into an entry portal design.

Acrylic-faced sign boxes, exposed neon, or acrylic-faced illuminated lettering or other types of internally illuminated signs will not be permitted.

Size: Maximum size of any letter is 10". A sign filling the full opening of the storefront is not permitted. The sign should be a panel not longer than 40% of the total storefront opening.

Restrictions: Typical mall full-store-width sign bands will not be permitted. Variances will not be allowed.

## East Connector

The East Connector, a Main Level passageway between the Train Concourse and the Retail Concourse, has a low ceiling, and therefore a Tenant will not be allowed to use a blade sign of any kind.



TYPE A-rc1, FLAT SIGN



RETAIL CONCOURSE STOREFRONT


WUS-USI TRANSITION DOCS033748 05/31/24

Case 1:26-cv-02243-APM  Document 1-3  Filed 06/24/26  Page 136 of 185

# MEZZANINE LEVEL

The Mezzanine Level has wide-open views of the historic train shed's coffered skylight ceiling. Successful Mezzanine storefront design should create unique architectural portal elements at each store entry while maintaining transparent unique store window displays.

A Tenant must adhere to the General Requirements and the Retail Concourse Design Requirements, as well as the Specific Area criteria for the Mezzanine Level.

## Storefront

Each Tenant has a glass shed skylight above the Display Control Zone. The glass shed maximizes customers' views of the historic coffered shed ceiling and allows natural light into the space. Tenants are not allowed to attach or alter the glass shed or the storefront demising frame.

Full-height walls are not allowed under the glass shed. A Tenant may not use any space on the Mezzanine's rooftop. A Tenant may paint the fascia below the glass shed a unique neutral color.

## DCZ Lighting

On the Mezzanine Level, the Tenant must replace the existing track lighting with new LED track and fixtures. The new track must be located in the original place of the existing. The sole purpose of this track is to light the Display Control Zone and the fascia of the glass shed parapet. Lights should not be aimed to cause glare or to shine directly into any public area.

The quality of the lighting levels in the DCZ reflects throughout the Retail Concourse. Lighting should be in the CRI range of 3200 to 3600 degrees. The footcandles in the DCZ should be in the range of 75 fc to 30 fc.

## Required Signage

**Landlord is installing a new frosted glass signband above the tenant demising frame.**

All Tenants are required to install Tenant's name to the glass signband. No other sign will be allowed on Tenant's storefront or in the Design Control Zone.

## Type A-rcz, Applied Letters

Refer to Typical Sign Shop Drawings for the details on the new glass signband provided by Landlord.

Materials: 1/4" thick acrylic letters applied to Landlord's glass signband. Letters to be centered horizontally and vertically within glass signband.

Size: Maximum height of any letter used is 12".

Restrictions: Letter color and font based on Tenant's Logo. Only the Tenant's name is allowed. Taglines are not allowed. No logo icons are allowed on the signband. Only one Tenant name per storefront bay.



RETAIL CONCOURSE MEZZANINE SIGNBAND TYPE-A RC2 AND F-RC

WUS-USI TRANSITION DOCS033749 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 137 of 185



MAX. TRANSPARENCY OF ANY STOREFRONT IS 85%. MAX. SIZE OF TENANT MARKETING PROGRAM IN WINDOW IS 12 SQUARE FEET OF GRAPHICS. SEMI-TRANSPARENCY VINYL MAY BE INCREASED TO 14 SQ. FT.

NEW TYPE A-SCZ - TENANT INSTALLS 1/4" THICK ACRYLIC LETTER ON FACE OF NEW LANDLORD'S GLASS SIGNBAND. MAX. HEIGHT OF ANY LETTER IS 10". ONLY 1 NAME PER BAY.

DRAFT - NOT APPROVED BY OWNER AND HISTORIC AGENCIES AT THIS TIME

ANN TAYLOR

NINE WEST

TYPE A-SC SIGN MUST HANG BEHIND STOREFRONT

RETAIL CONCOURSE MAIN /MEZZANINE LEVEL STOREFRONT ELEVATION

LANDLORD GLASS SHED ROOF

PAINT PER LANDLORD COLOR

NEW TYPE A-SCZ - TENANT INSTALLS 1/4" THICK ACRYLIC LETTER ON FACE OF NEW LANDLORD'S GLASS SIGNBAND. MAX. HEIGHT OF ANY LETTER IS 10". ONLY 1 NAME PER BAY.

NEW TYPE F-SC BLADE SIGN - WHITE ACRYLIC TENANT LETTERING PUSH THROUGH SOLID METAL FACE PAINTED PER TENANT LOGO COLOR.

TENANT STOREFRONT SET BACK 4" FROM LEASE LINE

NEW ELECTRICAL CONDUIT

EXISTING METAL BRACKET

NEW TYPE F SIGN

TYPE A-SC SIGN MUST HANG BEHIND STOREFRONT

STOREFRONT BY TENANT SET BACK 4" FROM FACE OF DEMISING FRAME

TENANT

1'-11"  1'-6"

TENANT

3'-5"

3'-10"

TENANT LED TRACK LIGHTS

3'-0"

DESIGN CONTROL ZONE

MEZZANINE LEVEL

TENANT

DRYWALL CEILING REQUIRED IN DCZ.

4"

3'-0"

DESIGN CONTROL ZONE

MAIN LEVEL

MIN. HEIGHT OF TENANT CEILING  9'-0"

MIN. HEIGHT OF TENANT CEILING  9'-0"

RETAIL CONCOURSE MAIN /MEZZANINE LEVEL STOREFRONT ELEVATION

UNIONSTATION
WASHINGTON D.C.   ■ June 2014 - Final Review No. 5

WUS-USI TRANSITION DOCS033750 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 138 of 185

WUS-USI TRANSITION DOCS033751 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 139 of 185

# CENTRAL CORNERS

The 1986 restoration of Union Station created a dual spiral staircase within a three storey opening. This central opening connects the Retail Concourse's Mezzanine Level with the Lower Level's Food Court. The central opening also allowed the public a view of the gracefully Beaux Arts architectural opening connecting the Train Shed to the Head House's Main Hall.

The Retail Concourse's demising steel framework extends to within 8'-2" of the railing overlooking the 3 storey opening. The framework steps down to maximum the view of the architectural features.

Tenants in this location will be required to abide by the General Requirements and Specific Area Criteria for the Retail Concourse's Mezzanine Level.

## Ceilings/Lighting

Solid ceilings are not allowed in these two locations. An open grid may be installed for security and to support tracking lighting. The air for this area comes from the base building HVAC system.

## Required Signage

The Tenant is required to install Tenant's name to the glass storefront. No other sign will be allowed on Tenant's storefront or in the Design Control Zone unless specified within the Specific Area Criteria.

## Type A-rcz, Applied Letters

Materials: 1/4" thick acrylic letters applied to glass storefront. Letters to be centered horizontally and vertically within glass signband.

Size: Maximum height of any letter used is 12".

Restrictions: Letter color and font based on Tenant's Logo. Only the Tenant's name is allowed and only one Tenant name per storefront bay.

Taglines are not allowed. No logo icons are allowed on the signband.

See the Retail Concourse's General Requirements for additional signage information.

## Corner Retail Tenant

The SW Corner Tenant has a butt joint glass storefront with swing door at the 45 degree entrances. No other entrance will be allowed. The storefront follows Criteria for the Retail Concourse Criteria on page 34.

The Design Control Zone (DCZ) extends around three sides of the space. Refer to the LOD for specific locations on the DCZ and glass storefronts. The store shall maximize the transparency through out the space and the view of the Train Shed's south facade wall. Refer to the LOD for the location of any storage or dressing rooms.

## Corner Cafe Tenant

The SE Corner Tenant as an open frame with a 45 degree entrances. No other entrance will be allowed. The cafe shall follow Criteria for the Retail Concourse's Cafes. A planter/rail system is required at the location of the front Lease Line. Only tables and chairs are allowed in 8'-2" zone following the perimeter of the 3 storey's opening.




CAFE SEATING ZONE


SOUTHEAST CORNER ANCHOR ON MEZZANINE LEVEL


SOUTHWEST CORNER ANCHOR ON MEZZANINE LEVEL

WUS-USI TRANSITION DOCS033752 05/31/24

# CAR RENTAL KIOSK

Located in the center of the Mezzanine Level is the Car Rental Kiosk: several Tenant stalls providing traveler services such as money exchanges and car rentals.

In each stall space, the Landlord provides a front counter, glass sidewalls, overhead lighting, roof, and back wall with a secure door.

The Tenant is responsible for providing all the interior millwork. Tenant may install a carpet using low-tac adhesive tape to the Landlord's marble floor.

The Landlord prohibits the Tenant from attaching anything to the glass walls, front counter, or floors; installing any partitions; or altering the Kiosk base structure, including the track lighting provided by the Landlord.

## Required Signage

The Tenant is required to install a Type O, sign specific only to this location, a double sided internally illuminated push-through acrylic lettering sign at the stall's back wall.

### Type O-rc3, Push-thru Letter Internal Illuminated

The Tenant is responsible for designing and installing the push-through acrylic individual letter internally illuminated sign that fits within the Landlord's designated sign frame.

Materials: Refer to Typical Car Rental Kiosk Sign Shop Drawings for this Signband provided by Landlord.

Size: Maximum height of any letter used is 10". Push Through Acrylic shall not exceed 1/2" thick.

Restrictions: LED lighting is required.

No brand logo icons unless a letter that is part of the Tenant name or taglines are allowed on this sign.

No other type of sign system is permitted in this designated sign area.

## Optional Signage

The Tenant may only install additional signage at the interior back wall if the signage is essential to the customer transactions. All signage must hang from the Kiosk frame or be supported from the floor.

Landlord will review any additional corporate signage requirements necessary to do business.



TYPE - O-RC3, SIGN AT CAR RENTAL KIOSK



BACK OF CAR RENTAL KIOSK



RETAIL CONCOURSE MEZZANINE CAR RENTAL KIOSK

# CAFES

Cafes are scattered in location on the Main and Mezzanine Levels as determined by the Landlord. The Tenant must work closely with the Landlord on developing designs appropriate for these special locations.

## Display Control Zone

The Display Control Zone (DCZ) includes the initial 3'-0" behind the Lease Line. The maximum height of any fixture located in the DCZ is 4'-6". No full-height partitions, equipment or food counters maybe located in any DCZ area.

## Lease Line

A railing should define the West End Cafe west Lease Line, clearly denote the entrance/exits, be no higher than 3'-0" and be anchored to the Landlord's floor.

In lieu of railings, fixtures no taller than 4'-6" maybe used. Fixtures must be affixed if located at the Lease Line. movable railing, planter or other similar elements. All seating, as well as seating-related elements must be submitted for the Landlord's review and approval, shall be entirely freestanding and movable and shall be maintained in a first-class condition. Maximum height of railings or planters defining the Seating Zone is 3'-0".

## Required Signage

### TYPE A-rc1 or A-rc2, Flat Sign

Depending on the Cafe's location, the Main or Mezzanine Level, the required signage details will vary. Refer to the Specific Area Criteria for the Main or Mezzanine Levels requirements.

### TYPE D – rc, Freestanding Sign

Each Cafe Tenant may have one Type D, Freestanding Sign, located at the Cafe's entrance.

Size: Maximum height of any letter is 6". Maximum overall size is 6'-0" h. x 2'-0" w. x 1'-6" d. The sign may be internally illuminated as long as its maximum area is

2'-0" w by 1'-6" h.

Restrictions: Sign must be located inside Lease Line at cafe's entry. It may incorporate a lockable menu case with hidden edge lighting. Maximum size of menu display is 2.5 square feet centered at 4'-6".

## Optional Signage

### TYPE N-rc, Canvas Signs

Materials: Canvas signs of one or two colors.

Size: As primary sign, maximum height of any letter is 10" in height. Maximum allowed s sign area for one facade side of any signage is 5 square feet.

Restrictions: Prohibited is multi-colored or patterned or translucent canvas fabric.



TYPE A-RC FLAT SIGN



TYPE D, FREESTANDING



TYPE N-RC, CANVAS



WEST END CAFE



# WEST END CAFE

Located in the midst of the Metro to Train Concourse on the Retail Concourse's Main Level through fare are two West End Cafes. The front portion of each cafe is located under the historic two storey Train Shed. The cafe's Work Zone is tucked under the Mezzanine Level. Each Tenant must work closely with the Landlord on developing designs that fit this special location.

## Display Control Zone

The Display Control Zone (DCZ) as designated on the plan to the right, is the zone that must remain open to the unique coffered vaulted ceiling. The maximum height of any millwork located in the DCZ is 4'6" AFF.

No full-height partitions, awnings or element over 4'6" is allowed in this area. Carefully situated equipment over 60" required for the cafe will be review and considered by the Landlord on a case by case basis.

Since a ceiling is not allowed in this area, no food service counters or prep counters will be allowed per the District of Columbia health requirements.

The Landlord's marble floor extends throughout the open public areas of each cafe.

## Seating

West End Tenants are required to provide enough seating to meet the demands of the space. All seating, as well as seating-related elements must be submitted for the Landlord's review and approval, shall be entirely freestanding and movable and shall be maintained in a first-class condition. Inexpensive aluminum street furniture is not allowed.

## Required Signage

The West End Cafe should have a maximum of one non-illuminated Type A-rc1, Flat Sign per side or Type N, Canvas sign, and one Type D-rc, Freestanding Sign located at the Cafe's entrance.

## Type A-rc1, Flat Sign

Materials: A non-illuminated flat wall-mounted or hanging sign incorporated into the cafe design.

Size: Maximum size of any letter is 10".

Restrictions: Sign panel can be no longer than 40% of the total storefront opening. Listing of meals or products is not permitted.

## TYPE N, Canvas Signs

Materials: Canvas signs of one or two colors.

Size: Maximum height of any letter is 10".

Restrictions: Multi-colored patterned or translucent canvas fabric is prohibited

## TYPE D–sc, Freestanding Sign

Size: Maximum height of any letter is 6". Maximum overall size is 6'-0" h. x 2'-0" w. x 8" d. It may incorporate a lockable menu case with hidden edge lighting. Maximum size of menu display is 2 square feet centered at 4'-6".



WEST TRAIN CONCOURSE

NORTH WEST END CAFE

DISPLAY CONTROL ZONE

WEST END ANCHOR

WEST END

DISPLAY CONTROL ZONE

SOUTH WEST END CAFE

WEST END CAFES' DESIGN CONTROL ZONE



WEST END CAFE WITH TYPE A-RC1, FLAT SIGN


WUS-USI TRANSITION DOCS033754 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 142 of 185

WUS-USI TRANSITION DOCS033755 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 143 of 185

# ANCHORS

In retail, an anchor Tenant is a unique destination retailer, a trend setter that impacts the traffic flow and the ambience with their presence. An Anchor is determined by its impact on driving sales, by its key location within the Station or by its size. The Landlord has the discretion to determine who is an Anchor Tenant.

As a major Tenant of significant size and impact, the Landlord may grant special consideration for the Tenant's brand image and store design. An Anchor Tenant must adhere to the critical aspects of the Schedule C and C-1 Criteria. However, at the Landlord's discretion, special design elements may be allowed for an Anchor Tenant, as long as the elements do not distract from the overall design objectives of this Schedule C Design Criteria.

Storefront designs for Anchor may be more individualized and should contribute to the Retail Concourse at Union Station as being a one-of-a-kind retail destination.

When Anchor Tenants are located in the historic building and make any changes from the original defined retail frontage, the building owner, USRC, may required the District of Columbia's State Historic Preservation Office to review the preliminary design.



RETAIL CONCOURSE ANCHOR TENANT



RETAIL CONCOURSE ANCHOR TENANT

BLANK PAGE

SCHEDULE C: TENANT DESIGN CRITERIA

UNIONSTATION
WASHINGTON D.C.
■ June 2014 - Final Review No. 5

WUS-USI TRANSITION DOCS033756 05/31/24



# TRAIN CONCOURSE

Union Station's Train Concourse is a bustling transportation center with buses, trains, Metro, and rental car transit modes. On the mezzanine is the connection to Union Station's Parking Garage, which has 2,300 parking spaces, 128 bus parking spaces, Greyhound Bus Station, and rental car parking. At the west end of the Train Concourse is the Metro entrance to the Red Line. And at the east end is the walkway access to a three-building complex with well-known tenants like the Securities and Exchange Commission and Kaiser Permanente. Stretching along the whole northside are Amtrak gates to the train tracks leading south, north, and west.

The Train Concourse Tenants are located in the following Specific Areas; Southside, Northside and Stalls.


June 2014 - Final Review No. 5

WUS-USI TRANSITION DOCS033757 05/31/24

Case 1:26-cv-02243-APM    Document 1-3    Filed 06/24/26    Page 145 of 185

# GENERAL REQUIREMENTS

## Display Control Zone

The Display Control Zone (DCZ) is 3'-0" deep from the front Lease Line.

## Queuing

The Tenant's queue must occur inside a Tenant's space. A Tenant is required to install a queue control system that includes stanchions and retractable ropes. No queue lines can interfere with the flow of travelers in the Train Concourse.

## Work Zone

The Work Zone (WZ) is a dedicated area for storage, kitchen, preparation, or any other non-public uses. No area in the WZ should be viewed from the public area. The WZ must have a full-height partition separating it from the rest of the space. All doors to the WZ must be kept closed during operational hours.

## Base Building Piers or Columns

A Tenant must not mounted any type of signage, equipment or fixtures to the face of the Base Building Pier or round Base Building Column.

## Ceilings

The Tenant is responsible for maintaining a minimum ceiling height of 8'-0" through the public area and must verify conditions in the field before specifying recessed fixtures. Note that there is not enough clearance in some ceilings for recessed light fixtures.

## Fixtures

Only movable freestanding furnishings are allowed in the DCZ. Customer service counters are considered permanent fixtures and are not allowed in the DCZ. Counters must be located at least 3'-0" from the Lease Line unless the space is considered a Stall.

Any machines or other self-service equipment, shall be located behind the DCZ.



TRAIN CONCOURSE SOUTHSIDE



TRAIN CONCOURSE MAIN LEVEL



WUS-USI TRANSITION DOCS033758 05/31/24

WUS-USI TRANSITION DOCS033759 05/31/24

## Required Signage

Refer to the Specific Area, of either the Southside or Northside for required signage.

### TYPE P, Banner Sign

Tenant is allowed one Type P, Banner Sign, a double-sided fabric pennant sign that hangs in center line of a Tenant's demising line per Landlord's location.

Materials: The sign material and hardware are per Landlord's specification.

No other specification will be permitted. The fabric is Sunbrella Awning/Marine #4630-0000; Cadet Grey.

The hardware is a clear, anodized aluminum outrigger at top and bottom with concealed fasteners at the wall connection.

Size: The maximum height of any lettering is 8". The bottom of the sign is positioned 8'-5" above the floor and 1'-8" w at the top and 1'-2" w at the base.

Restrictions: The Tenant's name, in a vertical layout, must be centered within the designated graphic box that is 8" w by 7'-0" h  The letter font and color may be Tenant's choice.

NO Logo's are allowed on this sign.

## Optional Signage

### TYPE C–tc, Lettering or Logo on Glass

Size: Maximum height of any letter is 3" high,

Sign is located on inside storefront glass face.

Restrictions: Centerline of sign must be located at 3'-0" from finish floor. Only one Tenant name sign per eight feet (8'-0") of glass width will be allowed. Total sign area can cannot exceed 1 square foot.

A listing of services or products is not allowed.

### TYPE E, Easel Marketing Sign

Type E is a rotating marketing sign offering information about menu, events, or merchandise.

Materials:  The easel should be of the highest quality design stand.

Size: Maximum overall dimensions are 5'-0" h. x 2'-0" w x 1'-6" d.  Maximum height of any letter size is 4".

Restrictions: <u>Absolutely NO easel sign will be allowed in front of the Lease Line.</u>  The Train Concourse is too congested to allow Tenant signs beyond the Lease Line. Signs in front of Lease Line will be removed by Landlord.

## Type L, Menu Board

Menu Boards are allowed as long as signs are located back behind the Display Control Zone.

Materials: Erasable materials, such as a chalkboard or an erasable marker surface edged in a magnetic or vinyl finish material, or changeable digit systems, like a "slide in" system, are acceptable. Permanent information must be painted, silk-screened, etched, or applied to metal, wood, matte plastic laminate, or glass.

Size:  Maximum height of any letter is 4".  The bottom of the menu board cannot be lower than 6'-8" unless mounted to a full-height partition. Lettering should be legible: no smaller than ½" high.

Restrictions:  Internally illuminated or backlight Menu Boards are strictly prohibited at Union Station. High-quality professional food photography will be allowed but only on the Menu Board.

Off-the-shelf Menu Boards or food and beverage distributor-supplied Menu Boards are not permitted.

No commercial trade names (such as Coca-Cola, Pepsi, etc.) may be used on menu boards or displayed anywhere within Tenant spaces except soda fountain dispenser handles.



**TYPE G, GRAPHICS WALL & TYPE P, BANNER SIGN**

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 147 of 185

WUS-USI TRANSITION DOCS033760 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 148 of 185

# SOUTHSIDE

Tenants located on the Train Concourse's Southside are required to follow the criteria below.

## Display Control Zone Ceiling

In the Display Control Zone (DCZ), the 3 feet from front Lease Line, the ceiling must be gypsum board for full storefront length and depth of the DCZ. The DCZ soffit shall be painted Sherwin Williams Progreen 200, a low-VOC, low-odor paint, in Snowbound #SW7004 with eggshell finish.

In locations where there is an existing finished drywall soffit, the Tenant shall be required to repair, finish, and paint the soffit to "As New" condition. The tenant shall install a new finished drywall soffit in locations where none exists.

The Tenant shall install recessed 4 1/2"- round 3500K LED downlights with clear reflector finish and a white flange equal to Lightolier #C4L10DL35KCCLW. The lights should be spaced every 3'-0" to 3'-6" on center across the length of the demised premises and installed a minimum of 2'-0" feet away from any permanent wall surface. The lights should be centered 1'-10" from front face of the storefront.

## Dual Storefront Entries

Any Tenant with a leased premise that is located on both the Southside of the Train Concourse and the Shopping Concourse Main Level must maintain a fully active and open storefront entrance on both the Train Concourse and the Shopping Concourse. The storefront must adhere to the Display Control Zone criteria required for the Specific Area it is located in.

For any Tenant with an entrance on both the Train Concourse and Shopping Concourse, the Work Zone must be located at least **8'-0"** from front Lease Line. Both entrances must include an active engaging customer area.

## Storefront

The Tenant must provide a storefront sliding door system that consists of ½" clear tempered glass with 4"-square top and bottom rails and a clear anodized aluminum cover plate concealing the roller track and assembly.

The system shall be a sliding glass door configuration located 3" from the front face of the base building piers to the storefront's front face. Storefront shall be equal to Dorma by Carolina Door's DRS 120 Series or C.R. Laurence Company's OTS top-hung system.

All door tracks must be flush to the adjacent floor surface. Tracks cannot be mounted directly to the top of a finish floor. The storefront glass panel width may range from 6'-0" maximum to 3'-0" minimum. The storefront opening during operation hours should be at least 6'-0" wide .

A stacking door storefront system is permitted, but Tenant will be required to install additional structure support. If using stacking doors, panels must stack at least 5" away from front Lease Line. Storefront doors may not be hidden in pockets or behind any walls located within the DCZ.

Standard aluminum mullion storefronts, swing doors, or typical mall sign bands are not permitted.

No door pulls will be permitted on sliding doors. The Tenant must provide strike plates to lock doors in the open position.

If the existing storefront does not meet the Criteria, the Tenant will be responsible to replace the storefront per the Criteria.

If a Tenant re-uses an approved storefront system, the storefront must be cleaned, refinished, and repaired as necessary to "AS NEW" condition.



SIGN TYPE G, BACKLIGHT GRAPHIC WALL

TYPE P, BANNER SIGN

AREA FOR TENANT'S NAME

BASE BUILDING PIER

SLIDING GLASS STOREFRONT

TYPE C, LETTERING ON GLASS

LEASE LINE

TILE PER LANDLORD SPEC

**TRAIN CONCOURSE SOUTHSIDE**

WUS-USI TRANSITION DOCS033761 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 149 of 185

## Floor at Storefront

Along column line "A.1", an engineered stone tile floor between the existing linear concrete slab and the storefront bottom rail is provided. The tile is Ergon engineered stone Kyoto in matte Anthracite with Laticrete Spectralock - Grout & Sealant, color: 45 Raven. The tile is a 2'-0" width cut to the depth of the storefront line.

Tenant is responsible for installing a clear anodized aluminum threshold strip as required by the storefront door configuration. The tile shall be installed flush to the height of the linear concrete slab.

If the floor material is not in place, the Tenant will be responsible for the installation of the Kyoto engineer stone tile. The Tenant is responsible for replacing any damaged tile per the Landlord's specification.

In some cases, Tenant may be responsible for the installation of Landlord's common area flooring up to the point of the counter or storefront system. Where the floor is visible below a front counter gate or in a storefront recess entrance, the flooring must match the Landlord's common area flooring.

Tenant is responsible for installing the storefront base. In some cases, Tenant will be responsible for installing a base around the Base Building columns as deemed necessary by the Landlord.

## Seating

The Tenant may opt to have a seating area behind the glass storefront. If a glass storefront panel is moved to open the seating area to the concourse, the Tenant must install a railing system behind the storefront line to contain tables and chairs. The railing design should be a maximum of 3'-0" high and complement the design of the store.

## Required Signage

### Type G, Backlight Graphic Wall

Unique to Union Station, the Landlord has created a monumental graphic opportunity, a one-story-high graphic LED internally illuminated sign above the Tenant's storefront.

The Tenant is expected to think outside the box and create a custom unique image that is a combination of storefront image, main identification sign, and any other artistic elements unique to the Tenant's brand. Tenant must submit a full-color, to-scale, letter-size pdf file of the proposed graphic during the design submittal phase for Landlord's review and approval.

Materials: The Graphic Wall frame fits the Tenant's full frontage and is approximately 7'-10" high. A vinyl film equivalent to 3M™ Panaflex™ Awning and Sign Facing 945GPS, a flexible, durable, white-pigmented vinyl with a reinforcing polyester scrim is screen-printed or piezo inkjet printed with a minimum resolution of 150 dpi on both sides. The image should be unique.

Size: Height of any letter cannot exceed 3'-0".

## Optional Signage

### TYPE C–tc, Lettering or Logo on Glass

Size: Maximum height of any letter is 3" high for any auxiliary sign. No Logo icon are allowed. Total sign area cannot exceed 1 square foot.

Restrictions: Centerline of sign is set at 3'-0" to finish floor. Only one Tenant name sign per eight feet (8'-0") of glass width will be allowed.

A listing of services or products is not allowed.





TYPE G- BACKLIGHT GRAPHIC WALL

TRAIN CONCOURSE STALL



WUS-USI TRANSITION DOCS033762 05/31/24

# NORTHSIDE

Located between Amtrak's gates on the Northside are several Cafés Tenants. Each location is unique, and therefore, it is critical for the Tenant's design team to meet with the Landlord prior to any design.

## Northside Cafe
## Seating Zone

A Cafe Tenant with seating area must install a custom design metal railing system unless the seating is behind a glass storefront. The railing should be no higher than 3'-0" A.F.F and must be located at all seating areas or service station locations.

Entries into the cafes should be optimally located to provide adequate egress. Any queue lines for the Tenant must be confined within the Tenant space.

All seating furniture and trash receptacles should complement the cafe's design. The Tenant is responsible for providing, securing, and maintaining the furniture.

Trash receptacles must be provided to handle its customers' trash demands. All receptacles must remain inside Tenant's leased premise.

## Ceiling

A Tenant may have an open ceiling structure. The Tenant is responsible for providing a grid structure within the space to support the lighting, ducts, and any other hanging elements

## Required Signage

Tenant is required only one sign unless it is a corner location either a Type A-tc or Type B-tc.

## TYPE A-tc, Non-illuminated Flat Sign

Materials: Painted letters and logos, applied to natural or painted metal, natural or painted wood, acrylic (non-glare clear or translucent), or clear or painted glass.

Size: Maximum height of any letter is 12". Maximum depth is 1" relief for applied letters or carving.

Restrictions: Edges must be neatly finished and sealed. Lettering may be non-illuminated or halo light.

## TYPE B-tc, Applied Letters

Materials: Individual letters must be professionally made from wood, painted acrylic, vinyl, or metal letters applied to solid surface. Metal can letters may be halo light

Size: Maximum height of any letter is 12". Maximum thickness of signage is 2".

Restrictions: Locations must be reviewed and approved by Landlord. No plastic or acrylic front illuminated lettering will be allowed.

# STALLS

A space with less than 15 feet of store depth is referred to as a Stall and may be either food or retail operations. A Stall Tenant may be located along the Southside or the Northside.

The Tenant must adhere to the Specific Area criteria based on its location and the General Design Requirements.

## Base Building Pier

NO promotional or marketing signs are allowed on the Base Building Pier unless it is set back 1'-6" from the lease line and is mounted in a professional frame. Signs taped to front counters or walls are not allowed and will be removed by the Landlord.

## Display Control Zone

A Stall Tenant's DCZ consists of the whole space open to public view.

A Tenant may opt to place a front service counter within the DCZ. The front counter must be set a minimum of 8" back from the face of the base building piers no matter what other existing condition are.

The maximum counter height is 3'-6". Any glass sneeze guard or display cases must not exceed 4'-6" in height. The maximum height of any equipment, if located in the DCZ, is 4'-6".

The Tenant may install a glass storefront system depending on the space configuration.

## Front Counters

The front counter design and material must be durable for a major public transportation center such as engineered or natural stone, solid surfacing, or stainless steel or other solid metals.

Prohibited materials are plastic laminates, ceramic tiles or any other material that easily chips, cracks, or scratches.

The front counter base is 6" solid stainless steel and should wrap around inside the space wherever a gate is located.

## Signage

Stall Tenants must adhere to the signage requirements dedicated for their location within the Train Concourse.



TRAIN CONCOURSE NORTHSIDE CAFE

Case 1:26-cv-02243-APM    Document 1-3    Filed 06/24/26    Page 150 of 185

BLANK PAGE

SCHEDULE C: TENANT DESIGN CRITERIA

UNIONSTATION ■ June 2014 - Final Review No. 5
WASHINGTON D.C.

WUS-USI TRANSITION DOCS033763 05/31/24

WUS-USI TRANSITION DOCS033764 05/31/24

Case 1:26-cv-02243-APM    Document 1-3    Filed 06/24/26    Page 152 of 185



# LOWER LEVEL

The Lower Level comprises a Food Court, Kiosks, and Metro Shops. A bustling area of activity, the Food Court has over 25 spaces offering a wide diversity of foods from the entire world. Kiosks are scattered throughout the Food Court. At the Metro entrance and the escalators to the Main Level is a series of retail and food shops.



SCHEDULE C: TENANT DESIGN CRITERIA

LOWER LEVEL – FOOD COURT    51



FOOD COURT

LOWER LEVEL FOOD COURT

UNIONSTATION ■ June 2014 - Final Review No. 5
WASHINGTON D.C.

WUS-USI TRANSITION DOCS033765 05/31/24

WUS-USI TRANSITION DOCS033766 05/31/24

# FOOD COURT

## Base Building Bulkhead Wall

The Food Court's most notable design feature is the festive and bold colorful tile fruit murals incorporated into the white ceramic tile Bulkhead Wall punctuated with arch openings.

Tenants are not allowed to add to, alter, or damage any of the tiles on this ceramic Bulkhead Wall. No signs maybe added to the Bulkhead Wall without the Landlord's specific written approval. No lighting, security cameras or any other equipment will be allowed to be mounted to the menu board bulkhead or to the white ceramic tile bulkhead wall.



FOOD COURT BULKHEAD WALL

## Demising Walls

All existing walls and all new walls in the Food Court must retain the one-hour fire rating currently in place.

## Display Control Zone

The Food Court's Display Control Zone (DCZ) extends from the front Lease Line of each tenant's space to 6" behind the decorative white ceramic tile Bulkhead Wall. In the DCZ area, the Tenant installs a front counter highlighting the fresh food offered to the customers.



Sign Type F-fc
Blade Sign

SignType B-fc
Max 8" h Black Letters

Existing Ceramic Tile Mural

PASTA! PASTA!

Ceramic Tile Bulkhead Wall

28

Type L-fc Menu Board

28

Sign Type Q, Promo Board

6'-9" Max H

1'-0"

Front Counter & Display Cases by Tenant

Existing Cer.Tile Demising T Wall

Landlord Base Tile Installed by Tenant

SST End Cap by Tenant

**FOOD COURT TYPICAL ELEVATION**



**WORK ZONE**

4" Min.

4" Min.

Work Wall By Tenant must be built behind this line.

4" Min.

Menu Board Hanging Zone

Ex. Cer.Tile Demising T Wall

White Cer.Tile Bulkhead Wall

**DISPLAY ZONE**

Front Counter Face Held Back Min. 1" LL

Front Countertop Max 1-1/2" in front of LL

1 1/2" 1"

Install SST End Cap

Lease Line

Install SST End Cap

**FOOD COURT TYPICAL TENANT PLAN**

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 154 of 185

# LOWER LEVEL– FOOD COURT 53

## SCHEDULE C: TENANT DESIGN CRITERIA

To emphasize freshness, food preparation is encouraged in the DCZ. Because this activity is completely visible to the public, meticulous care must be taken in the design and maintenance of food preparation facilities and equipment.

### Work Zone

Tenant is responsible for building the wall separating their DCZ from their Work Zone, located behind the tile archway Bulkhead Wall. Food storage, cooking, cleaning, dish washing, and other utility functions should be located in the Work Zone. The Work Zone should not be visible to the public. The minimum ceiling height in the Work Zone is 8'-0".

### Demising T Wall

In front of the Bulkhead Wall, the Landlord provides 4'-6"-high, T-shaped white ceramic tile demising walls ("T Wall") between each Tenant. Each Tenant must install a stainless steel end cap, finish #4, on each end of the T Wall where it abuts a Tenant's front counter.

No signs or equipment of any kind can be installed on the white ceramic tile T Walls.

### Front Counter

With the predominance of ceramic tile on the Landlord's T Wall, columns, and Bulkhead Wall, the Tenant is encouraged to use materials that will distinguish the front counter from the Landlord's white ceramic tile. Materials other than ceramic tile should be considered, such as stained wood, marble, other natural stones composed stone tile such as terrazzo, stainless steel or other metal panels, display case glass, or glass panels.

Plastic laminates, painted drywall or ceramic tile is prohibited from use on the face of a front counter. A Tenant must install the Landlord's base on the front counter.

Front counters are to be used for food display and sales only. All equipment should be located behind the Landlord's demising T Walls. Any additional Tenant counters may not exceed 3'-0" in height.

No display cases, fixtures, or equipment in the Front DCZ may exceed 4'-6" in height above finished floor. Equipment cannot display any manufacturer's trademark, name, or production identification logos.

Sneeze guards are required for all uncovered foods. Tenants are to use tempered glass for sneeze guards. Acrylic materials are not allowed. Counters and all Tenant finishes must meet the Washington, D.C., Health Department Code requirements.

Each Tenant is required to provide well-designed recessed bins or containers for various condiments, straws, napkins, and trash located in the front counter.

## FOOD COURT PROHIBITIONS

- No equipment over 4'6" high in DCZ.
- No boxes, serving paper goodies or other storage is allowed on display in DCZ.
- No generic food categories anywhere other than Type L, Menu Board.
- No internal illuminated signs.
- No paper signs .
- No vendor product decals or logos on signs, counters or equipment except soda dispensers.
- No hours of operation or credit card decals.
- No poor-quality materials.
- No trash cans on front counters. Use 6" diameter trash chute in countertop.
- No food photographic other than on Type L, Menu Boards or Type Q, Promo Board.
- No off the shelf menu boards or beverage distributor menu boards.
- No new equipment can be added to the Front Counter Zone without Landlord's approval.



SIGN TYPE B-FC AND TYPE L - MENU BOARD AT ARCH



FOOD COURT SIGN TYPE F-FC: BLADE SIGN

UNIONSTATION WASHINGTON D.C.    ■ June 2014 - Final Review No. 5

WUS-USI TRANSITION DOCS033767 05/31/24

## Tray Rails

The Landlord's exiting stainless steel tray rails are being phased out. Installation of new tray rails will not be allowed. New tenants will required to removed existing rails.

## Ceilings

The Landlord provides the ceiling and lighting in the Display Control Zone. Tenants may not alter the Landlord's ceiling or hang any signs from the ceiling other than those approved by the Landlord.

## Required Signage

Only the signs listed in the criteria is allowed and only if reviewed by Landlord.

### Type B-fc Applied Letters

Tenant with an arch is required to install Tenant business name center on the arch's tile voussoir.

Size: Maximum height of any lettering is 8" high and maximum thickness is 1/2".

Materials: Individual letters in black matte Sintra or equal with an anti-static coating using any font style.

### Type F- fc, Blade Sign

Tenant is required to install one double-sided Type F non-illuminated sign. Emphasizing the Tenant's logo, Sign F is an identifying sign mounted from the Landlord's ceiling.

Materials: Aesthetic goal is a lively, colorful graphic mounted on a single solid color panel.

Size: Maximum height of any letter is 8". Overall dimension must comply with Type F-fc requirements.

Restrictions: Sign shall be fabricate and install per the design indicated. One solid color as the background panel.

The sign is located and hung per Landlord's requirements on Landlord provided brackets. The bottom of the sign must be at 9'-0" A.F.F.

## Optional Signage

### Type Q, Promo Boards

Each Tenant is allowed to install a Promo Board for the solely use of marketing on each side of the arched opening. Promo boards are unique custom design sign..

Material: Quality materials such as metal and glass.

Size: Maximum overall sign cannot exceed 18" wide by 24" high. Maximum height of any lettering is 4".

Restrictions: Internal illumination prohibited. Only professional food photography will be allowed.

### Type L-fc Menu Boards

A Tenant is allowed one menu board consisting of a single or group of panels. Due to the Food Court's unique design, the menu board must be a custom menu board fitting the arch opening.

Materials: The menu board must be made from high quality, durable materials and allow flexibility in changing the menu listing.

Size: Maximum height of any letter is 4". The bottom of the board cannot be lower than 6'-8" unless mounted to a full-height partition.

Restrictions: Internal illumination is strictly prohibited. Only high-quality professional food photography will be allowed. Food photographs

## Countertop Signage

A maximum of two countertop signs will allowed for daily specials if signs are a professional quality and are well maintained.

Material: Counter signs should be placed in unique frames coordinating with the Tenant's design.

Size: Maximum size of a counter sign is 8-1/2" x 11" and must be Landlord approved before being displayed.



SIGN TYPE B-FC AND TYPE L

4'-6"

VINYL GRAPHIC OR APPLIED TENANT'S LOGO - 4'-6" W X 1'-6" H

3/4"  1'-6"  2'-0"  3/4"

USE ONE OF THE PRIMARY COLORS IN THE CERAMIC TILE BULKHEAD WALL MURAL.

SIGN TYPE F-FC, BLADE SIGN

17

TYPE Q, PROMO BOARD

WUS-USI TRANSITION DOCS033768 05/31/24

Case 1:26-cv-02243-APM  Document 1-3  Filed 06/24/26  Page 156 of 185

WUS-USI TRANSITION DOCS033769 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 157 of 185

# Food Court Kiosk

Kiosks, food or retail freestanding units, are scattered throughout the area and are interspersed with the seating. A Kiosk is located only in Landlord designated spots. Refer to LOD for clarification on whether plumbing and electric are provided for the space.

Each Kiosk should have a unique design that complements the Lower Level. It is important that the Tenant and Tenant's Design Team meet on site with the Landlord before designing the Kiosk to discuss design goals and concepts.

## Display Control Zone

Kiosks are open to public view; careful thought should be given to the design of these spaces. The whole area of a Kiosk is considered a Display Control

## Work Zone

Kiosks do not contain enclosed Work Zones. Full-height walls are not allowed around or inside any Kiosk. All three compartment sinks, mop sinks, storage, transformers, and other large equipment must be hidden from public view with a half-height wall. The wall shall not exceed 6'-0" in height.

There is no exhaust available to a Kiosk. On-premise cooking is not allowed. Only warming of food items is permitted. Food service equipment should be kept to a minimum because the base building air conditioning and electrical power are limited.

## Front Counter

The front counter, provided and installed by the Tenant, is the prime selling area and therefore should be given a great amount of attention to design, food display, and layout to maximize the impact on the customer. A front counter will have a maximum height of 3'-6".

## Counter Seating

Tenant may provide seating at a counter bar as long as the seating is compatible with the kiosk design and does not obstruct the public circulation path. The Tenant must submit furniture cut sheets to the Landlord for review and approval.

## Storage and Equipment

Because the Tenant's space is all Display Control Zone, no display cases, fixtures, or equipment in the space may exceed 5'-0" (60") in height above the finished floor except for an enclosed work zone with half-height walls. The height of these walls cannot exceed 84".

## Required Signage

Kiosks are required to have a Type F-fc, Blade Sign as described in the Food Court Specific Area Criteria.

## Optional Signage

A Tenant may opt to install a Type L-fc Menu Board Sign or Type O Countertop Sign as described in the Food Court Specific Area Criteria.

A Kiosk Tenant may also install a Type A sign on the Kiosk.

## Type A-fc, Flat Sign

Materials: Painted letters silk-screened, etched, or applied to natural or painted metal, natural or painted wood, acrylic (non-glare clear or translucent), or clear or painted glass.

Size: Maximum height of any lettering is 8" high, and the maximum thickness is 3/4".

Restrictions: Generic food names or foam letters will not be permitted. No Branding. Only the business name of the tenant will be allowed on the sign.



FOOD COURT VIEW OF HISTORICAL TRAIN SHED

WUS-USI TRANSITION DOCS033770 05/31/24

Case 1:26-cv-02243-APM    Document 1-3    Filed 06/24/26    Page 158 of 185

# METRO SHOPS

The Metro Shops are a series of small retail spaces located on either side of the hallway that forms the entry to the Metro System. In addition, the spaces around the corner on the southwest wall abide by the Metro Shop Specific Area criteria. This is a heavily traveled area, frequented by commuters, shoppers, and visitors.

## Display Control Zone

In the Display Control Zone, the Tenant must install a gypsum board ceiling that is the full length of the leased premises and 3'-0" deep from the front face of the storefront. The soffit shall be painted Sherwin Williams Progreen 200, a low-VOC, low-odor paint, in Snowbound #SW7004 with eggshell finish.

The Tenant shall install recessed 4 1/2" round 3500K LED downlights with clear reflector finish and white flange equal to Lightolier #C4L10DL35KCCLW / C4L10N. The lights should be spaced every 3'-0" to 3'-6" on center across the length of the demised premises and installed a minimum of 2'-0" feet away from any permanent wall surface. The lights should be centered 1'-10" from the front face of the storefront. Refer to the illustrative section in the criteria.

## Storefront

The Tenant will install a storefront based on the General Design Requirements Storefront and the Specific Area Criteria. The storefronts shall be fully transparent: the full-width and height of the storefront frame. Storefronts shall be butt glazed with a 6" aluminum base and 4" header. Sliding glass panels or doors that swing into the space may be used to create at open storefront. No other solid-wall storefronts or roll up grilles/enclosures will be allowed in this area unless approved by the Landlord

## Required Signage

### Type F-ms, Blade Sign

The Tenant is required to install one double-sided, non-illuminated Type F sign.

Materials: The sign shall consist of a double-sided metal sign panel with a solid background color and dimensional letters. Acceptable backgrounds are shop painted, vinyl, metal finish or silk-screened.

Size: Maximum height of any letter is 6" high with a thickness of ¾". Maximum overall sign dimensions are 4'-6" long x 1'-6" high x 1" deep.

Restrictions: The sign is located on the center line of the Tenant's storefront width. The bottom of the sign must be at 9'-0" A.F.F and must be installed per Landlord specifications. Low-density foam letters will not be accepted.

## Optional Signage

### TYPE C-ms, Lettering on Glass

Materials: Lettering may be vinyl applied or back painted on the inside storefront glass face.

Size: Maximum height of any letter is 6". Sign can not exceed 1 square foot.

Restrictions: Tenant is allowed one logo sign per every 6'-0" of storefront width. Centerline of sign must be placed at 3'-0" from finished floor.

Ancillary message signs may not be posted onto storefront glass. Listing of product is prohibited.

### TYPE E, Easel Marketing Sign

Only one Type E sign will be allowed per Tenant.

Size: Maximum height of any letter is 4." Maximum overall dimensions are 2'-0" wide x 4'-0" high.

Restrictions: Easel sign must be uniquely designed to complement the Tenant's store design. Easel must be located within the Lease Line. Signs that creep out into the public walkway will be removed.

Prohibited from use in the Station are exterior easel signs, marketing signs for brand products such as Pepsi, signs attached to the floor, or illuminated signs.



LOWER LEVEL METRO SHOP



METRO CAFE

WUS-USI TRANSITION DOCS033771 05/31/24

# RMU CARTS

Scattered throughout Union Station are Retail Merchandising Units (RMUs), movable carts provided by the Landlord.

All display areas are restricted to the RMU designated area as determined by the Landlord.

## Fixtures

The highest quality of displays is required for all RMU carts. Tenants may be required to work with an approved visual merchandiser at Tenants' expense.

The Landlord must approve all fixtures and their placement. Tenants will be asked to remove any fixture that did not receive prior approval.

If a Tenant wants to augment the RMU with an additional fixture, it must be reviewed and approved by the Landlord. Fixtures may not be attached to the RMU with nails, screws, bolts, tape, staples, glue, or by any other method.

The RMU and cash stand must be dusted and cleaned on a regular basis. Tenant should report to the Landlord any problems or damage to the RMU, chair, or cash stand immediately.

All personal belongings must be hidden from view at all times. These include purses, briefcases, books, bags, sweaters, coats, umbrellas, etc. Please keep these and any other similar items in the storage area of the cash stand.

A Tenant who defaces and/or damages the RMU, cash stand, or chair will be responsible for the cost of repairs up to and including replacement of the damaged item.

## Lighting

Internal illuminated display fixtures or fixtures with exposed bulbs or with fluorescent lighting are not permitted on any RMU.

## Signage

Each RMU has a specific location for the Tenant's name. This location and type of sign may vary with the RMU.

Tenant must comply with Landlord requirement on the location and type of sign allowed for the RMU.

All signage must be professional in nature and is subject to approval by the Landlord.

No handwritten signs are permitted at any time.

Signs by Vendors are not permitted.

All signs must be placed in sign holders. Signs that are taped, screwed, glued, or attached to the unit will be removed by Landlord. No stickers (that is,.credit cards) may be affixed to the RMU or cash stand.

## RMU CART PROHIBITIONS

- No equipment or internal illuminated displays may be used unless specifically approved by Landlord.
- No boxes or other storage allowed on display.
- No generic listing of products categories.
- No internal illuminated signs.
- No paper signs or personal items on display.
- No vendor product decals or logos on signs, counters or equipment except soda dispensers.
- No hours of operation or credit card decals.
- No poor-quality materials.
- No trash cans in the display area.
- No other signage than approved by Landlord.



RETAIL MERCHANDISE UNIT (RMU)



RETAIL MERCHANDISE UNIT (RMU)

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 159 of 185

BLANK PAGE

SCHEDULE C: TENANT DESIGN CRITERIA

UNIONSTATION WASHINGTON D.C. ■ June 2014 - Final Review No. 5

WUS-USI TRANSITION DOCS033772 05/31/24

WUS-USI TRANSITION DOCS033773 05/31/24



# APPENDIX

### DESIGN REVIEW PROCEDURES

### CONSTRUCTION BARRICADE & GRAPHIC GUIDELINES

## Overview

ALL construction work at Union Station requires the Tenant to submit their design and construction drawings to the Landlord for review and approval.

The Tenant must employ the services of a professional Architect and Engineers licensed in the District of Columbia, Maryland or Virginia. Structural Engineers may be required for any work involving the base building structures including the placement of unusually heavy loads on the existing slabs.

The Tenant is responsible for forwarding all their Lease design and construction documents to their design team including:

- Lease Outline Drawing (LOD)
- Schedule C: Tenant Design Criteria I
- Schedule C–1: MEP Design Criteria
- Schedule F: Fire Protection Criteria
- Union Station's Construction Rules & Regulations.

The Landlord's Representative for point of contact:

> Mark A. Polhemus Sr.
> General Manager, Union Station
> Jones Lang LaSalle Americas, Inc.
> Second Floor West
> 40 Massachusetts Avenue, NE
> Washington, DC 20002-4225
> phone: 202-683-4510
> mpolhemus@unionstationdc.com

## Building Code

Union Station is exempt from the District of Columbia's Regulatory Agency (DCRA) for building permitting and inspections. The Landlord's Representative is designated as the permit issuing agency and construction inspection authority.

All spaces must comply with the District of Columbia's most current building code requirements. Refer to the D.C. Department of Consumer and Regulatory Affairs. http://dcra.dc.gov.

Compliance to codes and regulations to the Landlord's satisfaction remains solely a Tenant's responsibility.

## Health Code Requirement

If the Tenant is a food use it must be reviewed and approved to operate a food establishment by District of Columbia's Department of Health.

The Tenant must apply and obtain a Department of Health Permit and follow D.C.'s inspection process. The application for this permit may occur as soon as the final draft of the construction documents are approved by the Landlord. The District of Columbia's Department of Health's conducts a final inspection before business is allowed to open.

The DC's Department of Health point of contact is:

> Jacqueline R. Coleman,
> Supervisory Sanitarian:
> Phone: 202-442-5928
> jacqueline.coleman@dc.gov.
> http://doh.dc.gov

## Field Survey

All on-site survey of Tenant's space must be coordinated with the Landlord

## Full Renovation of Tenant Spaces

In some cases, Tenant may be required to complete a 100% demolition of the space including old electrical transformers, plumbing lines, HVAC equipment and storefront systems. Spaces that have not been fully renovated in the past twenty years are subject to this requirement. Please confirm with the Landlord the level of demolition required with the space.

## Design Review Procedure

The Tenant is required to submit design and construction document based on the procedure outlines below.

The Landlord's Architectural and MEP Design Reviewers work with the Landlord during the review process. All design review submittals should be sent to the Landlord and to Pamela Gillen at pgillen@esoarc.com. Review of submittal drawings normal take less than two weeks depending on the number of design submittals in the queue and the size of projects

All submittals must be in conformance with the Lease throughout all processes.

All submissions are electronic (with exception of material finishes boards).

After each tenant review, the Landlord will submit review comments to the Tenant. The Tenant's design team is responsible for sending a response letter back with the next submittal review.

## Concept Submittal

For any space over 1000 square feet or for any food space, the Tenant must submit a concept floor plan.

A concept should indicate the layout of equipment or displays, the location of key sign elements, and any other key design elements.

## Preliminary Submittal

A Tenant must submit a Preliminary Design Submittal package that includes:

- Floor plan with finishes.
- Reflective ceiling plan with lighting cut sheets.
- Main storefront elevation with all finish materials and signage indicated.
- Key interior elevations.
- Material finish board, no larger than 11 x 17.
- Signage design and locations.
- For food, a equipment plan and all cuts sheets.

## Final Submittal

 

WUS-USI TRANSITION DOCS03774 05/31/24

Case 1:26-cv-02243-APM Document 1-3 Filed 06/24/26 Page 162 of 185

WUS-USI TRANSITION DOCS033775 05/31/24

Case 1:26-cv-02243-APM  Document 1-3  Filed 06/24/26  Page 163 of 185

A Tenant's design team incorporates all previous Landlord's comments into a full set of construction documents and is submitted as PDFs to the Landlord.

Final Submittal must include;

- Cut sheets for lighting, kitchen equipment, plumbing, furniture, exhaust system and hvac equipment, if applicable.
- Fully detailed signage drawings must be submitted or final Landlord approval will not be issued.
- Cover sheet:
  - Full Project Team and Landlord contact info.
  - Full Code Analysis and Egress Plan
  - Drawings index.
  - Space No. and Key Plan
- Specific General Notes added;
  - GC must adhere to Union Station's Construction Rules and Regulations.
  - GC must maintain at Tenant's cost a full one hour rated wall for all demising walls other than storefront.
- Energy Compliance Form
- Special Inspection Letter, if applicable.
- All changes should be highlighted in revisions bubbles.

To obtain 100% Landlord sign-off may require resubmitting several times until all the Landlord's comments are satisfactorily.

## Final Sign-Off

Upon receipt of Landlord's final design approval, the Tenant is required to send to Landlord's Contact one full size set of signed and sealed construction documents , one 1/2 size set and a disc of all cuts sheets and drawings in PDF format. One set is maintained as a record set and the other is use by Union Station's Inspection Team.

The final sign-off set is considered the permit set. Any changes to the permit set of construction documents after final approval must be submitted to the Landlord for review and approval before transmittal to the General

Contractor. All changes should be highlighted in revisions bubbles.

Any changes to Landlord's approved set that did not receive prior Landlord approval will result in Landlord enforcing the Lease and having unapproved work removed at Tenant's expense.

The Landlord will issue an approval letter for the Final Sign-Off set. This letter is considered the issuance of a permit and will request the scheduling of a pre-construction meeting with the Tenant's General Contractor. The letter will also include the list of the required documents and fees to be delivered at that meeting.

NO Tenant signs can hang unless it received Landlord's approval.

## Pre-Construction Process

A Tenant's General Contractor (GC) will meet with the Landlord to review Union Station's Construction Rules and Regulations, construction schedule, and delivery of all required documents outlined in the 'Rules and Regulations'.

If all the documents are in order, the Landlord will turn the space over to the GC to start construction.

- COI's Additional Insured include;

  Union Station Investco LLC.; Ashkenazy Acquisition Corporation; AAC Realty; Union Station Redevelopment Corporation ; Jones Lang LaSalle Americas, Inc.; Morgan Stanley Mortgage Capital, Inc.

## Certificate Holder:

Jones Lang LaSalle Americas, Inc.

Attn: Mark Aaron Polhemus Sr.

Director of Operations

Union Station Management Office

2 West/40 Massachusetts Avenue, NE

Washington, DC 20002-4225

Phone: (202) 289-1908

## Required Prior to Framing

Prior to the start of any framing the Tenant's General Contractor must submit the fire sprinkler system construction document submittals prepared and submitted by a NICET certified professional with stamp and seal.

If the Tenant is installed any type of exhaust hood, a full set of the exhaust hood system including the fire protection system must be submitted to the Landlord prior to the start of framing.

## Construction Process

Demolition, Framing or Low Voltage permits are not issued. Demolition can not start until that approval is issued.

All framing, close-in and final inspections are performed by the Union Station engineering inspection team, and must be scheduled 48 hours in advance.

All of the fire alarm and sprinkler shut-downs are scheduled 24 hours in advance and performed with the assistance of Union Station engineering and security personnel.

Any change orders involving design must be reviewed and approved in advance by the Landlord before proceeding.

All of the punch list items issued by the Union Station engineering inspection team for each inspection interval must be completed before proceeding with further construction.

All of the punch list items from the final inspection must be completed along with the approved DC Health Department inspection before the Tenant is allowed to open.

## As-Built Submittal

The Tenant must submit a complete as-built set of drawings in PDFs format and a DWG file of the floor plan with any equipment to the Landlord.



## Minor Renovations and Maintenance

Any and all construction work at the Station requires Landlord approval.

A Tenant requiring minor renovation or maintenance work must send a letter outlining the scope of work and schedule for work 10 working days prior start of any work. No work will can proceed without the Landlord's approval to proceed.

## Architectural and Structural FAQ

All spaces at Union Station are fully sprinklered.

Main Historical Union Station Built: 1908

Shopping Concourse Mezzanine Built: 1986

Lower Level Built: 1986

West End Concourse Built: 1995

Base Building Chases: Fire-proofing is by rated drywall enclosures.

Any change to the structure or any new concentrated loads placed on the structure will require a structural engineer.

Mobile stock shelving drawings are required to be part of the initial drawing submittal and will require a structural engineer's certification that the existing slab is adequate for the shelving unit.

## Mechanical, Electrical and Plumbing FAQ

Please review Schedule C-1; MEP Design Criteria for Union Station.

HVAC is required to be ducted. No plenums are allowed.

Are fire alarm shop drawings required to be part of the initial drawing submittal?

Retail Concourse and Train Concourse Tenants may count the Base Building's restrooms and may use the Landlord's mop sink.

If a Tenant installs or renovates a restroom within their Lease Premise it must comply with all current building code standards.

Restaurants must provide public restrooms within their Lease Premise and must it must comply with all current building code standards.

An electrical transformer may be hung from the structure or supported from the floor as long as the base building structure can support the load.

## Fire Alam Termination:

Landlord requires Tenant to contract fire protection system termination with:

Ark Systems, Inc.
Columbia, MD 21046
O: (301) 621-5736

WUS-USI TRANSITION DOCS03776 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 164 of 185

## Construction Barricade Standards

Union Station is a unique national treasure, one of the few grand train stations from the 19th century actively in use as a transportation center. The design requirements at Union Station are also unique.

Traditional mall standards does not work at this transportation-retail center. Please read and abide by the standards for construction barricades and barricade graphics as described below.

Union Station Investco's Management Office, the Landlord, will build the Tenant's construction barricade consisting of drywall and a pair of 30" x 84" doors at the Tenant's expense.

The Tenant is responsible for fabricating and installing the vinyl graphics onto the barricade or on existing storefront windows.

For existing glass storefront, where a barricade is not required, the Tenant should install a low tac vinyl to the inside face of the storefront glass. Use of paper, tape or any other material is not acceptable.

The Tenant is required to submit a final graphic (PDF format) with the size and door locations of doors to the Landlord for review and approval.

The graphic submittal must be a scaled full color image reflecting the final design including any text.





## Barricade Graphics Standards

Any Tenant graphic or logo mounted on the barricade must fit the scale of the shopping environment. Large "billboard' images are inappropriate in scale for this historical building.

The Landlord maintains the rights to decide what the appropriate scale for images. In the historical significant Head House, graphics should be very simple, elegant and scaled to fit the surroundings.

The use of color images on the barricade is limited to no more than 50% of the barricade area. The remaining 50% is a solid mid-tone to dark neutral such as warm or cool grey background. White or very saturated color backgrounds are not allowed.

One Tenant logo is allowed for each 10 linear feet of barricade frontage. Any single letter use in the Tenant logo name cannot be any larger than 10". No variance is allowed.

The only text allowed on the barricade is limited to • Logo Tenant Name. Official Tagline associated to Tenant and the Web site address.

5. Text that is prohibited includes:
    • Coming soon or Opening soon
    • Help wanted or for hire
    • GC or Architecture firm names
    • Product listing or service listing
    • Any other text than allowed text listed above.

Graphic images cannot exceed 9'-0" AFF.

All images must be family friendly, non-political and relate directly to the tenant's business.

No images from vendor products sold by the Tenant are allowed in the graphics

WUS-USI TRANSITION DOCS033777 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 165 of 185

WUS-USI TRANSITION DOCS033778 05/31/24

Case 1:26-cv-02243-APM   Document 1-3   Filed 06/24/26   Page 166 of 185

# UNIONSTATION

### WASHINGTON D.C.



## ASHKENAZY ACQUISITION CORPORATION

433 Fifth Avenue | Suite 200 | New York, NY 10016
212-213-4444

Union Station Management Office
Jones Lang LaSalle Americas, Inc.
2 West/40 Massachusetts Avenue, NE
Washington, DC 20002-4225
Phone: (202) 289-1908

www.unionstationdc.com

Approved edition: XXXX_XX_XX

June 2014 - Final Review No. 5

Oct. 2014 - Review No. 4

# ESOARC
### STUDIO

103 West Broad Street, Suite 200, Falls Church, VA 22046
703.637.2380     studio@esoarc.com     www.esoarc.com

# UNION STATION

## SCHEDULE D

_____

Date:

Re:    Union Station, Washington, D.C.
       Lease dated _____, 2014  between Union Station Investco, LLC,
       as Landlord, and _____ as Tenant.

The undersigned, as Tenant under that certain lease between us dated _____ ("Lease"), covering the premises described therein and referenced above ("Premises"), hereby states:

1.    Tenant is in possession of the Premises.

2.    The Lease is in full force and effect and has not been amended or modified except by _____.

3.    The Lease term commenced on _____, and shall continue to and include _____, subject to sooner termination at Tenant's option pursuant to the terms of the Lease.

4.    Tenant pays fixed monthly rent, which has been paid through (date).

5.    Tenant has paid no security deposit.

6.    As of this date, as far as can be ascertained, without due inquiry, Tenant has no offset against the payment of rent except as may be stated in the Lease.

7.    As of this date, as far as can be ascertained, without due inquiry, all improvements and work required under the terms of the Lease to be done by Landlord have been completed to the satisfaction of Tenant.

_____

E-2

8.      As of this date, as far as can be ascertained, without due inquiry, Landlord is not in default under the terms of the Lease.

9.      Notwithstanding the foregoing, Tenant reserves the right to enforce all of its rights and remedies under the Lease, including, but not limited to, those related to matters not described herein.

Very truly yours,

WALGREEN CO.

By_____

# UNION STATION

## SCHEDULE E

## MORTGAGE AND UNDERLYING LEASES CURRENTLY AFFECTING

## LANDLORD'S BUILDING AREA

|  | <u>Mortgage</u> | <u>Name and Address of Holder</u> |
|---|---|---|
| 1. | Leasehold Deed of Trust and Security Agreement dated as of November 7, 2014 from Union Station Investco, LLC to Banque J. Safra Sarasin (Luxembourg) SA | Banque J. Safra Sarasin (Luxembourg) SA<br>Banque J. Safra Sarasin (Luxembourg) SA<br>10A Boulevard Joseph II,<br>1840 Luxembourg, Grand-Duchy of Luxembourg<br>Attention: Mr. Ailton Bernardo<br>Telecopier: +352 45 47 81 541<br><br>With a copy to:<br>Clifford Chance US LLP<br>31 West 52nd Street<br>New York, New York 10019<br>Attention: Ness Cohen, Esq. |

with a copy to:

(to be supplied)

<div style="display:flex">

<div>

### Lease

1.  Lease dated as of October 31, 1985, by and between the Secretary of Transportation and Union Station Redevelopment Corporation, as amended

2.  Sublease Agreement dated as of October 31, 1985, by and between Union Station Redevelopment Corporation and Union Station Venture, Ltd., as amended, assigned by virtue of an Assumption and Assignee of Leasehold Interest dated November 5, 2004 and recorded November 12, 2004 as Instrument Number 2004155830.

</div>

<div>

### Name and Address of

Secretary of Transportation
400 Seventh Street, N.W.
Washington, D.C.  20590
Attn:  S. Mark Lindsey


Union Station Redevelopment Corporation
444 North Capital Street
Suite 740
Washington, D.C.  20001
Attn:

</div>

</div>

Walgreens v.2

E-4

# UNION STATION

## SCHEDULE F

UNION STATION

SCHEDULE F

| Tenant | Exclusive |
|---|---|
| Art of Shaving | Landlord shall not lease space in LL's Building to another retailer that primarily sells men's grooming products as their primary business |
| Bojangles | Landlord agrees that it shall not lease space in the exclusive use area shown on the attached site plan to another tenant whose primary use is the sale of "Bone in" chicken |
| Chipotle | Landlord shall not lease space on the main level (above grade portion of the development) to operate a fast-casual restaurant similar to Chipotle Mexican Grill, Baja Fresh, Q'Doba, Moe's Southwest Grill or similar business; provided however, Landlord shall be permitted to lease space in such area to full service sit-down restaurants such as Rosa Mexicana, Don Pablo's and Chili's. |
| Columbus Club | Landlord shall not use nor allow others to use the East Hall for the Permitted Use except such functions for which Landlord may itself use the East Hall or elect to donate the use of the East Hall without rental or other charges in excess of Landlord's actual incremental out-of-pocket cost and expenses of such uses. |
| Crumbs | Landlord shall not lease space in the Landlord's Building to any other future tenant whose shall sell cupcakes as more than fifteen (15%) percent of its total products. |
| Haagen Dazs | The sale of ice cream within the Protected Zone shown on Schedule A-2 hereof shall be exclusive to Haagen-Dazs, except that this restriction shall not apply to any existing tenants at Union Station, or another tenant whose Primary Use is other than the sale of ice cream. For purposes of this Exclusive covenant, "Primary Use" shall be deemed as fifteen percent (15%) or more of a tenant's Gross Sales being derived from the sale of ice cream and shall apply to any replacement Tenant of an existing Tenant located within the Protected Zone shown on Schedule A-2 hereof. |
| Jamba Juice | Landlord shall not, subject to the rights of existing tenants, and their respective successors or assigns, and applicable law, allow another tenant or occupant in the portion or the Train Concourse shown on Schedule A to operate any store for the primary purpose of the sale of ice cream smoothies, fruit smoothies and/or yogurt smoothies. |

| | |
|---|---|
| **Le Pain Quotidien** | Landlord shall not, subject to the rights of existing tenants, and their respective successors or assigns, lease space on the street level of Landlord's Buildings to Paul's Bakery. |
| **Roti Mediterranean Grill** | Landlord shall not lease space or allow the sublease of space within the Main Hall, East Hall or West Hall of Landlord's Buildings to any person or entity for a fast-casual Mediterranean-style restaurant which has as its primary use, the sale of shwarma, chicken kabob, steak kabob or felafel, whether on a plate or on a pita sandwich. |
| **Shake Shack** | Landlord agrees that Landlord shall not grant the right to (i) any other tenant in the street level of Landlord's Building, (ii) any tenant on the second level of the West Hall (in the premises currently occupied by Pizzeria Uno), or (iii) the second level mezzanine to operate a restaurant primarily selling hamburgers, hot dogs and frozen custard (e.g. 5 Napkin Burger, Better Burger, BLT Burger, BurgerFi, Fat Burger, Good Stuff Eatery, Umami Burger, Bobby's Burger Palace, Burger Joint, Burger Shoppe, Five Guys, In-N-Out, and Stand). The herein contained restrictions shall not apply to tenants occupying space in Landlord's Buildings prior to the Effective Date, including but not limited to McDonald's, Burger King, Flamers CharBurgers and Johnny Rockets |
| **Shophouse** | Landlord agrees that after the date of this Lease, so long as Tenant is operating its restaurant as a typical ShopHouse restaurant, Landlord shall not lease space on the main level (above grade portion of the development) to operate a fast-casual restaurant primarily serving Asian cuisine; provided however, Landlord shall be permitted to lease space in such area to full service sit-down restaurants. |
| **Sugar Factory** | Landlord shall not lease or license space to any tenant whose primary business is the same as Tenant, including Dylan's, Lolli and Pops, Sweetzies, M&M or Hersheys ("Competing Business"). |
| **Union Wine & Liquor** | Landlord shall not, subject to the rights of existing tenants, and their respective successors or assigns, and applicable law, allow another tenant or occupant to: (i) sell beer, liquor or wine to customers solely for off-premises consumption, provided, however, that such restriction shall not apply to tenants who sell beer, liquor or wine primarily to patrons for on-premises consumption; and (ii) sell lottery tickets within Landlord's Buildings. Notwithstanding the foregoing, Landlord shall have the right to permit a Tenant occupying at least 5,000sf and not a current tenant to sell |

| | |
|---|---|
| **Verizon Wireless** | **lottery tenants** |
| | **Landlord shall not, directly or indirectly; (a) enter into any agreement with any third party, which would give or permit any third party the right to conduct or permit the conduct of any business within Landlord's Buildings, which is the same, or substantially the same, in whole or in substantial part, as that conducted by Tenant, as permitted by Section 1. lE hereof, or (b) otherwise permit the use during the term hereof of any premises owned, managed or controlled by Landlord or its affiliates, for the conduct of a business, by any third party, within Landlord's Buildings, which is the same, or substantially the same, in whole or in part, as that conducted by Tenant, as permitted by Section 1.lE hereof. Notwithstanding the foregoing, the provisions of this Section shall not apply to: ( i) any Apple or Microsoft store or similar software, operating systems, internet sales or integrated computer related store, (such as, but not limited to, Dell, Gateway, HP, Sun Microsystems, Amazon, Adobe, Yahoo or Google) (ii) any store in excess of 10,000 square feet, or (iii) any store which sells any of the items set forth in Section 1.1 E on an incidental basis. For purposes of this subsection, "incidental" shall mean less than eighty (80) square feet of the rentable square footage of the store is dedicated to the sale of the items set forth in Section 1.lE.** |

WUS-USI TRANSITION DOCS033786 05/31/24

# UNION STATION

## SCHEDULE G

### Uses By Assignees or Subtenants.

The proposed use by any assignee or subtenant shall a retail use, which shall be reputable and "upscale", as determined by Landlord, and shall be operated by a national or regional chain retailer operating at least 5 other locations in the Mid-Atlantic region of the United States (defined as Delaware, Maryland, New Jersey, Pennsylvania, Washington, D.C., New York, Virginia and West Virginia).

Additionally, in no event shall any of the following uses be permitted by any assignee or subtenant:

       (1)    Adult book store, adult theatre, adult amusement facility, any facility selling or displaying pornographic materials or having such displays,

       (2)    Second hand store, odd lot, closeout or liquidation store,

       (3)    The operation of a so-called "dollar" or similar store which sells and/or advertises the sale of any products at a specific price point or below a specific deeply-discounted price level (e.g., a "dollar" or "99¢" store),

       (4)    Any facility for the sale of paraphernalia for use with illicit drugs,

       (5)    A bowling alley, video or amusement arcade, fitness center, gymnasium, aerobics studio or weightlifting center,

       (6)    A commercial laundry or dry cleaning plant,

       (7)    A pawn shop or flea market,A shooting gallery       (8)
Any use that permits music or sounds to be heard inside of the Premises,

(9)    Any use that permits noxious odors to be smelled inside of the Premises, and

(10)    Any use that permits vibrations to be felt inside of the Premises.

# UNION STATION
# SCHEDULE H

## AREA OF NON-COMPETITION

**Tenant shall not own, lease or operate, or permit a parent, subsidiary or affiliated entity of Tenant to own, lease or operate, a store or kiosk, with the same or substantially similar permitted use as the Permitted Use in the Lease within the area outlined on the drawing attached hereto as Schedule H-1.**

G-4

**SCHEDULE H-1**



# SCHEDULE 1 - Permanent Signage

WUS-USI TRANSITION DOCS053791 05/31/24



LOWER LEVEL - KEY PLAN



ASHKENAZY
ACQUISITION

UNIONSTATION
WASHINGTON D.C.

# SCHEDULE I - Permanent Signage





# SCHEDULE J - Two Month Grand Opening Signage



## Main Level

- High Impact Overhead Banner
- Large Format Escalator Bulkhead
- Large Format Bulkhead
- Back-Lit Directory
- Double-Sided Sign Holder

**UNION STATION**
WASHINGTON D.C.

**ASHKENAZY**
**ACQUISITION**

# SCHEDULE J - Two Month Grand Opening Signage



Mezzanine Level

Double-Sided Door Cling

Back-Lit Directory

Double-Sided Sign Holder

## UNION STATION
WASHINGTON D.C.

## ASHKENAZY
ACQUISITION

WUS-USI TRANSITION DOCS033794 05/31/24

# SCHEDULE J - Two Month Grand Opening Signage

WUS-USI TRANSITION DOCS033795 05/31/24



**6 - Overhead Banners**

**16 - Double-Sided Door Clings**

**6 - Double-Sided Sign Holders**





**2 - Large Format Bulkheads**

**1 - Large Format Escalator Bulkhead**

**4 - Back-Lit Directories**



ASHKENAZY
ACQUISITION

UNIONSTATION
WASHINGTON D.C.

# SCHEDULE K - Proposed Train Concourse Level Digital Signage

WUS-USI TRANSITION DOCS033796 05/31/24

TRAIN GATES

GATE A   GATE B   GATE C   GATE D   GATE E   GATE F   GATE G   GATE H   GATE J   GATE K   GATE L

PEDESTRIAN ACCESSWAY FROM STATION PLACE

TRAIN CONCOURSE

STATION MARKET PLACE   WEST RETAIL

STATION CONCOURSE

EAST RETAIL

OPEN TO BELOW    OPEN TO BELOW

CARRIAGE PORCH

MAIN HALL

WEST HALL

EAST HALL

ESCALATORS TO METRO

COLONNADE

TAXI

AMTRAK LOBBY

- Train Concourse Level Digital Signage



ASHKENAZY ACQUISITION



UNIONSTATION
WASHINGTON D.C.

# SCHEDULE K - Proposed Train Concourse Level Digital Signage

WUS-USI TRANSITION DOCS033797 05/31/24



Digital Signage



Digital Signage



Digital Signage



Digital Signage



ASHKENAZY
ACQUISITION



UNIONSTATION
WASHINGTON D.C.